IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| JENNIFER L. COOPER, EUGENE DIXON, FRANCIS J. CIZMAR, ANNA PENNALA, KATHLEEN DAAVETTILA, CYNTHIA BRUNELL, KARYN CHOPJIAN, AND ABBIE HELMINEN, INDIVIDUALLY, AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | CAUSE NO. _____ |
| v. | ) ) | |
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION, | ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |

## CLASS ACTION COMPLAINT

1.      This is a class action lawsuit brought by ordinary Americans whose rights under the First Amendment to participate in the public debate regarding election integrity and security have been infringed by US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation (collectively, "Dominion," the "Dominion entities," or "Defendants") through their campaign to intimidate Americans by waging and threatening to wage Lawsuit Warfare ("Lawfare") against anyone that speaks about anything negatively related to Dominion's possible role in election integrity and security.

2.      This lawsuit is not about who is right or wrong regarding the merits of the election or claims of fraud or mistake.  It is about whether these issues are worthy of

debate under the First Amendment, and whether a corporation that has participated in the election as a state-actor has the power to chill such debate by employing intimidating "Lawfare" tactics.

3.      Criticism of Dominion's election technology is not new.  Long before the November 2020 election, numerous investigative reports, public statements by officials and experts, and even popular movies like HBO's documentary *Kill Chain* highlighted how electronic voting machines, including those manufactured by Dominion,[1] defeat verifiability of election results and could be easily hacked to manipulate votes.  Despite such widespread criticisms, Dominion stayed silent before now.  It is only in connection with the November 2020 election that Dominion launched its Lawfare campaign to silence those who might speak out about possible election irregularities.

4.      As part of this campaign, Dominion publicly boasted, with the assistance of Hamilton Place Strategies, LLC ("HPS")—Dominion's Public Relations Firm—on its website and in interviews that its lawyers, Clare Locke, LLP ("Clare Locke") sent letters to over 150 individuals demanding they cease and desist from "taking part in defaming Dominion and to preserve all documents and communications that may be relevant to Dominion's [unspecified] pending claims" and threatened ruinous "imminent" litigation—even if the recipients of the letters **did not make any public statements about Dominion**.  In these letters, Dominion, among other things, demanded these Americans preserve all communications "related to Dominion **or allegations of alleged voting improprieties**" (emphasis added).  Dominion's true purpose is not

---

[1] https://www.youtube.com/watch?v=8Up73bFTsQg.

thus simply to silence Plaintiffs and the Class, but to silence any person, including news networks whose job it is to hold government officials accountable, who might speak about election integrity and security or bring evidence of possible voting fraud or irregularities to light regarding the November 2020 election.

5.     Generally, Plaintiffs are everyday Americans.  They are fathers, mothers, daughters, and sons.  They are the neighbor you say good morning to on your way to work. Many of these people were poll watchers and challengers who donated their time to the most fundamental of all democratic rights—elections.  They are Americans trying to participate in a public debate about election integrity and security.  Plaintiffs have been intimidated from participating in the debate, however, because of Dominion, Clare Locke, and HPS' Lawfare.  The following letter, which was sent to Plaintiff Jennifer Cooper ("Cooper"), is an example of one of Dominion's intimidation tactics:

THOMAS A. CLARE, P.C.　　　　C L A R E  L O C K E　　　　MEGAN L. MEIER
　　　　　　　　　　　　　　　　　　L L P

December 31, 2020

*Via Federal Express*

Jennifer Lindsey Cooper

Re:　　Notice of Obligation to Preserve Documents Related to Dominion

Dear Ms. Cooper:

Our firm is defamation counsel to US Dominion Inc.[1]  We write to you regarding the ongoing misinformation campaigns falsely accusing Dominion of somehow rigging or otherwise improperly influencing the outcome of the November 2020 U.S. presidential election.  In recent days we sent letters to Sidney Powell and various media entities demanding retraction of their myriad defamatory and conspiratorial claims about Dominion.

Dominion is prepared to defend its good name and set the record straight.  Litigation regarding these issues is imminent.  This letter is your formal notice to cease and desist taking part in defaming Dominion[2] and to preserve all documents and communications that may be relevant to Dominion's pending legal claims.

Accordingly, you must ensure that you and your principals, your agents, your subcontractors, any agents or employees under your supervision, and all sources of information upon which you relied are preserving and retaining all emails, text messages (including messages sent over messaging platforms such as WhatsApp), audiovisual recordings, voice mails, drafts, notes, communications, documents, data, and electronically stored information of any kind that relate in any way to these matters.  Without any limitation, this requires you to preserve all drafts, redline edits, versions, comments, and any other modifications to all affidavits or declarations that you prepared or were prepared for you (regardless of whether they were ultimately used); all research and any and all other work relating to statements you have made (whether made in affidavits or declarations, in other writings, or verbally) about alleged voting improprieties or Dominion; all research you conducted or instructed others to conduct relating to Dominion or allegations of alleged voting improprieties; and

---

[1] We also represent and write on behalf of its subsidiaries, Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation (collectively, "Dominion").

[2] For the avoidance of doubt, this is a retraction demand pursuant to relevant state statutes and applicable rules of court.

all prepared remarks that you drafted or that were drafted for you related to Dominion or alleged voting improprieties.

In addition, you must preserve, without limitation, all communications with:

- Any member, volunteer, staff, or employee of the Trump campaign;

- Sidney Powell, Rudy Giuliani, Jenna Ellis, L. Lin Wood, and each of their partners, associates, and paralegals;

- Every individual who assisted you in drafting, or drafted for you, any and all affidavits or declarations you submitted in litigation related to Dominion or the November 2020 presidential election;

- Every individual who assisted you in drafting, or drafted for you, any and all prepared remarks related to Dominion or alleged voting improprieties.

- Every reporter, editor, blogger, host, or other member of the media with whom you communicated about Dominion or the November 2020 presidential election, regardless of whether they published any of your claims; and

- Every individual who has compensated you or any related entity in any manner for making public statements about, submitting affidavits or declarations in litigation related to, or undertaking any other related actions related to Dominion or the November 2020 presidential election.

The laws and rules prohibiting destruction of evidence apply to electronically stored information in the same manner that they apply to other evidence. Due to its format, electronic information is easily deleted, modified, or corrupted. As a result, you must take every reasonable step to preserve this information until this matter is resolved. This may include, but would not be limited to, an obligation to discontinue all data destruction and data backup recycling policies and procedures on any and all devices within your possession, custody, or control. Your obligation to preserve documents applies both to you individually, and to any entities that you control.

2



Confirm receipt of this letter and that you intend to adhere to our request to retain its as set forth above. This is not a complete recitation of Dominion's rights and remedies, ich are expressly reserved.

We look forward to your prompt response.

Regards,

Thomas. A. Clare, P.C.

Megan L. Meier

This letter tells Cooper on page 1 that this is "your formal notice to cease and desist taking part in defaming Dominion [FN2] and to preserve all documents and communications

that may be relevant to Dominion's pending legal claims."  Footnote 2 on page 1 of the letter says, "For the avoidance of doubt, this is a retraction demand pursuant to relevant state statutes and applicable rules of court."  On page 3, the letter demands Cooper to "Confirm receipt of this letter and that you intend to adhere to our request to retain documents as set forth above."  Despite requiring confirmation of receipt, no contact information whatsoever was included in the Letters.

6.      Among the recipients of these attack letters from Dominion and Clare Locke are dozens of average Americans—not public figures—who volunteered as poll watchers and challengers and signed sworn statements about election irregularities they personally witnessed.  While it is unclear how Dominion and its co-conspirators determined the targets of their Lawfare campaign, Dominion dispatched Clare Locke to send threatening letters, falsely claiming they had defamed Dominion, even though many never mentioned Dominion.  In fact, as above, the Letters demanded retraction of unspecified statements, and in some instances point out the billion–dollar lawsuits Dominion had filed (the "Letters").  Said another way, the Letters were boilerplate directives meant to instill fear and intimidation.  Despite failing to identify the alleged defamation, Dominion then illegally demanded these private citizens preserve all communications, emails, texts— private or otherwise—and a host of other materials.

7.      Each of the named Plaintiffs herein received a Letter nearly identical to Cooper's, and each of the Letters they received contained FN2, which demanded a retraction of some unspecified statement.  The retraction demands received by the named Plaintiffs are especially offensive, as none of the affidavits executed by the named

Plaintiffs that presumably led Dominion, HPS, and Clare Locke to send the Letters even mentioned Dominion.

8.     Dominion did not stop there.  Within weeks after sending the Letters, Dominion began following through with its threats of "imminent" litigation by suing several individuals.  Then, to give the Letters even more intimidating effect, Dominion's public Lawfare campaign extended to suing news networks—Fox News, One America News Network, and Newsmax—and other individuals for billions of dollars.  The lawsuits were subsequently amplified by a high–powered, well–orchestrated publicity campaign, likely developed by HPS, designed to spread their allegations to as many people as possible.  Dominion and its co-conspirators intended for its media blitz to inflict a crippling fear of becoming the next target of a billion–dollar lawsuit if one decides to speak or testify regarding election integrity or security.  And Dominion's plan appears to have worked because news networks and individuals alike have begun self-regulating their speech concerning election integrity and security for fear of a billion–dollar lawsuit.

9.     For example, Plaintiffs are restricted—according to the Letters—from speaking about a topic of major public concern: the largest cyber breach in U.S. history. In December 2020, the U.S. government announced it suffered the largest cyber breach in history through the Solar Winds hack.  This breach demonstrates how vulnerable electronic voting systems are to hackers because those systems are, directly or indirectly, connected to the internet.[2]  Despite Dominion CEO John Poulos's claims that Dominion had never used SolarWinds, an archival screenshot of Dominion's website shows a now–

---

[2] *See, e.g.*, https://www.cnn.com/2020/12/14/politics/us-agencies-hack-solar-wind-russia/index.html.

erased SolarWinds logo.[3]   Based on this evidence, it appears that Dominion did use SolarWinds software.  Public debates, audits, and/or investigations of the 2020 General Election are currently being conducted or contemplated by state legislators in Arizona, Georgia, Wisconsin, Pennsylvania, and other states to ascertain the scale of vulnerabilities and whether they were exploited.  By widely publicizing its intimidation campaign, Dominion and its co-conspirators seek to intimidate and silence not just Plaintiffs and the Class, but also the public at large from exercising their right to speak and to share their own testimonial evidence relevant to proceedings investigating election fraud in the November 2020 election.

10.     Dominion has not waged its Lawfare campaign as only a corporate citizen, but also as a state–actor, *i.e.*, the government.  Dominion is a state–actor because States across the United States have outsourced their constitutional obligation to run elections by deferring to Dominion's professional experience and contracting out the administration, collection, counting, recording, and auditing of ballot results through voting technology, software, and thousands of hours of technical and election services. For example, Georgia paid Dominion roughly $90,000,000 for a complete, end–to–end election solution in their Master Solution contract.[4]   In the Master Solution, Georgia specifically stated "[t]he unique abilities, knowledge, and skills of [Dominion] constitute

---

[3] Zachary Stieber, *Dominion Voting Systems Uses Firm That Was Hacked*, THE EPOCH TIMES, Dec. 14, 2020.      https://www.theepochtimes.com/mkt_app/dominion–voting–systems–uses–firm–that–was–hacked_3617507.html.

[4] *See* Master Solution Purchase and Services Agreement at 17, ¶ 10 & 93–94 (Fee Schedule). https://sos.ga.gov/securevoting/ (Contract link) (last visited Sep. 28, 2021).

a material inducement for State entering into this Agreement."[5]   Such reliance and partnership between Dominion and States, according to which Dominion itself takes the place of the government, makes Dominion's conduct of elections and all its related activities a state-action.  The administration, collection, counting, recording, and auditing of ballot results in elections are inherently a traditional, exclusive public function.  So not only have these Americans received Letters from a corporate citizen with tens of millions in annual revenue and private equity support, but they have also been threatened by, in effect, the government itself.

11.     As stated previously, many Plaintiffs did not mention Dominion in their sworn statements.  Yet, Dominion and its co-conspirators not only sent the Letters but also demanded unspecified "retractions" from Plaintiffs.  Considering Plaintiffs did not talk about Dominion in the affidavits that presumably brought them to Dominion's attention in the first place, it appears that Dominion's true purpose was not to stop defamation, but to compel Plaintiffs to retract the statements attesting to their observations regarding election integrity generally.   Dominion has no authority, especially when acting as a state actor and the government, to demand such retractions.

12.     Through its promiscuous delivery of aggressive threats of litigation and its deliberately broad advertisement of its own threatening activities, Dominion seeks to intimidate anyone who might speak out regarding election integrity and security concerns, whether such speech is related to Dominion or not.  Plaintiffs and the Class have been damaged by Dominion's Lawfare campaign.

---

[5] *See* Master Solution Purchase and Services Agreement at ¶ 6.7. https://sos.ga.gov/securevoting/ (Contract link) (last visited Sep. 28, 2021).

**I.**
**JURISDICTION AND VENUE**

13.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because (1) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.   This Court has supplement jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

14.   Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants transact business in this district and are subject to personal jurisdiction in this district.   Additionally, Defendants have received substantial revenue and profits from sales of its products in this district.   Further, Defendants sent Letters to Plaintiffs from this district or made the business decision in this district to instruct Clare Locke to send such Letters because Defendants are a resident of this district and have their principle places of business here.   Therefore, a substantial part of the events and/or omissions giving rise to the claims herein occurred, at least in part, within this district.

15.   The Court has general personal jurisdiction over Defendants because they have conducted substantial business in this judicial district, are headquartered in this district, make this district their principle place of business, and intentionally and purposefully place their products into the stream of commerce throughout the United States from within this district.

## II.
## THE PARTIES

**A.    Plaintiffs:**

16.    Plaintiff Jennifer L. Cooper ("Cooper"), a small business owner, is an individual and resident of the State of Michigan and was a poll watcher and challenger during the November 2020 General Election.  *See* Ex. 1 (Affidavit of Jennifer Cooper Nov. 9, 2020).  Prior to election day, Cooper was trained to take notes of anything out of the ordinary that she witnessed during her work as a poll watcher and challenger.  On the day of the election, Cooper was at an offsite location counting absentee and military votes. The day after the election, Cooper was a ballot challenger at the TCF Center in Detroit. *See id*.  While there, she witnessed numerous problems and challenged these problems with the election workers.  *See id*.  Cooper also felt harassed and intimidated by the other election workers.  *See id*.  After having these experiences, Cooper traveled to Livonia, Michigan with the notes she recorded from the TCF Center and drafted an affidavit specifically detailing these issues.[6]  *See id*.  Cooper did not mention Dominion in her affidavit. *See id*.

17.    Despite never mentioning Dominion, Cooper received a FedEx envelope one day in early January 2021 that contained a Letter.  *See* Ex. 2 (Dominion and Clare Locke Lawfare Letter Dec. 31, 2020).  As Cooper started to read the Letter from Dominion and Clare Locke, she immediately had a visceral reaction, one of dread and fear.  In fact, the receipt of the Letter threatened the most valuable thing in Cooper's life—her sobriety. Cooper is a recovering alcoholic and is eleven (11) years sober.  But that Letter made her

---

[6] Cooper was unaware that her affidavit would be used for any specific litigation.

question everything.   So much so that she immediately attended an Alcoholics Anonymous' meeting for support from her community.   Cooper's strength to abstain is a testament to her character.   But Cooper was still unsure what her future looked like because the Letter demanded a retraction of some unknown statement she allegedly made.   It threatened ruinous litigation that she could not afford.   And it demanded her to preserve evidence she did not have.   She played out numerous situations in her head. What had she said that was defamatory toward Dominion?   How did they know where she lived?   Why would they want to sue?   Could her small business survive?   Was she going to be audited by the IRS?   Was she going to lose everything she had worked so hard for during her life?   These types of questions should never be asked by an American who volunteered her time to protect the most fundamental of all democratic rights—elections.

18.     Because of the threatening and intimidating nature of the Letter, Cooper was scared and thought unknown people may visit her home.   To combat this, Cooper invested in her own security by purchasing, among other things, a Ring video doorbell. Dominion, HPS, and, Clare Locke's Lawfare campaign has clearly damaged Cooper.

19.     Plaintiff Eugene Dixon ("Dixon"), a retired director of credit, is an individual and resident of the State of Michigan.   Dixon was a poll watcher and challenger during the November 2020 General Election.   As a poll challenger for the Election Integrity Fund, Dixon worked at the TCF Center in Detroit monitoring and challenging the ballot count and witnessed, among other things, ballot duplication.   See Ex. 3 (Affidavit of Eugene Dixon Nov. 3, 2020).   After witnessing numerous concerning issues,

Dixon was asked to draft an affidavit and send it to local government officials, which he did.[7]  Dixon's affidavit did not in any way discuss or even mention Dominion.  *See id.*

20.    After fulfilling his civic duty, Dixon received the same intimidating Letter from Dominion and Clare Locke, threatening a defamation lawsuit if his "defamatory" speech continued.  See Ex. 4 (Dominion and Clare Locke Lawfare Letter Dec. 28, 2020). The Letter also demanded a retraction and ordered him to preserve all evidence. *See id.* After reading the Letter, Dixon was consumed with a sense of fear.  He was also confused. What did he do to receive this Letter?  What had he said that was defamatory toward Dominion?  Was his volunteering as a poll challenger somehow tied to the Letter?  If so, how could fulfilling his civic duty result in such a draconian Letter?  How did Dominion and Clare Locke know who he was?  Concerned and not knowing whether people would visit his home, Dixon purchased security equipment to protect himself and his family, something that Dixon never thought was necessary before.  Clearly, Dixon has been damaged by Dominion, Clare Locke, and HPS' Lawfare campaign.

21.    Plaintiff Francis J. Cizmar ("Cizmar"), a former employee of a large accounting firm, is an individual and resident of the State of Michigan.  Cizmar, a poll challenger, also received an intimidating Letter from Dominion and Clare Locke, threatening a defamation lawsuit if his speech continued, demanded a retraction, and required him to preserve evidence.  *See* Ex. 5 (Dominion and Clare Locke Lawfare Letter Dec. 28, 2020).  Like the other named Plaintiffs, however, Cizmar never mentioned Dominion in his affidavit.  *See* Ex. 6 (Affidavit of Francis J. Cizmar Nov. 8, 2020).  Feeling

---

[7] Dixon was unaware that his affidavit would be used for any specific litigation.

overwhelmed, concerned, and afraid by the Letter and not understanding why it was sent, Cizmar decided to call Clare Locke, but no contact information was provided on the Letter.  Clearly, Clare Locke was not interested in hearing from the people they were harassing and intimidating with their Lawfare campaign, and their vexatious demand for confirmation of receipt at the end of their Letters was apparently intended only to burden and harass the recipient—just like the onerous preservation requests.  With no number on the Letter, Cizmar Googled the law firm and found a contact number.  Cizmar called the number but was directed to voicemail where he left his name and contact information and requested a call back from Clare Locke regarding the Letter.  Clare Locke never returned Cizmar's voicemail.  Because of the letter, Cizmar has become consumed with the safety of himself and his family.  He never leaves his home without making sure his security system is turned on.  And while at home, he makes sure that all doors and windows remain locked.  Cizmar also keeps the curtains drawn to prevent people from looking inside his home.  Dominion, Clare Locke, and HPS' Lawfare campaign has damaged Cizmar.

22.     Plaintiff Anna Pennala ("Pennala"), a mother and part-time office administrator, is an individual and resident of the State of Michigan and was a poll watcher and challenger during the November 2020 election.  *See* Ex. 7 (Affidavit of Anna Pennala Nov. 8, 2020).  As a poll challenger at the TCF Center in Detroit, Pennala observed several irregularities, including but not limited to unattended ballot boxes.  *See id.*  Several days after the election, local officials requested that anyone who witnessed issues with the election sign affidavits regarding the same.  Wanting to fulfill her civic

duty, Pennala traveled to Livonia, Michigan and filled out an affidavit that detailed the issues she personally witnessed while working at the TCF Center. Pennala's November 9, 2020 affidavit never mentioned Dominion.[8]

23.     Shortly after Christmas 2020, Pennala was taking down her Christmas tree when she received a FedEx envelope containing a Letter. The Letter was from Clare Locke and Dominion and it threatened ruinous litigation, demanded a retraction, and ordered her to preserve evidence. *See* Ex. 8 (Dominion and Clare Locke Lawfare Letter Dec. 23, 2020). Pennala was terrified and nervous. She has four (4) children, what did she get herself involved with when she fulfilled her civic duty? All Pennala did was observe an election. How did this law firm and people who run elections know where she lived? After researching Clare Locke and Dominion, Pennala realized that these were serious people who could destroy her life. Scared and not knowing whether people would come to her home, Pennala decided to purchase security equipment to protect herself and her family. Clearly, Pennala has been damaged by Dominion, Clare Locke, and HPS' Lawfare campaign.

24.     Plaintiff Kathleen Daavettila ("Daavettila"), a mother, is an individual and resident of the State of Michigan and a poll challenger. Daavettila was a poll challenger at the TCF Center in Detroit the day after the election. *See* Ex. 9 (Affidavit of Kathleen Daavettila Nov. 8, 2020). Daavettila witnessed numerous issues while at TCF and wrote notes to keep track of all the problems. *See id.* Several days after the election, local officials requested that anyone who witnessed issues with the election sign affidavits

---

[8] Pennala was unaware that her affidavit would be used for any specific litigation.

regarding the same.  Wanting to fulfill her civic duty, Daavettila traveled to Livonia, Michigan and filled out an affidavit that detailed the problems she personally witnessed while working at the TCF Center.  Daavettila's November 8, 2020 affidavit never mentioned Dominion.[9]

25.     One day in December 2020, Daavettila received a FedEx envelope containing a Letter.  The Letter was from Clare Locke and Dominion, and it threatened ruinous litigation, demanded a retraction, and ordered her to preserve evidence.  *See* Ex. 10 (Dominion and Clare Locke Lawfare Letter Dec. 28, 2020).  Upon reading the Letter, Daavettila felt afraid and scared for her family.  After being threatened and in fear of her life and that of her unborn child while working at the TCF Center, this letter exacerbated all of those feelings.  Why was she being threatened with a lawsuit?  How would this affect her family?  Daavettila was terrified and has been damaged by Dominion, Clare Locke, and HPS' Lawfare campaign.

26.     Plaintiff Cynthia Brunell ("Brunell") is an individual and resident of the State of Michigan and a poll challenger.  Brunell was a poll challenger at the TCF Center in Detroit late on election night.  *See* Ex. 11 (Affidavit of Cynthia Brunell Nov. 8, 2020).  Brunell witnessed numerous issues with the review of ballots and wrote notes that evening to keep track of all the issues.  *See id.*  Subsequently, Brunell signed an affidavit on November 8, 2020 attesting to these issues.[10]  *See id.*  But Brunell never mentioned anything about Dominion.  *See id.*  That did not stop Dominion and Clare Locke from

---

[9]  Daavettila was unaware that her affidavit would be used for any specific litigation.

[10]  Brunell was unaware that her affidavit would be used for any specific litigation.

sending an intimidation Letter to Brunell ordering her to stop talking, threatening litigation, demanding a retraction, and requiring her to preserve evidence. *See* Ex. 12 (Dominion and Clare Locke Lawfare Letter Dec. 23, 2020). Upon reading the Letter, Brunell felt bullied and afraid. She was self-employed. What would happen to her family financially if Dominion sued? After receiving the Letter, Brunell invested in security equipment to protect herself and her family. Brunell has been damaged by Dominion, HPS, and Clare Locke's Lawfare campaign.

27.    Plaintiff Karyn Chopjian ("Chopjian"), a business owner, is an individual and resident of the State of Michigan and was a poll challenger on election night and the following day at the TCF Center in Detroit. Chopjian also received an intimidating Letter from Dominion and Clare Locke, threatening ruinous litigation, demanding a retraction, and ordering her to preserve all evidence. *See* Ex. 13 (Dominion and Clare Locke Lawfare Letter Dec. 31, 2020). As with every other named Plaintiff, however, Chopjian never mentioned Dominion in her affidavit, nor did she know who Dominion was.[11] *See* Ex. 14 (Affidavit of Karyn Chopjian Nov. 9, 2020). All Chopjian knew was that she was being threatened with litigation that could potentially destroy her life as well as her business. Chopjian, like the others, was confused. Why had Dominion sent this letter? As a result of the Letter, Chopjian purchased security equipment to protect herself and her family. Chopjian has been damaged by Dominion, HPS, and Clare Locke's Lawfare campaign.

28.    Plaintiff Abbie Helminen ("Helminen") is an individual and resident of the State of Michigan. Helminen was a poll challenger at the TCF Center in Detroit on

---

[11] Chopjian was unaware that her affidavit would be used for any specific litigation.

November 4, 2020.  *See* Ex. 15 (Affidavit of Abbie Helminen Nov. 8, 2020).  Helminen

witnessed numerous issues with the review of ballots and wrote notes that evening to keep

track of all the issues.  *See id.*  Subsequently, Helminen signed an affidavit on November

8, 2020 attesting to these issues.[12]  *See id.*  Helminen never mentioned anything about

Dominion in her affidavit nor did she know who Dominion was.  *See id.*  Despite this,

Dominion and Clare Locke sent Helminen an intimidation Letter ordering her to stop

talking, threatening litigation, demanding a retraction, and requiring her to preserve

evidence.  *See* Ex. 16 (Dominion and Clare Locke Lawfare Letter Dec. 23, 2020).  Upon

reading the Letter, Helminen was afraid and scared.  How did this law firm and company

who runs elections know who she was?  How did they know where she lived?  What would

happen to her family financially if Dominion sued?  Helminen has been damaged by

Dominion, HPS, and Clare Locke's Lawfare campaign.

29.     Dominion, Clare Locke, and HPS have weaponized the court system and the

litigation process in an attempt to silence Plaintiffs' and others' political speech about

election integrity and potential fraud.  Plaintiffs are only several of well over a hundred,

likely more, individuals and entities who received Dominion, HPS, and Clare Locke's

intimidating Letters and/or have been sued by Dominion.   Because of the chilling effect

of Dominion, HPS, and Clare Locke's actions—which they have regularly publicized in the

news and on their website—Plaintiffs and others have been threatened and intimidated

from speaking out in their everyday lives and as witnesses in any capacity.

---

[12] Helminen was unaware that her affidavit would be used for any specific litigation.

**B.** <u>**Defendants**</u>**:**

30.     Defendant US Dominion, Inc., is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Denver, Colorado.  It may be served with process by delivering the summons and complaint to its Chief Executive Officer, John Poulos, at its principal place of business, 1201 18th Street, Suite 210, Denver, Colorado 80202.

31.     Defendant Dominion Voting Systems, Inc., is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Denver, Colorado.  It may be served with process through its registered agent for service of process in Colorado, Cogency Global, Inc., 7700 E. Arapahoe Road, Suite 220, Centennial, Colorado 80112.

32.     Defendant Dominion Voting Systems Corporation is a corporation organized and existing under the laws of the Province of Ontario, Canada with its principal place of business in Toronto, Ontario, Canada.  It may be served with process in accordance with the terms of the Hague Convention.

**C.**     <u>**Named Non-Party Co-Conspirators**</u>**:**

33.     Non-party co-conspirator Clare Locke, LLP is a limited liability partnership organized under the laws of the State of Virginia.

34.     Non-party co-conspirator Hamilton Place Strategies, LLC is a limited liability company organized under the laws of the District of Columbia.

### III.
### FACTUAL ALLEGATIONS

35.     Dominion, HPS, and Clare Locke, acting in concert and as part of an unlawful enterprise, have weaponized the court system and the litigation process in an improper attempt to silence Plaintiffs, the Class, and American citizens from participating in a long-standing, ongoing national conversation about election integrity and, in particular, speaking about and bringing to light evidence of alleged election fraud and irregularities in the November 2020 election.   Plaintiffs now sue to bring a stop to Defendants' abuses of the legal system and protect Americans' right to speak freely on matters of the utmost public concern.

### A.
### Dominion is a State Actor

36.     Increasingly, jurisdictions have chosen to outsource election operations, machines, software, and services to private contractors.  By the time of the 2020 General Election, at least 3,143 counties across the United States had outsourced responsibility for administering, collecting, counting, recording, and auditing ballot results to private contractors.  For the 2020 General Election, Dominion provided its voting machines and services to more than half of the United States from its U.S. corporate headquarters in Colorado.  Many of these states, such as Arizona, Nevada, Wisconsin, Michigan, Georgia, Florida, and Pennsylvania, have been referred to as battleground or swing states because their voters are equally divided (or nearly equally divided) in their degree of support for the two primary political parties.  In fact, Dominion has contracts with over 1,300 governmental jurisdictions around the United States to administer elections.

37.     In order to meet the ever-growing election demands, Dominion manufactures voting machines and has vertically integrated all other necessary components to administer, collect, count, record, and audit elections, including software that runs the machines and thousands of employees to provide technical and election support.  In order to meet contractual obligations with States across the country and maintain their machines, Dominion also executes software updates, fixes, and patches. As was seen by the 2020 General Election, some of these software updates, fixes, and patches came as late as the night before election day.  Dominion's software updates are done at its own discretion, including via the internet.

38.     Dominion designs public election processes with its hardware and software products at the center and provides administrative services for public elections.  While polls are open, Dominion employees stand by to provide troubleshooting and support when voting machines malfunction during many stages of the process, including during the audit.  Not only do Dominion employees provide essential functions, but so do the machines themselves.  In fact, Dominion incorporates within their "Democracy Suite" a piece of Dominion ballot scanning and interpretation software.  When questions arise regarding voters' intent, one of the most fundamental functions of election workers is to determine that intent so that the ballot can be counted correctly.  And it is without question that an election worker is a state actor.  Dominion's ballot scanning and interpretation software has attempted to remove the need of election workers in the process of voter intent because it details the system's interpretation of the voter's intent.

Clearly, Dominion's role of administering, collecting, counting, recording, auditing, and determining voter's intent is a state-action.

39.   By its own account Dominion provides an "End-To-End Election Management System" that "[d]rives the entire election project through a single comprehensive database."[13] Its tools "build the election project," and its technology provides "solutions" for "voting & tabulation," and "tallying & reporting," and "auditing the election." The products sold by Dominion include ballot marking machines, tabulation machines, and central tabulation machines, among others.  And just like election workers who sometimes are required to determine voter's intent, Dominion likewise does so through their AuditMark technology.  As a result of Dominion's contracts with government entities, it has been delegated the constitutional responsibility to administer public elections, which is a traditionally exclusive public function.  In at least one jurisdiction in the 2020 General Election, Maricopa County, Arizona, county officials did not even possess the administrator passwords to the Dominion voting machines— meaning only Dominion could program and operate the machines on behalf of the county.[14]

40.   Dominion's involvement in running elections amounts to state-action. Dominion willfully participates in joint activity with States during voting, including by

---

[13] DEMOCRACY SUITE® ELECTION MANAGEMENT SYSTEM,
 https://www.dominionvoting.com/democracy–suite–ems/ (last visited Aug. 25, 2021).

[14]  https://www.thegatewaypundit.com/2021/05/maricopa-county-elections-witness-testifies-dominion-ran-entire-election-county-officials-observers-never-access-passwords-video/.

supplying its products, services, and employees contemporaneously with election officials to carry out the election. There is pervasive entwinement between Dominion and States.

41.     Fundamentally, States have outsourced their Constitutional obligation by deferring to Dominion's professional judgment to administer, collect, count, record, and audit ballot results. In Georgia, for example, voters can only use Dominion machines, software, and services because of the statewide contract and a state law that requires the statewide use of a uniform voting system. *See* O.C.G.A. § 21–2–300(a)(1). States have exercised their authority to regulate elections by contracting with Dominion and then deprived their citizens of a venue independent of Dominion to cast their votes. And Dominion's business of administering, collecting, counting, recording, and auditing ballot results did not end on November 3, 2020. Rather, States were conducting audits of the election results up to a month later, and Dominion was there throughout. Even well after the election was over and Congress certified the results, Dominion began providing software updates. It has been publicly alleged in various jurisdictions that Dominion's software updates performed after the November 2020 election removed certain information from the voting system and voting machines that federal law requires to be preserved for 22 months. *See* 52 U.S.C. § 20701. Because elections are now conducted with technology instead of paper ballots, state and federal elections could not happen without Dominion and companies like it. Said another way, Dominion currently has more power than individual states and the federal government regarding elections. Such an intertwined partnership and power is the definition of a traditionally, exclusive public function and state-action.

**B.**
**Democratic Party Congressional Leaders**
**Raise Concerns about Dominion**

42.   Voting machine companies are at the center of a long-standing, ongoing national conversation about election integrity. Legislators have long raised questions publicly about who exactly owns and controls election companies like Dominion.  To give one recent example, in December 2019, United States Senators Elizabeth Warren (D–Mass.), Amy Klobuchar (D–Minn.), Ron Wyden (D–Or.), and Congressman Mark Pocan (D–Wis.) wrote a public letter to Stephen D. Owens and Hootan Yaghoobzadeh, Managing Directors of Staple Street Capital, LLC, a private equity firm, which acquired Dominion in 2018.  After recognizing that Dominion was "one of three election technology vendors responsible for developing, manufacturing and maintaining the vast majority of voting machines and software in the United States, the four Democratic congressional leaders raised a number of serious concerns regarding "the spread and effect of private equity investment in many sectors of the economy, including the election technology industry—an integral part of our nation's democratic process."[15]   Those concerns included:

    a.    "[T]hat secretive and 'trouble–plagued companies,' owned by private equity firms and responsible for manufacturing and maintaining voting machines and other election administration equipment, 'have long skimped on security in favor of convenience,' leaving voting systems across the country 'prone to security problems.'"

    b.    "[T]hree large vendors—Election Systems & Software, Dominion, and Hart InterCivic—collectively provide voting machines and software that facilitate voting for over 90% of all eligible voters in the United States."

---

[15] https://www.warren.senate.gov/imo/media/doc/H.I.G.
%20McCarthy,%20&%20Staple%20Street%20letters.pdf (last visited on Sep. 30, 2021).

c.      "Election security experts have noted for years that our nation's election systems and infrastructure are under serious threat."

d.      "[V]oting machines are reportedly falling apart across the country, as vendors neglect to innovate and improve important voting systems, putting our elections at avoidable and increased risk."

e.      "[R]esearchers recently uncovered previously undisclosed vulnerabilities in 'nearly three dozen backend election systems in 10 states.'"

f.      "These problems threaten the integrity of our elections and demonstrate the importance of election systems that are strong, durable, and not vulnerable to attack."

The congressional leaders' letter followed these concerns with a request for seven specific categories of information "[i]n order to help us understand your firm's role in this sector."

43.     The congressional leaders' concerns were not unfounded.  It had been widely publicly reported, by the time of the 2020 election, that Chinese government–related entities, Chinese technology companies, and powerful Chinese financial interests had direct or indirect ownership of and near–total access to Dominion's voting machine technology.  Small wonder that by then congressional leaders had publicly raised their own serious concerns regarding "the spread and effect of private equity investment in many sectors of the economy, including the election technology industry."

44.     Despite the existence of a national discussion involving bi–partisan questions regarding Dominion, and despite the public focus of national leaders on these questions, Plaintiffs cannot comment about these matters of huge public importance because of Dominion, HPS, and Clare Locke's illegal Lawfare campaign.

**C.**
**Long History of Robust Public**
**Debate Regarding Dominion and Election Integrity**

45.     There is a long history of robust public debate concerning Dominion, including from Democrats and traditional liberal media.  Such extensive news coverage was meant to and did inform the public regarding potential election integrity and security issues during the 2020 General Election.  And many people who listened to law makers and watched news coverage developed opinions regarding Dominion and election integrity.  Despite this long history of public debate concerning the traditionally, exclusive public function of administering elections, Dominion, HPS, and Clare Locke have set out to "defend democracy" by using Lawfare against Plaintiffs and their speech and have restricted Plaintiffs' ability to discuss their opinions, derived from lawmakers, news coverage, and firsthand accounts.

46.     Evidence of problems with electronic voting systems, including Dominion's system, have been accumulating for over a decade, and the 2020 General Election only accelerated this trend.  Prior to 2020, it was well established that these systems were wide open to hacking.  In fact, some States—*e.g.*, Texas—rejected Dominion voting systems after examining their vulnerability to hacking.  Others, like Arizona, have found cause to order post-election forensic audits of electronic voting systems—including Dominion's voting machines—to attempt to "restore integrity to the election process."[16]  The New

---

[16] Press Release, Ariz. Senate Republicans, Senate chooses qualified auditing firm to conduct forensic audit of Maricopa County election results (Jan. 29, 2021) https://www.azsenaterepublicans.com/post/senate–chooses–qualified–auditing–firm–to–conduct–forensic–audit–of–maricopa–county–election–results.

Hampshire Senate even voted 24–0 to conduct a complete examination of Dominion–owned voting machines after suspicious shorting of votes was discovered.[17]

47.     During a December 30, 2020, live–streamed hearing held by the Georgia Senate Judiciary Subcommittee on Elections, a testifying expert hacked into a Dominion polling pad.[18]  And, at the same hearing, legislators were shown replays of real-time news reports showing that tens of thousands of previously reported votes were switched from President Trump to former Vice President Biden in several counties in Georgia.[19]

48.     In 2009, during a New York congressional election, Dominion's software allowed voters to vote for more than one candidate, and its faulty machines froze during operation due to insufficient memory.[20]  In the 2010 general election in the Philippines, allegations of technical problems and offers of vote manipulation were rampant.[21]  In that election, where Dominion's products were in more than 2,200 local municipalities, a Dominion "glitch" caused voting machines to incorrectly read ballots.[22]   A Product

[17] Chad Groenig, *Dominion gets caught shorting GOP candidates*, One News Now, Mar. 5, 2021, https://onenewsnow.com/politics–govt/2021/03/05/dominion–gets–caught–shorting–gop–candidates.

[18] Ski, *Dominion machines hacked LIVE during Georgia election hearing*, Blue White Illustrated (Dec. 30, 2020, 10:31 AM), https://bwi.forums.rivals.com/threads/dominion–machines–hacked–live–during–georgia–election–hearing.286325/.

[19]     https://epochtimes.today/georgia-data-shows-24658-of-trumps-votes-removed-another-12713-switched-to-biden-data-scientists/.

[20] *Dominion also handled 2009 NY congressional poll*, ABS–CBN News, May 7, 2010, https://news.abs–cbn.com/nation/05/07/10/dominion–also–handled–2009–ny–congressional–poll.

[21] *See, e.g.*, Reuters, "Aquino unfazed by Philippine poll fraud allegations," May 27, 2010, https://www.reuters.com/article/idINIndia–48840420100527.

[22] Ina Reformina, *Source code firm Dominion sheds light on voting glitch*, ABS–CBN News, May 7, 2010, https://news.abs–cbn.com/nation/05/07/10/source–code–firm–dominion–sheds–light–voting–glitch.

Manager of Dominion indicated that more than 76,000 compact flash cards had to be configured just days before the election.[23]

49.     In July 2017, an election-integrity advocacy organization and individual voters filed an action in Georgia's Fulton County Superior Court, seeking to set aside the results of a 2017 Congressional special election race in which the Republican candidate had prevailed.  The *Curling v. Raffensperger* plaintiffs alleged "sophisticated hackers—whether Russian or otherwise—had the capability and intent to manipulate elections in the United States."[24] After the defendants removed the case to federal court, the plaintiffs in *Curling* successfully obtained an injunction against the State of Georgia's continued use of its existing, Dominion-serviced and maintained direct recording electronic ("DRE") voting system beyond the end of 2019. *Curling v. Raffensperger*, 397 F.Supp.3d 1334, 1412 (N.D. Ga. Aug. 15, 2019).  After Georgia adopted a new Dominion ballot marking device ("BMD") voting system (the Democracy Suite 5.5–A) to replace the DRE system in the fall of 2019, the plaintiffs asked the court to enjoin the new BMD system ahead of the 2020 general election.  *See Curling v. Raffensperger*, 493 F.Supp.3d 1264, 1267 (N.D. Ga. Oct. 11, 2020).

50.     On October 11, 2020, just three weeks before the 2020 General Election, Judge Amy Totenberg issued an order regarding the Dominion voting system's security risks and the potential for fraud or irregularities.[25]  Judge Totenberg found substantial

---

[23] *See id.*

[24] Amended Complaint, Doc. 15, at 4 in *Curling v. Raffensperger*, No. 1:17-cv-02989-AT (N.D. Ga. Aug. 18, 2017) (Ex. 17).

[25] *Curling v. Raffensperger*, 493 F.Supp.3d 1264, 1267 (N.D. Ga. Oct. 11, 2020) (Ex. 18).

evidence that the Dominion system was plagued by security risks and the potential for votes to be improperly rejected or misallocated.  She wrote, "The Plaintiffs' national security experts convincingly present evidence that this is not a question of 'might this actually ever happen?' – but 'when it will happen,' especially if further protective measures are not taken."[26]

51.    Judge Totenberg found:

- "[H]uge volume of significant evidence regarding the security risks and deficits in the [Dominion] system as implemented . . ."

- "Evidence presented in this case overall indicates the possibility generally of hacking or malware attacks occurring in voting systems and this particular system through a variety of routes – whether through physical access and use of a USB flash drive or another form of mini–computer, or connection with the internet."

- "[E]vidence credibly explaining how malware can mask itself when inserted in voting software systems or QR codes, erase the malware's tracks, alter data, or create system disruption."

- "Defendants do not appear to actually dispute that cybersecurity risks are significant in the electoral sphere."

- Dominion's Director of Product Strategy and Security "acknowledged the potential for compromise of the [Android] operating system [underlying the Dominion voting system], by exploiting a vulnerability, that could allow a hacker to take over the Voting machine and compromise the security of the voting system software."

- "[A] formidable amount of evidence that casts serious doubt on the validity of the use of the [risk-limiting audit statistical

---

[26] *Id*. at 1342.

method for auditing election outcomes] with the current [Dominion] system." [27]

52.     Although Judge Totenberg declined the plaintiffs' late 2020 request in *Curling* for injunctive relief requiring paper ballots—because she felt bound by Eleventh Circuit precedent and because there was insufficient time to implement the requested relief prior to the election—she nevertheless expressed profound concern regarding the Dominion voting system and Dominion's less-than-transparent actions:

> The Court's Order has delved deep into the true risks posed by the new [Dominion] BMD voting system as well as its manner of implementation.  These risks are neither hypothetical nor remote under the current circumstances.  The insularity of the Defendants' and Dominion's stance here in evaluation and management of the security and vulnerability of the BMD system does not benefit the public or citizens' confident exercise of the franchise.   The stealth vote alteration or operational interference risks posed by malware that can be effectively invisible to detection, whether intentionally seeded or not, are high once implanted, if equipment and software systems are not properly protected, implemented, and audited.
>
> . . . .
>
> The Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of 'might this actually ever happen?' — but 'when it will happen,' especially if further protective measures are not taken.  Given the masking nature of malware and the current systems described here, if the State and Dominion simply stand by and say, "we have never seen it," the future does not bode well.[28]

---

[27] *Id.* at 1278, 1280, 1281, 1283, 1287, 1306.

[28] *Id.* at 1341–42.

53.     In addition to her December 2019 letter to Dominion's parent company, Staple Street Capital, Senator Warren noted how Dominion kept their operations under a cloak of secrecy: "These vendors make little to no information publicly available on how much money they dedicate to research and development, or to maintenance of their voting systems and technology.  They also share little or no information regarding annual profits or executive compensation for their owners."[29]

54.     In August 2018, Senator Klobuchar stated on nationally broadcast television, Meet the Press, "I'm very concerned you could have a hack that finally went through. You have 21 states that were hacked into, they didn't find out about it for a year."[30]

55.     Senator Wyden, also in the lead up to the 2020 election, explained during an interview:

> [T]oday, you can have a voting machine with an open connection to the internet, which is the equivalent of stashing American ballots in the Kremlin . . . [As] of today, what we see in terms of foreign interference in 2020 is going to make 2016 look like small potatoes.  This is a national security issue! . . . The total lack of cybersecurity standards is especially troubling . . . But the lack of cybersecurity standards leads local officials to unwittingly buy overpriced, insecure junk. Insecure junk guarantees three things: a big payday for the election–tech companies, long lines on Election Day, and

---

[29] *Warren, Klobuchar, Wyden, and Pocan Investigate Vulnerabilities and Shortcomings of Election Technology Industry with Ties to Private Equity*, Elizabeth Warren: United States Senator for MA (Dec. 10, 2019) https://www.warren.senate.gov/oversight/letters/warren–klobuchar–wyden–and–pocan–investigate–vulnerabilities–and–shortcomings–of–election–technology–industry–with–ties–to–private–equity.

[30] NBC News, Amy Klobuchar: Concerned That A 2018 Election Hack Could Succeed (Full) | Meet The Press | NBC News, YouTube (Aug. 5, 2018), https://www.youtube.com/watch?v=9wtUxqqLh6U.

> other hostile foreign governments can influence the outcome
> of elections through hacks.[31]

56.     After failing certification in Texas in January 2019, Dominion again presented its Democracy Suite 5.5–A voting system in Texas for examination and certification on October 2 and 3, 2019.[32] It failed the second time as well.  "The examiner reports identified multiple hardware and software issues . . . Specifically, the examiner reports raise concerns about whether the Democracy Suite 5.5–A system is suitable for its intended purpose; operates efficiently and accurately; and is safe from fraudulent or unauthorized manipulation."[33]

57.     On January 24, 2020, the Texas Secretary of State denied certification of the system for use in Texas elections.   Texas' designated experts who evaluated Democracy Suite 5.5–A flagged risk from the system's connectivity to the internet despite "vendor claims" that the system is "protected by hardening of data and IP address features."[34, 35]

> [T]he machines could be vulnerable to a rogue operator on a
> machine if the election LAN is not confined to just the
> machines used for the election . . . The ethernet port is active

---

[31] Mark Sullivan, *Senator Ron Wyden: The GOP is 'making a mockery' of election security*, FAST COMPANY (Feb. 19, 2020), available at https://www.fastcompany.com/90465001/senator–ron–wyden–the–gop–is–making–a–mockery–of–election–security.

[32] Jose A. Esparza, *Report of Review of Dominion Voting Systems Democracy Suite 5.5A*, Tex. Sec'y of State (Jan. 24, 2020), available at https://www.sos.texas.gov/elections/forms/sysexam/dominion–d–suite–5.5–a.pdf (Ex. 19).

[33] *Id.*

[34] Letter from Brandon Hurley to Keith Ingram (Feb. 19, 2019) (Ex. 20).

[35] James Sneeringer, Ph.D., *Voting System Examination: Dominion Voting Systems Democracy Suite 5.5–A* 2, 5 (TX Sec. of State Elections Div.), available at https://www.sos.texas.gov/elections/forms/sysexam/oct2019–sneeringer.pdf.

> on the ICX BMD during an election . . . This is an unnecessary open port during the voting period and could be used as an attack vector.[36]

Other security vulnerabilities found by Texas include use of a "rack mounted server" which "would typically be in a room other than a room used for the central count" and would present a security risk "since it is out of sight."[37]

58.   Texas Attorney General Ken Paxton later explained, "We have not approved these voting systems based on repeated software and hardware issues.  It was determined they were not accurate and that they failed—they had a vulnerability to fraud and unauthorized manipulation."[38]

59.   Election officials and voting system manufacturers, including Dominion's CEO, have publicly denied that voting systems are connected to the internet and suggested that such systems, therefore, are not susceptible to attack via the internet.[39] Dominion's CEO, John Poulos, testified in December 2020 that Dominion's voting systems are "closed systems that are not networked meaning they are not connected to the internet."[40]  Yet, *Vice* reported in 2019:

---

[36] Tom Watson, *Democracy Suite 5.5A* 4–5 (TX Sec. of State Elections Div.), available at https://www.sos.texas.gov/elections/forms/sysexam/oct2019–watson.pdf.

[37] *Id.*

[38] Brad Johnson, *Texas Rejected Use of Dominion Voting System Software Due to Efficiency Issues*, The Texan, Nov. 19, 2020, https://thetexan.news/texas–rejected–use–of–dominion–voting–system–software–due–to–efficiency–issues/.

[39] Kim Zetter, *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials*, Vice (Aug. 8, 2019), available at https://www.vice.com/en/article/3kxzk9/exclusive–critical–us–election–systems–have–been–left–exposed–online–despite–official–denials.

[40] *See* https://danfromsquirrelhill.wordpress.com/2020/12/31/oomf/ (emphasis added).  Again, Google's YouTube deleted this video shortly after it began to gain circulation.

> [A] group of election security experts have found what they
> believe to be nearly three dozen backend election systems in
> 10 states connected to the internet over the last year, including
> some in critical swing states. These include systems in nine
> Wisconsin counties, in four Michigan counties, and in seven
> Florida counties . . . [A]t least some jurisdictions were not
> aware that their systems were online[.] . . . Election officials
> were publicly saying that their systems were never connected
> to the internet because they didn't know differently."[41]

In 2020, a team of election security experts found more than 35 voting systems were

online.[42]

60.     In 2020, NBC reported that voting machines were in fact connected to the

internet, making them susceptible to hacking, and

> The three largest voting manufacturing companies—Election
> Systems & Software, Dominion Voting Systems and Hart
> InterCivic—have acknowledged they all put modems in some
> of their tabulators and scanners . . . Those modems connect to
> cell phone networks, which, in turn, are connected to the
> internet . . . "Once a hacker starts talking to the voting
> machine through the modem . . . they can hack the software
> in the voting machine and make it cheat in future elections,"
> Andrew Appel [a Princeton computer science professor and
> expert on elections] said.[43]

---

[41] *Id.* (emphasis added).

[42] Kevin Monahan, Cynthia McFadden, and Didi Martinez, 'Online and Vulnerable': Experts find nearly three dozen U.S. voting systems connected to internet, NBC News, Jan. 10, 2020, available at https://www.nbcnews.com/politics/elections/online–vulnerable–experts–find–nearly–three–dozen–u–s–voting–n1112436.

[43] *Id.*



61.     In a 2019 story about the DEF CON hacking conference, NBC News reported that Dominion avoided participation in the conference; that hackers can target voting systems with ease; and that Dominion's voting machines are connected to the internet.[44]



---

[44] NBC News, *How Hackers Can Target Voting Machines | NBC News Now*, YouTube (Aug. 12, 2019), https://www.youtube.com/watch?v=QtWP0KDx2hA.

62.     In 2017, Dominion refused to respond to CNNTech's request for comment about its hackable voting machines.[45] CNNTech also asked Jake Braun, a former security advisor for the Obama administration and organizer of the DEF CON hacking conference, "Do you believe that right now, we are in a position where the 2020 election will be hacked?" He answered, "Oh, without question.  I mean the 2020 election will be hacked no matter what we do. . . ."[46]



63.     The Congressional Task Force on Election Security's Final Report in January 2018 identified the vulnerability of U.S. elections to foreign interference:[47]

---

[45] CNN Business, *We watched hackers break into voting machines*, YouTube (Aug. 11, 2017), https://www.youtube.com/watch?v=HA2DWMHgLnc.

[46] *Id.*

[47] CONGRESSIONAL TASK FORCE ON ELECTION SECURITY, FINAL REPORT (2018) (Ex. 21).

> According to DHS, Russian agents targeted election systems
> in at least 21 states, stealing personal voter records and
> positioning themselves to carry out future attacks . . . media
> also reported that the Russians accessed at least one U.S.
> voting software supplier . . . in most of the targeted states
> officials saw only preparations for hacking . . . [but] in Arizona
> and Illinois, voter registration databases were reportedly
> breached . . . If 2016 was all about preparation, what more can
> they do and when will they strike? . . . [W]hen asked in March
> about the prospects for future interference by Russia, then-
> FBI Director James Comey testified before Congress that:
> "[T]hey'll be back. They'll be back in 2020. They may be back
> in 2018."[48]

64.     The Congressional Task Force on Election Security report also stated that "many jurisdictions are using voting machines that are highly vulnerable to an outside attack," in part because "many machines have foreign-made internal parts." Therefore, "[A] hacker's point-of-entry into an entire make or model of voting machine could happen well before that voting machine rolls off the production line."[49]

65.     In 2016, "Russian agents probed voting systems in all 50 states, and successfully breached the voter registration systems of Arizona and Illinois."[50] The Robert Mueller report and a previous indictment of twelve Russian agents confirmed that Russian hackers had targeted vendors that provide election software, and Russian intelligence officers "targeted employees of [REDACTED], a voting technology company

---

[48] *Id.* at 6–7.

[49] *Id.* at 25 (citing Matt Blaze, *et al.*, *DEFCON 25 Voting Machine Hacking Village: Rep. on Cyber Vulnerabilities in U.S. Election Equipment, Databases, and Infrastructure*, 16 (2017) available at https://www.defcon.org/images/defcon–25/DEF%20CON%2025%20voting%20village%20report.pdf).

[50] Jordan Wilkie, 'They think they are above the law': the firms that own America's voting system, THE GUARDIAN, Apr. 23, 2019, https://www.theguardian.com/us-news/2019/apr/22/us-voting-machine-private-companies-voter-registration.

that developed software used by numerous U.S. counties to manage voter rolls, and installed malware on the company network."[51]

66.    A 2015 report issued by the Brennan Center for Justice listed two and a half–pages of instances of issues with voting machines, including a 2014 post-election investigation into machine crashes in Virginia which found "voters in Virginia Beach observed that when they selected one candidate, the machine would register their selection for a different candidate."[52]  The investigation also found that the Advanced Voting Solutions WINVote machine, which is Wi-Fi-enabled, "had serious security vulnerabilities" because wireless cards on the system could allow "an external party to access the [machine] and modify the data [on the machine] without notice from a nearby location," and "an attacker could join the wireless ad–hoc network, record voting data or inject malicious [data.]"[53]

67.    HBO's documentary *Kill Chain: The Cyber War on America's Elections*,[54] details the vulnerability of election voting machines, including Dominion machines. Harri Hursti, a world-renowned data security expert, showed that he hacked digital voting

---

[51] Report On The Investigation Into Russian Interference In The 2016 Presidential Election, p. 50, available at https://www.justice.gov/archives/sco/file/1373816/download.

[52] Lawrence Norden and Christopher Famighetti, *AMERICA'S VOTING MACHINES AT RISK*, Brennan Ctr. for Just., 13 (Sep. 15, 2014), available at https://www.brennancenter.org/sites/default/files/201908/Report_Americas_Voting_Machines_At_Risk.pdf (Ex. 22).

[53] *Id.*

[54] Simon Ardizzone, Russell Michaels, and Sarah Teale, *Kill Chain: The Cyber War on America's Elections*, HBO (Mar. 26, 2020), available at https://play.hbomax.com/feature/urn:hbo:feature:GXk7d3QAJHI7CZgEAACa0?reentered=true&userProfileType=liteUserProfile.

machines to *change votes* in 2005.  According to Hursti, the same Dominion machine that he hacked in 2005 was slated for use in 20 states for the 2020 election.

68.     In the documentary, Marilyn Marks, Executive Director of Coalition of Good Governance (one of the Plaintiffs in *Curling*), stated, "In Georgia, we ended up seeing the strangest thing.  In a heavily Democratic precinct, there was one machine out of a seven-machine precinct that showed heavy Republican wins, while the precinct itself and all of the other machines were showing heavy Democratic wins."  Dr. Kellie Ottoboni, Department of Statistics, UC Berkeley, stated the likelihood of this happening is "an astronomically small chance."  It was less than one in a million.[55]



---

[55] Screenshot from https://www.facebook.com/KillChainDoc/videos/2715244992032273/.

69.     In December 2020, the Department of Homeland Security's Cybersecurity & Infrastructure Agency ("CISA") revealed that hackers infiltrated SolarWinds software.[56] While Dominion CEO John Poulos's claim that Dominion had never used SolarWinds, an archival screenshot of Dominion's website appears to show a now-deleted SolarWinds logo (screenshot below).  On information and belief, Dominion in fact did use SolarWinds.



70.     Attorneys representing a Democratic candidate who lost in 2020 filed a brief raising Dominion machine errors and election issues, arguing:

> [D]iscrepancies between the number of votes cast and the number of votes tabulated have been pervasive in the counting of ballots for this race . . . In addition to the table-to-machine count discrepancies of which the parties are aware, there have also been procedural inconsistencies that question the integrity of the process . . . [T]he audit results revealed "unexplained discrepancies" but failed to provide any explanation . . . what caused those discrepancies or if they were ever resolved . . . In this case, there is reason to believe that voting tabulation machines misread *hundreds* if not *thousands* of valid votes as undervotes . . .[57]

---

[56] Zachary Stieber, *Dominion Voting Systems Uses Firm That Was Hacked*, THE EPOCH TIMES, Dec. 14, 2020, https://www.theepochtimes.com/mkt_app/dominion–voting–systems–uses–firm–that–was–hacked_3617507.html.

[57] Oswego County, Index No. ECF 2020–1376, dated February 1, 2021 at 2.

71.     Following the 2020 election, state lawmakers initiated investigations and audits of the results, often directing particular attention to Dominion's voting systems.

a.     Congressman Paul Gosar called for a special session of the Arizona legislature to investigate the accuracy and reliability of the Dominion ballot software.[58] On January 27, 2021, the Maricopa County, Arizona Board of Supervisors voted unanimously to approve an audit of the 2020 election results and a forensic audit of Dominion's voting machines.[59] The Arizona senate hired a team of forensic auditors consisting of four companies to review Maricopa's election process.[60] A week later, attorneys sent each of those four companies a threatening cease–and–desist letter, improperly attempting to influence the reviews.[61] The audit began in April 2021 and, despite nearly-continuous efforts by left-minded litigants and certain Maricopa County officials to thwart it, concluded in September 2021.

b.     In the Michigan case of *Bailey v. Antrim County*, Cyber Ninjas and CyFir found Dominion voting machines are connected to the internet, either by Wi-Fi or a LAN wire; there are multiple ways election results could be modified and leave no trace; and the same problems have been around for 10 years or more.[62]

c.     In that same case, forensic analysts gained access to the Dominion voting machines used in the November 2020 election and determined the following:

i.     "The system intentionally generates an enormously high number of ballot errors . . . The intentional errors lead to bulk adjudication of ballots with no oversight, no transparency, and no audit trail."

---

[58] Hannah Bleau, *Rep. Paul Gosar Calls on Arizona Officials to 'Investigate the Accuracy' of the Dominion Ballot Software After Reports of 'Glitches,'* Breitbart, Nov. 7, 2020, https://www.breitbart.com/politics/2020/11/07/rep–gosar–calls–on–az–officials–investigate–the–accuracy–of–the–dominion–ballot–software–after–reports–of–glitches/.

[59] AUDITING ELECTIONS EQUIPMENT IN MARICOPA COUNTY, https://www.maricopa.gov/5681/Elections–Equipment–Audit (last visited Sep. 2, 2021).

[60] Press Release, Arizona State Senate, Arizona Senate hires auditor to review 2020 election in Maricopa County (Mar. 31, 2021) (on file with author) (Ex. 23).

[61] Letter from Sara Chimene–Weiss, James E. Barton II, Roopali H. Desai, and Sarah R. Gonski to Cyber Ninjas, CyFir, Digital Discovery, and Wake Technology Services (Apr. 6, 2021) (Ex. 24).

[62] Pl.'s Collective Resp. to Defs.' and Non–Party Counties' Mots. to Quash and for Protective Orders at Exs. 7–8 (April 9, 2021), Bailey v. Antrim County (No. 20–9238).

ii.  "[T]he computer system shows vote adjudication logs for prior years; but all adjudication log entries for the 2020 election cycle are missing . . . Removal of these files violates state law."

iii.  "[A]ll" server security logs prior to 11:03 pm on November 4, 2020 are missing.  This means that all security logs for the day after the election, on election day, and prior to election day are gone . . . Other server logs before November 4, 2020 are present; therefore, there is no reasonable explanation for the security logs to be missing." [63]

d.  On April 12, 2021, New Hampshire Governor Christopher Sununu announced he had signed legislation appointing an audit of a Rockingham County race that relied upon Dominion voting machines after suspicious uniform shorting of vote tallies for four candidates was uncovered.

e.  On March 23, 2021, the Wisconsin Assembly ordered an investigation into the 2020 election.  Wisconsin uses Dominion voting machines.[64]

f.  Investigations into election irregularities are also ongoing in Pennsylvania and Georgia, states which also use Dominion voting machines.

Even the Biden administration has recently sanctioned Russia for election interference and hacking.[65]

72.  Lawmakers in the state of Pennsylvania recently launched a probe into election integrity and security and have sought sworn testimony from witnesses to voter irregularities and election improprieties.[66]  A spokesman for the Senate President Pro

---

[63] Allied Security Operations Group Revised Preliminary Summary v.2, Antrim Michigan Forensics Report, 12/13/2020, available at
 https://www.depernolaw.com/uploads/2/7/0/2/27029178/ex_8–9.pdf.

[64] Scott Bauer, *Wisconsin Assembly OKs investigation into 2020 election*, FOX6 NEWS MILWAUKEE, Mar. 23, 2020, https://www.fox6now.com/news/wisconsin–assembly–approves–election–investigation.

[65] *See, e.g.*, Truak, Natasha and Amanda Macias, "Biden administration slaps new sanctions on Russia for cyberattacks, election interference," Apr. 14, 2021, https://www.cnbc.com/2021/04/15/biden–administration–sanctions–russia–for–cyber–attacks–election–interference.html.

[66] *See* Penn. Republicans launch election audit, solicit testimony on "improprieties" REUTERS (Sep. 3, 2021).

Tempore of Pennsylvania stated the election probe "is to restore faith in the system by strengthening election security."[67] "That means conducting a thorough investigation that goes much, much further than the limited audits required by state law."[68] Yet, Plaintiffs cannot participate in this probe, despite their firsthand knowledge, because of Dominion's Lawfare campaign.

73.     Clearly, vigorous debate and investigations have been going on for years surrounding Dominion—its voting machines' vulnerabilities—and election integrity and security.  Yet, Plaintiffs, many of whom never mentioned Dominion, have been excluded from speaking openly about such a robust public debate because of Dominion, HPS, and Clare Locke's Lawfare campaign to intimidate and silence their First Amendment rights. For example, Plaintiffs cannot speak about:

- The Michigan Senate Report on the November 2020 Election in Michigan;[69]

- Problems with Dominion machines and software during the 2009 New York congressional election;

- Issues with Dominion machines and software in the 2010 Philippines general election;

- Judge Totenberg's decision in *Curling v. Raffensperger*, 493 F. Supp. 3d 1264 (N.D. Ga. 2020);

- The Texas Secretary of State's denial of certification for Dominion machines and software;

- NBC news or any others' reporting concerning voting machine's connectivity to the internet or election integrity and security;

---

[67] *Id.*

[68] *Id.*

[69] *See* https://misenategopcdn.s3.us-east-1.amazonaws.com/99/doccuments/20210623/SMPO_2020ElectionReport_2.pdf.

- The Robert Mueller report regarding hacking of election software;

- The Brennan Center for Justice's report regarding voting machines changing votes;

- The HBO Documentary *Kill Chain: The Cyber War on America's Elections*;

- Maricopa County, Arizona's investigation into election integrity and security or any other county's similar investigation;

- The Biden Administration's sanctioning of Russia for election interference and hacking; and/or

- Dominion's lawsuits against Sidney Powell, Rudy Giuliani, Mike Lindell, MyPillow, Fox News, Newsmax, One America News Network, and Patrick Byrne, let alone potentially testify in any of these matters.

For no justifiable reason, Plaintiffs have been threatened not to take any further part in the national debate concerning these topics and election integrity more generally because of Dominion, HPS, and Clare Locke's Lawfare campaign. Such Lawfare should not and cannot be tolerated in a free and open society.

### D.
### Plaintiffs' Alleged Defamation of Dominion

74. Dominion and Clare Locke completely failed to identify even one supposedly defamatory statement in their Letters to Plaintiffs demanding a retraction. That is because Dominion, HPS, and Clare Locke's strategy has never actually been aimed at stopping defamation. To the contrary, what Dominion, HPS, and Clare Locke actually sought to accomplish by their Letters was to "defend democracy" by creating a national environment of intimidation and fear regarding concerns about the 2020 General Election and about election integrity and security generally, such that anyone who watched the news or was a part of the public debate on these topics would self-regulate and censor their own legitimate speech for fear of drawing a billion-dollar lawsuit.

75.     If Dominion, HPS, and Clare Locke were genuinely concerned with potential defamation, then why the standard, boilerplate language in every Letter?   For example, the boilerplate language stated, in pertinent part:

> Dear Ms. Cooper,
>
> Our firm is defamation counsel for US Dominion Inc. We write to you regarding the ongoing misinformation campaigns falsely accusing Dominion of somehow rigging or otherwise improperly influencing the outcome of the November 2020 U.S. presidential election. ***In recent days we sent letters to Sydney Powell and various media entities*** demanding retraction of their myriad defamatory and conspiratorial claims about Dominion.
>
> Dominion is prepared to defend its good name and set the record straight. ***Litigation regarding these issues is imminent.  This letter is your formal notice to cease and desist taking part in defaming Dominion [FN2] and preserve all documents and communications that may be relevant to Dominion's pending legal claims***.

Ex. 2 (emphasis added).  Footnote 2 in the letter states "[f]or the avoidance of doubt, this is a retraction demand pursuant to relevant state statutes and applicable rules of court." What possible defamatory conduct did Ms. Cooper allegedly say against Dominion worthy of such an intimidating Letter threating "imminent" litigation?   Nothing.   Below is the affidavit of Ms. Cooper based on her firsthand knowledge of issues she witnessed as a poll challenger in Michigan, none of which included Dominion:

**AFFIDAVIT OF JENNIFER LINDSEY COOPER**

Jennifer Lindsey Cooper, being sworn, declares under penalty of perjury:

1.      I am personally familiar with the facts stated in this Affidavit and, if sworn as a witness, am competent to testify to them as well.

2.      I am a registered voter in the State of Michigan.

3.      For the 2020 General Election I was hired and trained as an election worker for Waterford Township Michigan.  I was trained for all counting positions, but was assigned to be an absentee ballot counter, including military ballots.

4.      I worked as an election worker counting absentee and military ballots from 7:00am on November 3, 2020 to 12:30am on November 4, 2020 in Waterford Township.  I encountered no issues during this time, but gained experience in the ballot counting process.

5.      From my experience and training, military ballots are processed and counted in the following manner: The envelope is opened and contains a letter from the military voter and a copy of a ballot on plain paper that is filled in by the military voter.  These are checked and then the voter's votes are transferred to a blank ballot to be counted. This process is done one ballot at a time.  One Republican and one Democrat election worker are supposed to be present for this process.

6.      On November 4, 2020 I was a Republican challenger for ballot counting at the TCF Center in Detroit, Michigan. I arrived at approximately 10:00am.

7.      I observed Table 16 in the TCF center. I observed an election worker collect approximately five to seven blank ballots and bring them to the table.  The election worker left these blank ballots sitting on the table for approximately five minutes

- 1 -

before placing them in a box marked "problem ballots." I challenged the election worker as to what she was doing with the blank ballots. In response the election worker moved the blank ballots and placed them underneath what looked like a poll book. The election worker responded to me that she was waiting for her supervisor to "do military ballots."

8.  Approximately fifteen minutes after I challenged her, the election worker was joined by two more election workers. One of the election workers began to read from a standard ballot, not a military ballot, that she had pulled from a stack of other standard ballots. This ballot did not appear to be a military ballot in anyway. There was no outside packaging, there was no military letter, and it was a standard ballot, not the type of ballot returned from military voters.

9.  I then saw two more blank ballots filled out in the same manner described in paragraph 8. A standard ballot that did not appear to be a military ballot was read off and a blank ballot was filled in.

10. All of the ballots that I observed filled out in this way contained votes for Joe Biden for President.

11. I further observed that many blank ballots were transferred between tables at a time. They were picked up in large batches and not counted. There was no recording of the chain of custody of these blank ballots. Blank ballots were tucked underneath things, shuffled into boxes labeled "problem ballots" and not tracked.

12. As I attempted to challenge this process I was harassed by Democrat challengers. I was told "go back to the suburbs Karen" and other harassing statements. The Democrat challengers would say things like "Do you feel safe with this women near

- 2 -

- 3 -

you" and "is this Karen bothering you?" I believe this was designed to intimidate me

and obstruct me from observing and challenging.

Dated: November 9, 2020

_J L Cooper_
[signature]

[Print name]

_JenNIFER LiNDSEy/CoOpER_
_11/09/2020_

Subscribed and sworn to before me on: 11/9/2020

_Kimberly Matson_
Notary public, State of Michigan, County of: Wayne

My commission expires:

9/2/2024

```
┌─────────────────────────────────────┐
│        Kimberly Joi Matson           │
│  Notary Public - State of Michigan   │
│           County of Wayne            │
│  My Commission Expires 9/2/2024      │
│  Acting in the County of Wayne       │
└─────────────────────────────────────┘
```

- 3 -

Clearly, Ms. Cooper did not defame Dominion.  Nor is Ms. Cooper aware of making any other statement that Dominion, HPS, and Clare Locke could possibly consider defamatory.  Yet, she received a Letter from Dominion threatening "imminent" litigation—a clear threat that she must stop speaking immediately about election integrity, irregularities, and potential fraud, as well as retract her unspecified "defamatory" statements.  Ms. Cooper has been intimidated because of Dominion, HPS, and Clare Locke's Lawfare campaign.

76.     As an additional example, Mr. Dixon received an identical threatening Letter promising "imminent" litigation from Dominion and Clare Locke.  What was Mr. Dixon's alleged defamatory conduct?  Again, nothing.

State of MI

EUGENE G. DIXON

Affidavit

I, Eugene Dixon, a registered voter ████████████████████████, MI,

At Appx. 1 pm. I observed two ballots being duplicated at Icc# 11, 51 Inspector did not know party affiliation at table and the two ballots were duplicated by 3 people who initialed the 2 original ballots and placed them in the manila envelope. The new ballots were then placed in the tray for Tabulating.

Eugene Dixon
Nov, 3, 2020

Susan L. Mills, Notary Public
Susan L Mills
Exp. October 27, 2025

51

Just as with Ms. Cooper's affidavit, Mr. Dixon said nothing related to Dominion.  Mr. Dixon was simply testifying regarding election integrity and irregularities.  The pattern is similar for all Plaintiffs.  Plaintiffs state their observations and concerns over election integrity and security, like so many others discussed above, and they receive Letters threatening lawsuits from Dominion and Clare Locke.  Clearly, Plaintiffs' right to freedom of expression has been chilled by Dominion, HPS, and Clare Locke's Lawfare campaign.

**E.**
**Dominion Uses Lawfare to Silence and Intimidate Everyone,**
**Not Just Plaintiffs; Creating a National Culture of Intimidation and Fear**

77.     Not only has Dominion filed billion–dollar defamation lawsuits against several Americans, even more egregiously, they have used Lawfare to stifle the very foundation of an open and free society—the press.  Dominion has filed a $1.6 billion lawsuit against Fox News.  Dominion has filed a $1.73 billion lawsuit against One America News Network.  And Dominion has filed a $1.73 billion lawsuit against Newsmax Media, Inc.  All of these cases are prominently showcased on Dominion's website.



Dominion's exaggerated lawsuits are only superficially about recovering damages. Their primary purpose is strategic, with the principal goal of these suits being to intimidate those who exercise their right to free speech about concerns regarding the 2020 General

---

[70] https://www.dominionvoting.com/.

[71] https://www.dominionvoting.com/legal-updates-learn-how-we-are-defending-dominion/.

Election and regarding election integrity and security of electronic voting systems. Dominion's willingness to sue news networks reporting newsworthy coverage regarding election integrity and security demonstrates that Dominion is seeking to silence anyone, including Plaintiffs, the Class, and *every American*.

78.     Dominion's Lawfare campaign appears to only be just beginning.  In a Forbes article released on August 10, 2021, attorneys for Dominion stated they were "still exploring options" as to how to "hold others accountable," including but not limited to several individuals close to President Trump and potentially Trump himself.[72]   According to Forbes, the company has "not ruled out other parties."[73]

79.     Dominion, HPS, and Clare Locke's Lawfare campaign to date includes:

a.     At least 150 Letters, threatening the recipients with legal action. Some of these Letters include copies of Dominion's legal papers in its lawsuits.  The clear message of these Letters is that anyone who comments publicly about Dominion or the election generally will be ruined.

b.     Threatening Letters to numerous individuals, in addition to the Plaintiffs, who signed sworn affidavits that were used in litigation about the election process. In many cases, the poll watchers' affidavits did not include any statement about Dominion or the election.  But the Lawfare campaign is total; it seeks to deter *any public expression* questioning the 2020 election. Dominion's clear, even if implicit, threats that it will sue witnesses who testify about election irregularities or fraud do not threaten just the individual witnesses; it threatens the integrity of the justice system as a whole.

c.     In another instance, Dominion sent an intimidating letter to *the uncle* of an attorney involved in litigation about the 2020 election.  The uncle himself had no connection to his nephew's litigation efforts, but for the circumstance of being related to someone who was investigating Dominion and the election.   Nonetheless, Dominion accused the uncle of

---

[72] https://www.forbes.com/sites/alisondurkee/2021/08/10/after-lawsuits-against-newsmax-and-oann-heres-who-dominion-has-sued-so-far-and-who-could-be-next/?sh=3480e299510e.

[73] *Id.*

disseminating misinformation and making false accusations. Its letter threatened that "Litigation regarding these issues is imminent." Threatening family members is a tactic usually associated with criminal enterprises, not allegedly reputable private corporations and especially not with the State.

d.      Another individual, an actuary, performed statistical analyses of certain 2020 election returns, inquiring whether the presence of Dominion voting machines affected election outcomes.  He found non-random differences in counties that used Dominion machines. He shared these findings publicly. Dominion mailed him a box, pictured below, full of legal papers, which included lawsuits filed against other citizens along with a threatening cease and desist letter.  As a result of speaking out, the actuary lost business.



80.      To further amplify the impact of its Letters and exaggerated lawsuits, Dominion and HPS has widely publicized them, seeking to ensure that everyone—not just the recipients of its Letters—knows they will be punished with Lawfare if they exercise their First Amendment rights to speak against Dominion or about concerns over the conduct of the 2020 General Election generally, and anyone could be the next victim of a Dominion billion-dollar lawsuit.  For example:

a.      In a nationally televised interview, Dominion CEO John Poulos announced, **"Our legal team is looking at frankly everyone, and we're not**

**ruling anybody out.**" He said Dominion's previous lawsuit was "definitely not the last lawsuit" it would be filing.



    b.    Dominion's website prominently displays its lawsuits and statements from its own attorneys, even ahead of its own products.  The website boasts, "Dominion has sent preservation request letters[74] to Powell, Giuliani, Fox, OAN, and Newsmax, as well as more than 150 other individuals and news organizations.  Stay tuned to this page for updates."

    81.    The life disruption and substantial expense threatened by the prospect of having to defend against a defamation litigation brought by powerful corporations that are also effectively governmental actors (like Dominion) has a predictable and enormous chilling effect on the speech of any reasonable person.  Dominion has issued a general threat to all ("Our legal team is looking at frankly everyone, and we're not ruling anybody out") and has sharpened that threat by delivering Letters to specific individuals ("litigation regarding these issues is imminent")—sometimes accompanied by copies of

---

[74] Dominion has attempted to mischaracterize the Letters as "preservation" letters, which they are not.  The Letters begin by prominently stating "Litigation regarding these issues is imminent. This letter is your formal notice to cease and desist taking part in defaming Dominion . . .," then it points to the footnote regarding retraction, and finally discusses evidence preservation.  Dominion's characterization of the Letters as "preservation requests" is disingenuous, as the Letters are clearly extortionate and transparently intended to threaten the recipients into silence.

lawsuits Dominion had already filed against others.  Dominion is also actually suing several individuals and the press for billions of dollars.

82.     Through its Lawfare campaign, Dominion has likely accomplished its goal of silencing discussion regarding election integrity and security tied to the November 2020 election.  News networks and individuals alike, including Plaintiffs, are self-regulating their speech for fear of a billion–dollar lawsuit.  Dominion's use of Lawfare tears at the fabric of our constitutional order.  The scheme has already started to cripple our system's ability to ferret out and discuss these issues.  And it has cut a wide hole in the First Amendment.

83.     Dominion, HPS, and Clare Locke aggressively pushed a narrative that there should be no concern regarding the integrity and security of the election.  Dominion took equally aggressive action to demand no criticism.  In response to Plaintiffs' exercise of their First Amendment free speech rights, Dominion, HPS, and Clare Locke launched their Lawfare campaign against Plaintiffs and hundreds of others.  By design, Dominion, HPS, and Clare Locke's campaign not only chilled Plaintiffs' speech, but also chilled the speech of many others that received a Letter, including potentially thousands of poll watchers, new media reporters and bloggers, and others.  The campaign has also chilled potential witnesses to irregularities in jurisdictions where Dominion served as a state actor by virtue of its role in administering and conducting the 2020 election.  Dominion, HPS, and Clare Locke conspired in this wrongful scheme because their purpose is to deter fundamentally important constitutionally-protected activity—free expression by the People about a particular matter of public concern.

84.     Plaintiffs and the Class are victims of this conspiracy and enterprise by state-actor Dominion, HPS, and Clare Locke to silence them by abusing the litigation process.  Plaintiffs and the Class are entitled to recover their actual and special damages from Dominion for their collective role in the conspiracy and enterprise to harm them.

85.     In the context of election integrity—so crucial to the functioning and survival of a democratic form of government—no litigant should be able to weaponize the courts and the litigation process at a mass scale to stifle public debate.  Freedom of speech is constrained by the law of defamation, but the fact that Dominion is threatening people like Plaintiffs who have plainly not defamed Dominion reveals what is really happening.  Through their joint enterprise to suppress certain viewpoints in the country's political debate about the integrity of the 2020 election, Dominion, HPS, and Clare Locke are deliberately and abusively threatening to invoke the right to petition the government on the pretext of defamation in order to eliminate any exercise of the right to free speech on an issue of fundamental public importance.  Plaintiffs and the Class have been harmed as a result and bring this suit to recover for that harm.

86.     In short, Plaintiffs bring this lawsuit to put an end to Dominion, HPS, and Clare Locke's campaign of Lawfare against those who speak about election integrity and security, particularly with regard to the 2020 election.  Plaintiffs' claims rise above any prerogative that Dominion may assert to wage their Lawfare campaign by promiscuously threatening litigation, because the law of defamation does not and should not immunize state–actors from weaponizing the judicial system and the litigation process to silence dissent, unpopular beliefs, or facts inconveniently out-of-line with mainstream opinion.

58

## IV.
## CLASS ACTION ALLEGATIONS

87.     Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on behalf of the following **Nationwide Class**: All persons who received Letters from non–party co–conspirator Clare Locke on behalf of their client, Dominion, from November 4, 2020 to the present (the "Class").   Excluded from the Class are Defendants, Defendants' employees, and Defendants' subsidiaries.  Also excluded from the Class are those persons who, as of the date of this Complaint, are in pending litigation with affirmative claims against Dominion.  This Class Definition may be amended or modified as warranted by discovery or other activities in the case hereafter.

88.     **Numerosity**: The Class encompasses hundreds of individuals, which is so numerous that joinder of all members is impracticable.  The Class is ascertainable from Defendants' records.

89.     **Typicality**: Plaintiffs' claims are typical of the claims of the Class, because Plaintiffs and the members of the Class each received Letters demanding they preserve all communications and documents, including those of any purported agents, and threatening imminent litigation on the baseless claims that they had defamed Dominion, and were similarly damaged thereby.  Many Class Members who received these Letters from Dominion's counsel had never even publicly mentioned Dominion.  Dominion's purpose in this widespread scorched earth campaign is to intimidate and suppress anyone who might speak out about Dominion and election fraud in violation of, *inter alia*, the

First Amendment.  Plaintiffs and the other members of the Class also share the same interest in preventing Defendants from engaging in such activity in the future.

90.   **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class.  Plaintiffs have retained counsel competent and experienced in class and consumer litigation and have no conflict of interest with other members of the Class in the maintenance of this class action.   Plaintiffs will vigorously pursue the claims of the Class.

91.   **Existence and Predominance of Common Questions of Fact and Law**: This case presents many common questions of law and fact that will predominate over questions affecting members of the Class only as individuals. The damages sustained by Plaintiff and the Class's members flow from the common nucleus of operative facts surrounding Defendants' misconduct.  The common questions include, but are not limited to:

    a.   Whether Defendants engaged in a campaign to illegally intimidate individuals—including witnesses who filed declarations in federal court—from speaking out about election fraud in the November 2020 election or from being witnesses to pending litigation.

    b.   Whether Defendants or their agents pursued a uniform practice to intimidate and suppress free speech though the improper practice of Lawfare by sending hundreds of baseless Letters to silence speech and ideas Dominion deems unacceptable to their narrative.

    c.   Whether Plaintiffs and Class members are entitled to monetary damages or injunctive relief and/or other remedies and, if so, the nature of any such relief.

92.   **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is

impracticable. Furthermore, because the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the members of the Class to individually seek redress from the wrongs done to them. Plaintiffs believe that members of the Class, to the extent they are aware of their rights against Defendants, would be unable to secure counsel to litigate their claims individually because of the relatively limited nature of the individual damages, and thus, a class action is the only feasible means of recovery for these individuals. Even if members of the Class could afford such individual litigation, the court system could not efficiently handle all of these cases. Individual litigation would pose a high likelihood of inconsistent and contradictory judgments. Further, individualized litigation would increase the delay and expense to all parties and the court system, due to the complex legal and factual issues presented by this dispute. In contrast, the class action procedure presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. This action presents no difficulties in management that would preclude its maintenance as a class action.

93.     In addition, or in the alternative, the Class may be certified because:

a.      The prosecution of separate actions by individual members of the Class would create a risk of adjudications regarding them which would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications, or substantially impair or impede the ability to protect their interests; and

b.      Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate final and injunctive relief regarding the Class.

# V.
## CAUSES OF ACTION

94.     The facts alleged above and to be proven at trial demonstrate that Plaintiffs are entitled to recover damages and other relief against the various Dominion entities in this case on one or more theories and causes of action as set out below:

### COUNT I:
### VIOLATIONS OF THE RACKETEER INFLUENCED
### AND CORRUPT ORGANIZATION ACT, 18 U.S.C. § 1962

95.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth verbatim below.

96.     Pleading further and in the alternative, the facts set forth herein and to be proven at trial demonstrate that Plaintiffs are entitled to recovery under 18 U.S.C. §1964 against the Defendants for violations of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §1962.

97.     To establish a civil RICO claim, the plaintiff must show that the defendant engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, and that he (5) sustained an injury to business or property (6) that was caused by the RICO violation.

98.     An "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.  An "association–in–fact" enterprise does not require a formal structure such as a hierarchical chain–of–command, fixed roles for members, a name, regular meetings, or established rules and regulations.  To establish an enterprise, the plaintiff must show (1) a common purpose, (2) relationships among those associated

with the enterprise, and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

99.   The facts alleged above and to be proven at trial demonstrate that Dominion was the controlling person of the enterprise, with the assistance and participation of non–party co–conspirators HPS and Clare Locke, and those unknown individuals working with them, constituted an association–in–fact enterprise ("the Dominion Enterprise") having the common purpose of suppressing speech, dissent, and intimidating potential witnesses.  Further, in carrying out their conduct described in this Complaint, Clare Locke and HPS have not acted merely as agents or instruments of Dominion, but have instead acted as independent entities whose conduct, under the circumstances, rises to the level of active participation in Dominion's wrongdoing.

100.   The facts alleged above and to be proven at trial demonstrate that the Dominion Enterprise was at all relevant times engaged in the production, distribution, or acquisition of goods or services in interstate commerce.  Specifically, the Dominion entities' principal place of business is in Colorado, but Dominion provides voting machines to twenty–eight different states, and hired HPS and issued along with Clare Locke written threats to those speaking out about election integrity and security in numerous states beyond the borders of the State of Colorado.

101.   The facts alleged above and to be proven at trial further demonstrate that the Dominion Enterprise has engaged in numerous related acts of racketeering activity that amount to or pose a threat of continued criminal activity.  Specifically, the Dominion Enterprise has issued—according to Dominion's own boasting on its website—over 150

"cease and desist" Letters threatening companies and individuals (including family members of those who have spoken publicly against the voting machines, who have not themselves spoken publicly about them). Those Letters threaten the recipients with ruinous litigation unless the recipients recant unspecified statements and cease further public expression regarding election integrity and security or evidence of fraud related to the 2020 Presidential Election in certain jurisdictions. These threats constitute extortion, witness intimidation, witness retaliation, witness tampering, and mail fraud for purposes of establishing the requisite "predicate acts" for a civil RICO claim.

102.    Under 18 U.S.C. § 1512(b), a person who:

Knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

(1) influence, delay, or prevent the testimony of any person in an official proceeding;

(2) cause or induce any person to--

(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

(B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

(C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

(D) be absent from an official proceeding to which such person has been summoned by legal process; or

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of

probation supervised release, parole, or release pending judicial proceedings;

shall be fined under this title or imprisoned not more than 20 years, or both.

Under 18 U.S.C. § 1512(d):

(d) Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from--

(1) attending or testifying in an official proceeding;

(2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation1 supervised release,,2 parole, or release pending judicial proceedings;

(3) arresting or seeking the arrest of another person in connection with a Federal offense; or

(4) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding;

or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both.

Here, the Dominion Enterprise has violated 18 U.S.C. § 1512 and related Michigan and Colorado law through its illegal Lawfare campaign. *See also* 18 U.S.C.A. § 1961.

103.    These Letters and threats constitute a "pattern" for purposes of a civil RICO claim because the Dominion Enterprise has made them continuously since shortly after the 2020 Presidential Election, and it continues to issue new extortionate threats and Letters to additional recipients to this day, with no apparent end in sight to the pattern of

racketeering activity.  In fact, Dominion's attorneys stated as recently as August 10, 2021 that they have not ruled out bringing additional lawsuits.

104.    Plaintiffs have suffered actual injury as a result of the Dominion Enterprise's actions in furtherance of its racketeering conspiracy and activities, for which they are entitled to recovery against those defendants, jointly and severally, together with treble damages as allowed by law, as well as attorney's fees, and for which they now bring this suit.

**COUNT II:**
**42 U.S.C. § 1983 DEPRIVATION OF**
**EQUAL PROTECTION BY DOMINION'S STATE-ACTION**

105.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth verbatim below.

106.    Pleading further and in the alternative, the facts set forth herein and to be proven at trial demonstrate that Plaintiffs are entitled to recovery under 42 U.S.C. §1983 against Defendants, jointly and severally, for violation of Plaintiffs' rights under the First Amendment, the Fourteen Amendment, and Equal Protection Clause of the United States Constitution.

107.    At all relevant times, Dominion committed state-action in connection with the 2020 Presidential Election.  Specifically, a private party is committing state-action when the state has delegated to that private entity a function traditionally, exclusively reserved to the State or when the State has outsourced one of its Constitutional obligations to the private entity.  Administering elections of public officials is one such function and a Constitutional duty required of States, and the facts alleged above and to be proven at trial will demonstrate that Dominion was administering elections in

numerous jurisdictions throughout and across the United States, the results of whose local 2020 presidential voting significantly and materially impacted the outcome of the 2020 Presidential Election nationally.

108.    To establish a § 1983 claim, a plaintiff must show that (1) he has Article III standing to bring the claim, (2) a right secured by the Constitution or laws of the United States was violated, and (3) the alleged violation was committed by a person acting under the color of state law.  *Parratt v. Taylor,* 451 U.S. 527, 535 (1981), overruled in part on other grounds by *Daniels v. Williams,* 474 U.S. 327, 330–31 (1986).  Said another way, a plaintiff must show that the private entity was a state actor because it was exercising a function traditionally, exclusively reserved to the State, *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1926 (2019) (citing *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352 (1974)), or because the State outsourced its constitutional obligations to a private entity, *West v. Atkins*, 487 U.S. 42 (1988).

109.    To establish a violation of the Equal Protection Clause under 42 U.S.C. § 1983, the plaintiff must show state-action that inherently favors or disfavors a particular group of voters.  The facts alleged above and to be proven at trial will demonstrate that Dominion committed state–action by engaging in invidious discrimination or intentional misconduct to the detriment of Plaintiffs and others of their same class of voter. Specifically, Dominion, acting under color of state law as a private corporation authorized and employed by various states to perform the essential state function of administering and conducting the 2020 Presidential Election, have attempted through the use of the courts and the litigation process to suppress Plaintiffs' freedom of speech.  In doing so,

Dominion disfavored the conservative political viewpoint of Plaintiffs over those of left–leaning or Democrat–supporting individuals *who also publicized the role of Dominion voting machines in election fraud and election tampering*.  A state actor like Dominion cannot engage in viewpoint–based discrimination in attempting to suppress a private citizen's exercise of its First Amendment right to free speech, and in doing so, Dominion unlawfully deprived Plaintiffs of a legally protected interest in violation of 42 U.S.C. § 1983.

**COUNT III:**
**42 U.S.C. § 1983 DEPRIVATION**
**OF FIRST AMENDMENT BY DOMINION'S STATE-ACTION**

110.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth verbatim below.

111.    Pleading further and in the alternative, the facts set forth herein and to be proven at trial demonstrate that Plaintiffs are entitled to recovery under 42 U.S.C. §1983 against Defendants, jointly and severally, for violation of Plaintiffs' rights under the First Amendment, the Fourteen Amendment, and Equal Protection Clause of the United States Constitution.

112.    At all relevant times, Dominion committed state-action in connection with the 2020 Presidential Election.  Specifically, a private party is committing state-action when the state has delegated to that private entity a function traditionally, exclusively reserved to the State or when the State has outsourced one of its Constitutional obligations to the private entity.  Administering elections of public officials is one such function and a Constitutional duty required of States, and the facts alleged above and to be proven at trial will demonstrate that Dominion was administering elections in

numerous jurisdictions throughout and across the United States, the results of whose local 2020 presidential voting significantly and materially impacted the outcome of the 2020 Presidential Election nationally.

113.    To establish a § 1983 claim, a plaintiff must show that (1) he has Article III standing to bring the claim, (2) a right secured by the Constitution or laws of the United States was violated, and (3) the alleged violation was committed by a person acting under the color of state law.  *Parratt v. Taylor,* 451 U.S. 527, 535 (1981), overruled in part on other grounds by *Daniels v. Williams,* 474 U.S. 327, 330–31 (1986).  Said another way, a plaintiff must show that the private entity was a state actor because it was exercising a function traditionally, exclusively reserved to the State, *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1926 (2019) (citing *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352 (1974)), or because the State outsourced its constitutional obligations to a private entity, *West v. Atkins*, 487 U.S. 42 (1988).

114.    It is well settled that the First Amendment prohibits the government from subjecting an individual to retaliatory actions for their speech.  *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)).  As the Supreme Court has noted, "[o]fficial reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'"  *Id.* (quoting *Crawford–El v. Britton*, 523 U.S. 574, 588, n. 10 (1998)).  The facts alleged above and to be proven at trial will demonstrate that Dominion committed state-action and engaged in First Amendment retaliation by sending hundreds of Letters and waging Lawfare against Plaintiffs and members of the Class for their constitutionally protected speech concerning

election integrity and security and Dominion's role in the November 2020 General Election.

### COUNT IV:
### CIVIL CONSPIRACY

115.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth verbatim below.

116.    Pleading further and in the alternative, the facts set forth herein and to be proven at trial demonstrate that Plaintiffs are entitled to recovery for common law civil conspiracy against Dominion, jointly and severally, for their collusion and agreement to the common objective or course of action, acting under color of state law, to deprive Plaintiffs of their constitutional rights under the First Amendment, and their overt acts in connection with that common purpose.

117.    To establish a civil conspiracy, plaintiffs must show five elements: (1) two or more persons, a corporation is a person; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action to be taken; (4) one or more unlawful overt acts; and (5) damages as the proximate result of the conspiracy. *See Walker v. Van Laningham*, 148 P.3d 391, 396 (Colo. App. 2006).

118.    The facts set out above and to be proven at trial will establish that Dominion collectively, with the assistance and participation of non–party co–conspirators HPS and Clare Locke, had a meeting of the minds on the object or course of action of depriving Plaintiffs of their Constitutional rights under the First Amendment, while committing state–action.  The facts will further establish that Defendants committed one or more

wrongful overt acts, including but not limited to the following, in furtherance of this common objective or course of action:

    a.    Engaging in a campaign of abuse of process threatening Plaintiffs not for the pretextual purpose of vindicating any legitimate right or grievance but for the primary purpose of intimidating Plaintiffs into silencing their political speech in opposition to Defendants' point of view.

    b.    As a state actor depriving Plaintiffs of their rights under the First Amendment and their rights of equal protection and due process by threatening sham and potentially ruinous litigation against Plaintiffs based upon their political viewpoint and the content of their speech, in violation of 42 U.S.C. §1983.

The facts will further establish that Plaintiffs have suffered actual damages as a proximate cause of Defendants, HPS, and Clare Locke's agreement and wrongful overt acts.

## VI.
## CONDITIONS PRECEDENT

119.    All conditions precedent to Plaintiffs bringing and maintaining this action have been satisfied or waived.

## VII.
## JURY DEMAND

120.    Plaintiffs respectfully requests trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask that Defendants be cited to answer and appear herein and that, after trial or other hearing on the merits, Plaintiffs and the Class have and recover against the Defendants, jointly and severally, the relief requested herein, together with all writs and processes necessary to the enforcement of same, and all other relief to which they may show themselves justly entitled, including but not limited to:

    a.    Actual and special damages as allowed by law, in an amount to be proven at trial, including but not limited to the following:

      i.    Damages to be determined by the trier of fact suffered as a result of the deprivation of their rights under the First Amendment to the U.S. Constitution; together with,

b.    Three times actual damages for violations of 18 U.S.C. §1962;

c.    Punitive damages as allowed by law, in an amount to be determined by the trier of fact;

d.    Reasonable and necessary attorney's fees, as allowed by law; and,

e.    Costs of suit.

DATED: September 30, 2021

Respectfully submitted,

ROBERT MCGUIRE LAW FIRM

*/s/ Robert A. McGuire, III*
Robert A. McGuire, III
Colorado Reg. No. 37134
ram@lawram.com
1624 Market St. Suite 226 No. 86685
Denver, Colorado 80202-2523
(720) 420-1395 (Telephone / Fax)

Douglas A. Daniels*
Texas State Bar No. 00793579
doug.daniels@dtlawyers.com
Heath A. Novosad*
Texas State Bar No. 24037199
heath.novosad@dtlawyers.com
J. Christopher Diamond*
Texas State Bar No. 00792459
chris.diamond@dtlawyers.com
DANIELS & TREDENNICK PLLC
6363 Woodway Drive, Suite 700
Houston, Texas 77057
(713) 917-0024 (Telephone)
(713) 917-0026 (Facsimile)

Kurt B. Olsen*
DC Bar No. 445279
ko@olsenlawpc.com

OLSEN LAW, P.C.
1250 Connecticut Avenue, NW, Suite 700
Washington, D.C. 20036
(202) 408-7025 (Telephone)
(202) 261-3508 (Facsimile)

*Admission Application Pending

***Counsel for Plaintiffs***

Alan Dershowitz
Massachusetts Bar No. 121200
1575 Massachusetts Avenue
Cambridge, Massachusetts 02138

***Of Counsel for Plaintiffs***

Plaintiffs Addresses:

Jennifer L. Cooper
Waterford, Michigan

Eugene Dixon
Bloomfield Hills, Michigan

Francis J. Cizmar
Troy, Michigan

Anna Pennala
Brighton, Michigan

Kathleen Daavettila
Fowlerville, Michigan

Cynthia Brunell
Livonia, Michigan

Karyn Chopjian
Novi, Michigan

Abbie Helminen
Howell, Michigan