**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. Case 1:21-cv-02672-STV

JENNIFER L. COOPER, EUGENE DIXON, FRANCIS J. CIZMAR, ANNA PENNALA,
KATHLEEN DAAVETTILA, CYNTHIA BRUNELL, KARYN CHOPJIAN, AND ABBIE
HELMINEN, INDIVIDUALLY, AND ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

              Plaintiffs,

v.

US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., DOMINION VOTING
SYSTEMS CORPORATION, and HAMILTON PLACE STRATEGIES, LLC,

              Defendants.

---

**DOMINION'S MOTION TO DISMISS
THE FIRST AMENDED CLASS ACTION COMPLAINT**

---

Pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure, Defendants

US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation

(collectively, "Dominion"), by and through their undersigned counsel, respectfully move to

dismiss this case, and in support, state as follows:

## INTRODUCTION

This case seeks retribution against Dominion for defending itself against defamatory

statements made following the 2020 election.  Plaintiffs, all eight of whom are Michigan

residents, were poll watchers and/or challengers at the TCF Center in Detroit during the election.

(Am. Compl., ¶¶ 16–28.)  After the election, they signed affidavits that were used as exhibits to

complaints challenging the 2020 elections results.  (*See, e.g.*, Exs. A–B (complaints attaching

Plaintiffs' affidavits as exhibits).)  These lawsuits were meritless.  In fact, in its order sanctioning attorney Sidney Powell and others, the U.S. District Court in Michigan characterized one of the very "Kraken" lawsuits that attached Plaintiffs' affidavits as exhibits to the complaints as "a historic and profound abuse of the judicial process."  *King v. Whitmer*, No. 20-13134, 2021 WL 3771875, at *1 (E.D. Mich. Aug. 25, 2021).  By submitting these affidavits used in support of Ms. Powell's sham litigation, Plaintiffs were active participants in a disinformation campaign that deceived millions into thinking Dominion had stolen their vote and rigged the election.

Plaintiffs' evident connection to those spreading falsehoods prompted Dominion's defamation counsel, Clare Locke LLP ("Clare Locke"), to send them document preservation letters.  (*See* Am. Compl., Ex. 2, ¶¶ 16–28.)  Dominion has a right to defend itself against defamation, and it has a right to ensure evidence is preserved.

Plaintiffs nevertheless turn Dominion's actions on their head.  In this lawsuit, they are suing Dominion for pursuing defamation litigation against others under the facially absurd theories that Dominion, by sending document preservation letters, somehow committed illegal racketeering and civil conspiracy, and violated their constitutional rights.  They even attach to the First Amended Class Action Complaint (the "Amended Complaint") the very affidavits that purported to be "evidence" in the failed "Kraken" litigation.  (*See id.*, Exs. 1, 3, 6–7, 9, 11, 13, 15.)  Plaintiffs' theories, if permitted, would undermine standard civil litigation practices and throw defamation law into chaos.  By definition, document preservation letters and other prelitigation correspondence do ***not*** initiate any legal action.  And they certainly are not criminal. Plaintiffs' theories nevertheless would give private individuals constitutional protection to defame private companies (and especially those that contract with the government), and would

arm these individuals with causes of action upon receipt of any prelitigation correspondence.

Given this lawsuit's spurious purpose, it is not surprising that Plaintiffs' four claims fail to state a claim for relief and are non-justiciable. For example, Plaintiffs attempt to plead a claim for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The allegations, however, fail to fit the intent of RICO and fall well short of satisfying any element of a RICO claim. Further, the constitutional claims are premised on the false theory that Dominion, a private company, acted as the government in sending the letters. The conspiracy claim likewise fails for many of the same reasons, as well as that Dominion cannot conspire with itself. This case is simply another meritless lawsuit in a long line of equally meritless lawsuits related to the 2020 election, including several where courts (including the District of Colorado) have imposed sanctions. The Amended Complaint must be dismissed in its entirety, with prejudice.[1]

## **BACKGROUND**

### I.   The 2020 Election

The 2020 election was the "most secure in American history."[2] The U.S. Justice Department found no evidence of widespread fraud that would have changed the outcome of the

---

[1] Although not addressed in this motion, even if this case was justiciable and Plaintiffs could state a claim for relief, the class allegations should be stricken under Rules 23(c)(1)(A) and 23(d)(1)(D) because, for example, common issues do not predominate. Not only are Plaintiffs' alleged damages unclear, but proving such diverse and personal damages as emotional distress and mental anguish will need to be assessed on an individual basis. Dominion reserves the right to move to strike the class allegations in a separate motion.

[2] *Joint statement from the Election Infrastructure Government Coordinating Council & the Election Infrastructure Sector Coordinating Executive Committees*, Cybersecurity & Infrastructure Security Agency (Nov. 12, 2020), *available at* https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election (concluding that "[t]here is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised").

2020 election.[3]  Audits and hand recounts of paper ballots have repeatedly confirmed the accuracy of Dominion's voting systems.[4]  Indeed, Plaintiffs' own affidavits include no allegations of issues involving Dominion's systems.  (*See id.*, Exs. 1, 3, 6–7, 9, 11, 14–15.)[5]

Yet, despite these facts, Plaintiffs channel MyPillow CEO Mike Lindell and accuse Dominion of engaging in "Lawfare" to stifle speech and debate regarding election security.  Just before this lawsuit was filed, Mr. Lindell announced that there would be a new class action lawsuit against Dominion filed on behalf of those who received letters from Dominion.[6]  This case, which recycles many of Mr. Lindell's talking points, appears to be it.

---

[3] *See, e.g.*, Katie Benner & Michael S. Schmidt, *Barr Acknowledges Justice Dept. Has Found No Widespread Voter Fraud,* N.Y. Times (Dec. 14, 2020), *available at* https://www.nytimes.com/2020/12/01/us/politics/william-barr-voter-fraud.html.

[4] *See, e.g.*, *Trump still wins small Michigan county after hand recount*, Assoc. Press (Dec. 17, 2020), *available at* https://apnews.com/article/election-2020-joe-biden-donald-trump-michigan-elections-07e52e643d682c8033a0f26b0d863387 (explaining that the audit found that the small number of additional votes for Trump was attributable to human error); *Georgia Secretary of State, Historic First Statewide Audit of Paper Ballots Upholds Result of Presidential Race*, *available at* https://sos.ga.gov/index.php/elections/historic_first_statewide_audit_of_paper_ballots_upholds_result_of_presidential_race; Final Audit Reports and Affirmations, Colo. Sec'y of State, *available at* https://www.sos.state.co.us/pubs/elections/RLA/files/2020/general/finalReports.html (last visited Oct. 8, 2021) (providing links to Risk Limiting Audits from Colorado counties that give a statistical level of confidence that the outcome of the 2020 election was correct); Casey Van Divier, *Wayne Williams Stands by Dominion Voting Systems Results . . . in Colorado*, Westword (Nov. 20, 2020), *available at* https://www.westword.com/news/former-secretary-of-state-defends-dominion-voting-systems-resultsin-colorado-11847518 (quoting former Colorado Secretary of State Wayne Williams, a Republican, stating: "Since its adoption, Dominion machines have been tested in 62 Colorado counties at least 807 times. They have passed every test."); Ben Giles, *The Discredited GOP Election Review In Arizona's Largest County Also Finds Biden Won*, NPR (Sept. 24, 2021), *available at* https://www.npr.org/2021/09/24/1040327483/the-controversial-election-review-in-arizona-confirms-bidens-win.

[5] In a transparent effort to discredit Dominion's defamation lawsuits, the Amended Complaint devotes considerable space to allegations that Dominion's voting systems are not secure and promote fraud.  (*See generally* Am. Compl., ¶¶ 44–77.)

[6] *See, e.g.*, *Mike Lindell Drops Massive Class Action Lawsuit*, OFFICIAL STEVE BANNON'S WAR ROOM PANDEMIC (Oct. 4, 2021), *available at* https://warroom.org/2021/09/30/mike-lindell-drops-massive-class-action-lawsuit/.

## II.    Nature of the Underlying Case

This case centers on document preservation letters sent to Plaintiffs by Dominion's defamation counsel.  Plaintiffs characterize these letters as "cease-and-desist letters" sent as part of purported "Lawfare" being waged by Dominion.  (*See* Am. Compl., ¶¶ 1, 4.)  The letters' plain language, however, undermines this characterization.[7]

The nearly identical letters received by Plaintiffs speak for themselves.  (*See id.* ¶ 5, Exs. 2, 4–5, 8, 10, 12–13, 16 (reproducing or attaching the letters).)  The letters, which are entitled "Notice of Obligation to Preserve Documents Related to Dominion," are nothing more than typical prelitigation correspondence principally designed to put the recipient on notice to preserve documents that may be relevant to litigation.  None of them threaten imminent litigation against the recipient.  Instead, the letters make clear that they were sent in response to the "ongoing misinformation campaigns falsely accusing Dominion of somehow rigging or otherwise improperly influencing the outcome of the November 2020 U.S. presidential election" and that separate letters have been sent to "Sidney Powell and various media entities demanding retraction of their myriad defamatory and conspiratorial claims about Dominion."  (*Id.* ¶ 5.) Because Plaintiffs all signed affidavits that were attached as exhibits to multiple discredited election fraud lawsuits, including Sidney Powell's non-sanctioned "Kraken" litigation falsely accusing Dominion of rigging the 2020 election, (*see* Exs. A–B), Dominion believed that Plaintiffs had likely exchanged defamatory communications with Sidney Powell and others.  The

---

[7] In footnote 3 to the Amended Complaint, Plaintiffs accuse Dominion of using "ex post facto spin" in characterizing the letters as document preservation letters.  This is a sideshow.  As described more fully below, regardless of how one characterizes these letters, sending them to Plaintiffs does not render Dominion liable under Plaintiffs' theories or any others.

letters thus implore Plaintiffs to "cease and desist taking part in defaming Dominion," and "to preserve all documents and communications that may be relevant to Dominion's pending legal claims."  (Am. Compl., Exs. 2, 4–5, 8, 10, 12–13, 16.)  The letters further ask Plaintiffs to retract any defamatory statements they had made about Dominion should they have done so, a request that is a prerequisite for bringing a defamation lawsuit in many states.  (*Id.*)  Sending the letters is clearly not an abuse of the legal system.

Dominion has since sued Sidney Powell, Mike Lindell, various media organizations, and others for making false statements about Dominion related to the 2020 election.  Motions to dismiss these lawsuits, which asserted many of the same theories expressed in the Amended Complaint, have failed.  *See, e.g.*, *US Dominion, Inc. v. Powell*, No. 1:21-cv-00040 (CJN), 2021 WL 3550974, (D.D.C. Aug. 11, 2021) (denying motions to dismiss filed by Sidney Powell, Rudy Giuliani, My Pillow, Inc., and its Chief Executive Officer, Mike Lindell).  Discovery is ongoing, and the preservation of relevant documents will aid Dominion in prosecuting its claims.

## III.    Procedural History

Plaintiffs filed the Amended Complaint in response to this Court's Show Cause Order. (*See* Dkt. 21.)  In addition to clarifying that Plaintiffs are domiciled in Michigan, the Amended Complaint adds another defendant, Hamilton Place Strategies, LLC ("HPS"); makes additional conclusory allegations; and cites to further discredited sources, such as the Maricopa County Forensic Election Audit.  (*See* Am. Compl., ¶ 75(b) n.87.)  It does not attach any new exhibits or add new claims.  Because the Amended Complaint does not resolve any of the fatal flaws in the original Complaint identified in Dominion's first Motion to Dismiss, it provides further reason why amendment is futile and Plaintiffs' claims must be dismissed with prejudice.

## LEGAL STANDARD

Rule 12(b)(1) provides for dismissal of an action for "lack of subject matter jurisdiction." *See* Fed. R. Civ. P. 12(b)(1). To survive a motion to dismiss under Rule 12(b)(1), the plaintiff bears the burden of establishing that the Court has subject matter jurisdiction under Rule 12(b)(1). *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' are insufficient." *Morman v. Campbell Cnty. Mem'l Hosp.*, 632 F. App'x 927, 931 (10th Cir. 2015). Thus, "a court should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011).

## ARGUMENT

### I. Plaintiffs Fail to State a Plausible Claim for Relief.

All four of Plaintiffs' claims for relief against Dominion—Counts I through IV—must be dismissed because Plaintiffs fail to state a claim for relief that survives Rule 12(b)(6).

#### a. Plaintiffs fail to state a claim for a violation of RICO.

Plaintiffs' first claim astonishingly alleges that Dominion violated RICO by sending the document preservation letters. A RICO violation under 18 U.S.C. §§ 1962(c), (d)[8] requires a

_____

[8] Plaintiffs fail to specify which particular subpart of statute on which the RICO claim is based. However, because Plaintiffs do not allege that Dominion invested racketeering income or acquired a controlling interest in an enterprise through a pattern of racketeering activity, *see* 18

plaintiff to meet the statutory standing requirement and plausibly allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *See, e.g.*, *Bixler v. Foster*, 596 F.3d 751, 761 (10th Cir. 2010); *see also Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1223–24 (D.C. Cir. 1991) ("Congress enacted the RICO statute . . . to combat criminal organizations at large in the American commercial republic."). Plaintiffs' allegations, which allege conduct far remote from the type of behavior Congress sought to curb in passing RICO, do not come close to satisfying RICO standing or any of these elements.

### i. *Plaintiffs do not allege a sufficient RICO injury.*

First and foremost, Plaintiffs' RICO claim fails because Plaintiffs' purported injuries are insufficient to convey RICO standing. To bring a civil RICO claim, a plaintiff must show that "he was injured in his business or property by reason of the defendant's violation of § 1962." *Deck v. Engineered Laminates*, 349 F.3d 1253, 1257 (10th Cir. 2003). This element "requires that a plaintiff prove both but-for and proximate causation," *CGC Holding Co., LLC v. Hutchens*, 974 F.3d 1201, 1213 (10th Cir. 2020), including that the "alleged violation led directly to the plaintiff's [purported] injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). This injury requirement has generally been strictly construed to mean pecuniary injury to a proprietary interest. *See, e.g.*, *Grogan v. Platt*, 835 F.2d 844, 848 (11th Cir. 1988). In other words, a plaintiff must show a concrete financial loss. *See In re Taxable Mun. Bond Secs. Litig.*, 51 F.3d 518, 523 (5th Cir. 1995); *Fleischhauer v. Feltner*, 879 F.2d 1290, 1299–1300 (6th Cir. 1989); *Imagineering, Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303, 1310 (9th Cir. 1992).

---

U.S.C. §§ 1962(a), (b), it appears Plaintiffs' RICO claim relates to the two remaining subsections under the statute—namely, 18 U.S.C. §§ 1962(c), (d).

The Amended Complaint is entirely devoid of any factual allegations concerning injuries to Plaintiffs' business or property interests. It simply repeats the conclusory allegation that Plaintiffs have suffered "an actual injury in the form of damages to [their] property . . ." (*See* Am. Compl., ¶¶ 18, 20, 21, 23, 25, 26, 27, 28.) This is not enough. The sending of document preservation letters did not injure Plaintiffs' business or property in any "ascertainable and definable" way. *See, e.g.*, *Isaak v. Trumbull Sav. & Loan Co.*, 169 F.3d 390, 396–97 (6th Cir. 1999) (concluding that plaintiffs had RICO standing when camping resorts filed for bankruptcy, because a "bust-out" scheme to defraud buyers was complete by the fraudulent act of placing the property into bankruptcy); *Deck*, 349 F.3d at 1257. Rather, it appears that Plaintiffs' purported injuries caused by receiving these letters include fear (which allegedly prompted some Plaintiffs to purchase security equipment) and emotional distress. (*See* Am. Compl., ¶¶ 17–28.) Fear and emotional distress are simply insufficient injuries to support Plaintiffs' RICO claim. This Court need not look any further to dismiss Plaintiffs' first claim for relief.

ii.     *Plaintiffs fail to sufficiently allege any racketeering activity.*

Another fatal flaw in Plaintiffs' RICO claim is that they do not identify any activity by Dominion that constitutes a predicate "racketeering" act under RICO. *See Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006) (noting that a failure to allege a predicate act requires dismissal of a RICO claim). Although Plaintiffs allege that Dominion committed a host of predicate acts,[9]

---

[9] Plaintiffs also fail to allege various predicate acts with particularity. For example, allegations of mail fraud under RICO must be plead with particularity pursuant to Rule 9(b). *See, e.g.*, *Cayman Expl. Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1362 (10th Cir. 1989) (collecting cases). "To satisfy Rule 9(b), "the complaint must set forth the time, place and contents of the false representations, the identity of the party making the false statements, and the consequences thereof." *Christou v. Beatport, LLC*, 849 F.Supp.2d 1055, 1077 (D. Colo. 2012). The Amended Complaint lacks any specific allegations of false representations.

including "extortion, witness intimidation, witness retaliation, witness tampering, and mail fraud," (*see* Am. Compl., ¶ 105), the Amended Complaint fails to plausibly allege that Dominion committed any of these predicate acts by sending document preservation letters.

First, Plaintiffs' allegation that sending document preservation letters constitutes mail fraud ignores what that crime requires.  The elements of mail fraud under 18 U.S.C. § 1341 are "(1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of the mails to execute the scheme."  *United States v. Zander*, 794 F.3d 1220, 1226 (10th Cir. 2015).  The statute defines "scheme or artifice to defraud" as a "scheme or artifice to deprive another of the intangible right of honest services."  18 U.S.C. § 1346; *see also Skilling v. United States*, 561 U.S. 358, 408–09 (2010) (holding that 18 U.S.C. § 1346 criminalizes only bribes and kickbacks).

Here, Plaintiffs fail to plead the requisite elements of mail fraud.  Wholly absent from the Amended Complaint are any allegations that Dominion sent these letters to obtain physical property from Plaintiffs or to deprive them of any sort of intangible honest services through bribes or kickbacks.  *See, e.g.*, *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, No. 92 C 2808, 1993 WL 8340, at *4 (N.D. Ill. Jan. 8, 1993), *judgment aff'd*, 20 F.3d 771 (7th Cir. 1994) (A scheme to defraud encompasses "acts of artifice or deceit which are intended to deprive an owner of his property or money.").  Plaintiffs instead allege that these letters were sent with the aim of "deter[ing] . . . free expression."  (Am. Compl., ¶ 87.)  This is not intent to defraud.

Second, Plaintiffs fail to sufficiently plead the elements of extortion, which requires the "wrongful use of actual or threatened force, violence or fear."  18 U.S.C. § 1951(b)(2).  Dominion's issuance of alleged "cease and desist" letters does not qualify as "the wrongful use

of actual or threatened force, violence or fear." *See, e.g.*, *San Juan Reg'l Med. Ctr. v. 21st Cent. Centennial Ins. Co.*, 19-CV-734 MV/JFR, 2020 WL 6146445, at *4 (D.N.M. Oct. 20, 2020); *Sorensen v. Polukoff*, 2:18-CV-67 TS, 2018 WL 2012738, at *6 (D. Utah Apr. 30, 2018) (reasoning that "the threat of extensive litigation, whether meritorious or frivolous, is, at worst, abusive or bad-faith litigation," not "extortion under § 1951," and thus holding "that Plaintiff failed to plead extortion and the Court will not consider it as a predicate act"). Chaos would unfold if potential civil plaintiffs could face RICO claims, or be criminally prosecuted, every time they sent prelitigation letters. *See Curtis & Assocs., P.C. v. Law Offs. of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 173 (E.D.N.Y. 2010) (dismissing civil RICO claims and reasoning that permitting such an interpretation "would result in the inundation of federal courts with civil RICO actions that could potentially subsume all other state and federal litigation in an endless cycle where any victorious litigant immediately sues opponents for RICO violations").

Equally fatal is that extortion requires "the obtaining of property from another, with his consent." 18 U.S.C. § 1951(b)(2); *see also Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 407 (2003) (holding that to prove extortion under the Hobbs Act, a plaintiff must show that the defendant actually obtained or sought to obtain property through wrongful means). Thus, "the property extorted must therefore be transferable" and "capable of passing from one person to another." *Sekhar v. United States*, 570 U.S. 729, 734 (2013). As noted above, the Amended Complaint does not allege that Dominion obtained any property from Plaintiffs, nor could it. Accordingly, Plaintiffs have failed to plead any act by Dominion constituting extortion.

Third, Plaintiffs fail to adequately allege that Dominion engaged in witness retaliation, witness intimidation, or witness tampering. With respect to witness retaliation under Colorado

law, Plaintiffs must allege that Dominion "use[d] a threat, act of harassment . . . , or act of harm or injury upon any person or property, which action is directed to or committed upon a witness in any criminal or civil proceeding [or] a victim of any crime." C.R.S. § 18-8-706(1). The statutory scheme defines "witness" as those "having knowledge of 'any crime' or who have reported 'any crime,' as well as witnesses who have made statements under oath [which has been received as evidence] or have been served with subpoenas." *People v. Johnson*, 446 P.3d 826, 831 (Colo. App. 2017) (describing C.R.S. § 18-8-702, which defines "witness" as "any natural person . . . whose declaration under oath is received or has been received as evidence for any purpose"). But absent from the Amended Complaint are any allegations showing that Plaintiffs were victims or witnesses of crimes, or witnesses who submitted affidavits that have been received as evidence (as opposed to affidavits merely being attached to a complaint). Plaintiffs also cannot establish a claim for witness retaliation under federal law because they have not appeared as witnesses in a proceeding. *See Witt v. Snider*, No. 16-cv-01303-MSK-CBS, 2017 WL 2215252, at *8 (D. Colo. May 19, 2017) (explaining that 18 U.S.C. § 1513 "applies only to retaliation relating to a person who has actually appeared as a witness at a proceeding").

With regard to witness intimidation, Plaintiffs must allege that Dominion "by use of a threat, act of harassment . . . , or act of harm or injury to any person or property directed to or committed upon a witness in any criminal or civil proceeding [or] a victim of any crime" attempts to or does influence the witness to testify falsely, induce the witness to avoid a legal summons to testify, induce the witness to "absent himself" from an official proceeding, or inflict harm or injury prior to a witness's testimony. C.R.S. § 18-8-704(1). The definitions of "witness" and "victim" enumerated above apply with equal force to witness intimidation. *See*

C.R.S. § 18-8-702.  The Amended Complaint thus fails to allege that Dominion engaged in witness intimidation because there are no allegations that Plaintiffs are witnesses or victims that fit those definitions under the statute.

Finally, with respect to witness tampering under federal law[10] (and as relevant here), 18 U.S.C. § 1512(b) prohibits knowingly "intimidat[ing], threaten[ing], or corruptly persuad[ing] another person, or attempt[ing] to do so . . . with intent to . . . influence, delay, or prevent the testimony of any person in an official proceeding" or "cause or induce any person to" withhold testimony or documents from a proceeding.  18 U.S.C. § 1512(b).  The statute further prohibits intentionally "harass[ing] another person and thereby hinder[ing], delay[ing], prevent[ing], or dissuad[ing] any person from . . . attending or testifying in an official proceeding."  *Id.* § 1512(d).  Here, Plaintiffs do not allege that the letters hindered, delayed, prevented, or dissuaded any person from attending or testifying in an official proceeding.  Instead, Plaintiffs broadly allege that the letters asked Plaintiffs to "recant unspecified statements."  (*See* Am. Compl., ¶ 105.)  This is insufficient to plausibly allege a predicate act of witness tampering.

### iii.   *Plaintiffs fail to allege a RICO enterprise.*

Plaintiffs also insufficiently plead a RICO "enterprise," which is "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  Plaintiffs allege that Dominion formed an association-in-fact enterprise with Clare Locke, its defamation counsel, and HPS, its public relations firm.  (Am. Compl., ¶ 103.)  But the factual allegations do not support

---

[10] The federal crimes of witness tampering and witness intimidation are not treated distinctly but rather codified under a single statute—18 U.S.C. § 1512.

this characterization.  An association-in-fact enterprise must have some structure, meaning: (1) "a purpose"; (2) "relationships among those associated with the enterprise"; and (3) "longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Boyle v. United States*, 556 U.S. 938, 946 (2009).

Principally, no "enterprise" has been pleaded here because a party cannot be both the defendant "person" and the RICO enterprise.  *See, e.g.*, *Garbade v. Great Divide Mining & Milling Corp.*, 831 F.2d 212, 213 (10th Cir. 1987).  A corporation generally will not be liable for operating an association-in-fact enterprise consisting of itself and its officers or employees.  *See, e.g.*, *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 164 (2001); *Brannon v. Boatmen's First Nat'l Bank of Okla.*, 153 F.3d 1144, 1146 (10th Cir. 1998) (corporate parent and subsidiary not distinct).  In other words, a RICO plaintiff cannot circumvent the distinctiveness requirement by alleging the existence of an enterprise consisting of only a corporate defendant associating with its own employees or agents in the regular affairs of the corporation.  *See, e.g.*, *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994).  Indeed, "[b]ecause a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant itself."  *Id.*

The purported enterprise does not meet RICO's distinctiveness requirement.  Plaintiffs' allegations amount to nothing more than an association between a corporate defendant (Dominion) and its agents (Clare Locke and HPS) conducting Dominion's regular affairs.  (*See* Am. Compl., ¶¶ 6, 8 (alleging that Clare Locke was "dispatched" by Dominion to send these document preservation letters and that HPS amplified Dominion's defamation lawsuits through a

"well-orchestrated publicity campaign" on Dominion's behalf).  These allegations do not establish some nefarious purpose; rather, they illustrate that Dominion utilized Clare Locke's legal services and HPS's public relations services to conduct Dominion's everyday affairs.  *See, e.g.*, *Kelly v. Palmer, Reifler & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1379 (S.D. Fla. 2010) (concluding that by sending demand letters, a law firm defendant was "acting as an agent for its retail clients and therefore not a separate and independent entity" for RICO purposes).  Thus, Plaintiffs fail to adequately establish the existence of a distinct RICO enterprise.

Further, the Amended Complaint does not allege a "RICO-qualifying common purpose" that unites Dominion, Clare Locke, and HPS.  *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1213 (11th Cir. 2020).  Plaintiffs claim that "Dominion, HPS, and Clare Locke," sought to "weaponize[ ] the court system and the litigation process in an improper attempt to silence Plaintiffs."  (Am. Compl., ¶ 35; *see also id.* ¶ 81.)  Plaintiffs' conclusory assertions are unsupported by factual allegations.  Instead, the crux of the Amended Complaint is that Dominion, with Clare Locke's and HPS's assistance, sent document preservation letters to Plaintiffs.  (*See generally id.*)  "[T]here is nothing inconsistent or even particularly suspicious about" the conduct Plaintiffs target here.  *Cisneros*, 972 F.3d at 1213 (finding that the complaint failed to establish a common purpose because the "concrete factual allegations" did not show any criminality in the defendants' business activities).  In fact, "[n]othing about" Dominion's activities "remotely suggests" criminal conduct.  *Id.* at 1212.  To infer an "enterprise" from them would not only defy the plausibility standard under *Iqbal*, but expose "countless law-abiding companies" to RICO liability.  *Id.*  Moreover, the Amended Complaint is entirely devoid of any allegations establishing the longevity of this purported "enterprise."  Plaintiffs do not even to

attempt to allege how long Dominion, Clare Locke, and HPS have supposedly been pursuing a common objective.  *See, e.g.*, *Boyle*, 556 U.S. at 946.

> iv.    *Plaintiffs fail to sufficiently allege an effect on interstate commerce.*

Plaintiffs additionally fail to meet a related threshold requirement to establish their RICO claim: showing an effect on interstate commerce.  A RICO claim cannot exist without some nexus to interstate commerce.  *See* 18 U.S.C. § 1962(c); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 232–33 (1989).  Although the statutory language expressly requires that the "enterprise" must affect interstate commerce, courts have ruled that the interstate commerce requirement is satisfied if the activity of either the enterprise or the predicate racketeering acts affect interstate commerce.  *See, e.g.*, *DeFalco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001); *United States v. Delgado*, 401 F.3d 290, 297 (5th Cir. 2005); *Bunker Ramo Corp. v. United Bus. Forms, Inc.*, 713 F.2d 1272, 1289 (7th Cir. 1983).  A RICO enterprise is involved in interstate commerce when it is itself "directly engaged in the production, distribution, or acquisition of goods and services in interstate commerce."  *United States v. Robertson*, 514 U.S. 669, 672 (1995).

Plaintiffs' attempts to establish a sufficient nexus with interstate commerce fall short.  In the Amended Complaint, Plaintiffs allege that the "Dominion Enterprise" was involved in interstate commerce by "provid[ing] voting machines and election services to customers in twenty-eight different states."  (Am. Compl., ¶ 104.)  But the alleged "enterprise" consisting of Dominion, Clare Locke, and HPS did no such thing.  There are no allegations that Clare Locke and HPS had any role providing voting machines to states because it simply did not occur.  Such activity is separate from the alleged activity of the "enterprise" (*i.e.*, sending document preservation letters and allegedly engaging in "Lawfare").  Regardless, as discussed above, a

plaintiff cannot establish a RICO enterprise through simply alleging a corporate defendant

associates with its own employees or agents in the regular affairs of the corporation.  *See, e.g.*,

*Riverwoods Chappaqua Corp.*, 30 F.3d at 344.  As such, Plaintiffs' allegations concerning

Dominion's regular affairs are insufficient to show that the purported RICO enterprise's

activities impact interstate commerce.  Moreover, the Amended Complaint is devoid of

allegations concerning how mailing a letter involves interstate commerce, save for the

conclusory assertion that the letters were sent "in numerous states beyond the borders of the

State of Colorado."  (Am. Compl., ¶ 104.)  This is not enough to support Plaintiffs' RICO claim.

*See, e.g.*, *Rose v. Bartle*, 692 F. Supp. 521, 534 (E.D. Pa. 1988) (dismissing Section 1962(c)

claim because plaintiff did not allege that the enterprises affected interstate commerce), *aff'd in*

*part, vacated in part, rev'd in part*, 871 F.2d 331 (3d Cir. 1989); *Bowoto v. Chevron Corp.*, 481

F. Supp. 2d 1010, 1014–15 (N.D. Cal. 2007).

> ### *v.     Plaintiffs fail to allege a RICO conspiracy.*

Finally, the RICO conspiracy claim fails for the same reasons as the substantive RICO

claim.  The RICO conspiracy provision makes it "unlawful for any person to conspire to violate

the provisions of subsection (a), (b), or (c) of" 18 U.S.C. § 1962.  *See* 18 U.S.C. § 1962(d).

Because Plaintiffs have failed to plead facts supporting a plausible RICO violation under Section

1962(c), their claim under Section 1962(d) must fail.  *See E. Sav. Bank, FSB v. Papageorge*, 31

F. Supp. 3d 1, 15 (D.D.C. 2014) (dismissing a RICO conspiracy claim "because there was no

violation in which the defendant could have conspired"); *Snyder v. ACORD Corp.*, No. 1:14-cv-

01736-JLK, 2016 WL 192270, at *9 (D. Colo. Jan. 15, 2016) (same).

### b. Plaintiffs fail to state a claim under Section 1983.

Plaintiffs' second and third claims, which allege that Dominion deprived Plaintiffs of equal protection and their First Amendment rights under 42 U.S.C. § 1983, are also fundamentally flawed. To succeed on a Section 1983 claim, a plaintiff must prove that his constitutional rights were violated, and that the violation was caused by a person acting under color of law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Plaintiffs can do neither. It is not unlawful for a private company to send prelitigation letters or to bring a defamation suit. Dominion is not the government; its actions cannot deprive private individuals of their constitutional rights.

#### i. Plaintiffs cannot show that Dominion acted under color of law.

Plaintiffs' challenged action—Dominion's sending of document preservation letters— cannot be attributed to the state. *See Gallagher v. "Neil Young Freedom Concert"*, 49 F.3d 1442, 1447 (10th Cir. 1995) ("[T]he only proper defendants in a Section 1983 claim are those who represent the state in some capacity, whether they act in accordance with their authority or misuse it." (internal citations and quotations omitted)). Plaintiffs' Section 1983 claims require that they plausibly allege that Dominion's sending of letters amounts to state action under any of the four tests recognized in the Tenth Circuit: (1) the nexus test, (2) the symbiotic-relationship test, (3) the joint-action test, and (4) the public-function test. *Id.* at 1448–57. They cannot. Not only do Plaintiffs misunderstand Dominion's role in elections, but Dominion acted as a private entity, and not a state actor, in sending the letters.

Plaintiffs specifically allege that Dominion is a state actor under the public function test. (*See generally* Am. Compl., ¶¶ 36–43, 111–13, 116.) Their claims are premised on the logical fallacy that because various state and local governments purchased Dominion's voting systems

for elections, Dominion acted under color of law (*i.e.*, as a state actor) when it sent document preservation letters to Plaintiffs.  (*See id.* ¶¶ 36, 40, 42, 43 (new allegations that Dominion is a state actor by virtue of the election-related services and products it provides).)  In other words, Plaintiffs allege that because the administration of elections is a traditional public function, and Dominion's voting systems aid in those elections by counting votes, Dominion's separate actions taken as a private company somehow must always be characterized as state action.  (*See id.*)

The public function test does not extend state action that far.  This test "asks whether the ***challenged action*** is a traditional and exclusive function of the state."  *Wittner v. Banner Health*, 720 F.3d 770, 776–77 (10th Cir. 2013) (emphasis added).  It "is difficult to satisfy" because "very few [functions] have been exclusively reserved to the State."  *Gallagher*, 49 F.3d at 1456. The challenged action in this lawsuit is Dominion's sending of document preservation letters to protect its reputation or to assist with defamation litigation, which is unequivocally ***not*** a traditional and exclusive state function.[11]  To hold otherwise would untether the public function test from its purpose and attribute to the state purely private actions undertaken by private

---

[11] Even if Plaintiffs were challenging Dominion's role in providing voting systems to state and local governments, which they are not, the claims would fail.  In Dominion's defamation lawsuit, where Plaintiffs' counsel represents My Pillow, Inc. and Mike Lindell, it has been made abundantly clear that "Dominion does not administer elections." *See US Dominion, Inc. v. MyPillow, Inc. and Mike Lindell*, No. 1:21-cv-00445-CJN, 2021 WL 3260120 (D.D.C. May 28, 2021).  No court has held that a private company providing voting systems to governments satisfies any of the state action tests.  Courts have instead narrowly interpreted *Terry v. Adams*, 345 U.S. 461 (1953).  *See, e.g.*, *Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597, 629 (E.D. Pa. 2018) (characterizing the *Terry v. Adams* decision as holding that the "'Jaybird Association,' a private Democratic club, was a state actor during its primary election because the Jaybird primary was 'an integral part, indeed the only effective part, of the elective process' that determined who would govern the county," and that "courts have declined to extend the holdings of these Supreme Court cases to the actions of political parties in other contexts").  Dominion's limited role in elections does not even remotely rise to the level of the Jaybird Association.

companies. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (explaining that under each of the state action tests, "the conduct allegedly causing the deprivation of a federal right" must "be fairly attributable to the State").

Dominion likewise is not a state actor under the other three tests. Under the symbiotic relationship test, "[s]tate action is also present if the state 'has so far insinuated itself into a position of interdependence' with a private party that 'it must be recognized as a joint participant in the challenged activity.'" *Gallagher*, 49 F.3d at 1451 (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961), and noting that the focus of the test is on long-term interdependence between the state and a private entity). Similarly, a private party is a state actor under the joint action test if it "is a 'willful participant in joint action with the State or its agents.'" *Id.* at 1453 (quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)). Under this test, "courts examine whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Id.* Here, however, there are no allegations that government played any role in Dominion's decision to send document preservation letters, let alone that the challenged activity resulted from long-term interdependence. The letters themselves do not mention any governmental entity. (*See* Am. Compl., Exs. 2, 4–5, 8, 10, 12–13, 16.) No person would think receiving a letter from Dominion is akin to receiving a letter from the state, nor have Plaintiffs alleged that they thought that Dominion's document preservation letters were government activity. The letters are private action. *See Jackson v. Metro. Edison Co.*, 419 U.S. 345, 349 (1974) ("[T]he principle that private action is immune from the restrictions of the Fourteenth Amendment is well established and easily stated.").

The nexus test is particularly illustrative. Under this final test, a private entity can only

be a state actor if "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may fairly be treated as that of the State itself." *Id.* at 351; *see also Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 192 (1988) ("In the typical case raising a state-action issue, a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that ***decisive conduct*** as state action." (emphasis added)).  The decisive conduct here is sending letters.  But "private businesses may restrict private expression."  *VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151, 1164 (10th Cir. 2021).  Plaintiffs do not allege that any government entity participated in drafting the letters or had any role in their issuance.  No connection exists between any state government and the sending of document preservation letters.  There is simply no nexus between the letters and any state, such that the challenged action "may fairly be treated as that of the State itself."

> ii.  *Plaintiffs cannot show that their constitutional rights were violated.*

Plaintiffs' two Section 1983 claims are substantively similar—they both allege that Dominion's document preservation letters and litigation tactics chilled Plaintiffs' speech.  Their difference appears to be that the equal protection claim alleges that Dominion engaged in viewpoint-based discrimination by stifling Plaintiffs' politically conservative voices, whereas the First Amendment claim alleges that Dominion sent the letters to retaliate after seeing Plaintiffs' affidavits.  (*See* Am. Compl., ¶ 29 (alleging that Dominion acted based on Plaintiffs' election views), ¶ 113 (alleging in Count II that Dominion has "attempted through the use of the courts and the litigation process to suppress Plaintiffs' freedom of speech"), ¶ 118 (alleging in Count III that Dominion "engaged in First Amendment retaliation by sending hundreds of Letters and

waging Lawfare").)  Plaintiffs' constitutional theories runs directly counter to First Amendment jurisprudence and cannot support the claims for relief.  Indeed, Dominion sent the document preservation letters to stop the spread of misinformation about Dominion.  Nothing in the letters prevent Plaintiffs from discussing election security—a separate topic altogether.

### A.  Dominion did not violate the First Amendment.

Plaintiffs' constitutional rights were not violated because defamation law already protects First Amendment values.  The mere sending of document preservation letters, a routine prelitigation procedural step, cannot be a free-standing First Amendment violation because it would constitute the sort of "double-counting" that the U.S. Supreme Court has *rejected*.  As the Court clarified, additional procedural protections for defendants in defamation litigation would be "piling on" and inconsistent with the balance struck under the First Amendment.  *See Calder v. Jones*, 465 U.S. 783, 790 (1984) (explaining that "the potential chill on protected First Amendment activity stemming from libel and defamation actions is already taken into account in the constitutional limitations on the substantive law governing such suits" and that "[t]o reintroduce those concerns at the jurisdictional stage would be a form of double counting").  The Court has "already declined in other contexts to grant special procedural protections to defendants in libel and defamation actions in addition to the constitutional protections embodied in the substantive laws."  *Id.* at 790–91.

Dominion has not sued these Plaintiffs.  But if it were to sue any of them, they would be entitled to all the constitutional protections under existing constitutional and common law principles, including the elemental requirement that defamation claims must be based on false statements of fact, not mere expression of opinion.  *See, e.g.*, *Milkovich v. Lorain Journal Co.*,

497 U.S. 1, 16–17 (1990).  Any claim by the Plaintiffs that their free speech rights had been

violated is belied by the fundamental notion that no viable defamation claim against them could

ever be brought for the mere expression of their opinions.  *See, e.g.*, *id.* at 13.  Rather, if

Dominion sued Plaintiffs for defamation, they could avail themselves of the applicable fault

requirements designed to accommodate competing First Amendment and reputational interests.

*See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 332–48 (1974).

The Court has emphasized that defamation law actually serves the purposes of the First

Amendment by incentivizing truth in public discourse and exposing falsehood.  *See, e.g.*, *Keeton*

*v. Hustler Magazine, Inc.*, 465 U.S. 770, 777 (1984) ("New Hampshire has clearly expressed its

interest in protecting such persons from libel, as well as in safeguarding its populace from

falsehoods.").  As the court recognized in Dominion's currently pending defamation litigation,

Dominion's defamation lawsuits do not violate those First Amendment principles, but rather

vindicate them because the First Amendment protects "imaginative expression" and "rhetorical

hyperbole" under "the theory that 'the ultimate good desired is better reached by free trade in

ideas—that the best test of truth is the power of the thought to get itself accepted in the

competition of the market.'"  *US Dominion, Inc. v. Powell*, No. 1:21-cv-00040 (CJN), 2021 WL

3550974, at *7 n. 7 (D.D.C. Aug. 11, 2021) (quoting *Abrams v. United States*, 250 U.S. 616, 630

(1919) (Holmes, J., dissenting)).  The court observed, however, that the "free trade of ideas

depends on a common understanding of the facts, which is undermined by provably untrue

statements."  *Id.* at *7 n.7; *see also id.* at *7 n.8 (rejecting the assertion by Mike Lindell's

company, My Pillow, Inc., "that the First Amendment grants some kind of blanket protection to

statements about 'public debate in a public forum," and bluntly ruling "that there is no such

immunity").  Instead, existing doctrines strike the constitutional balance "by limiting viable defamation claims to provably false statements made with actual malice."  *Id.* at \*7 n.8.

That simply sending a prelitigation document preservation letter could in itself constitute a First Amendment violation is further undermined by the various forms of prelitigation notices, or demands for corrections or retractions, that are embedded in the defamation law of various states.  Many states, including Michigan (where Plaintiffs are domiciled), require some form of notice of the alleged defamation and demand for a correction or retraction, either as a pre-requisite to bringing suit or as an incentive to demand a retraction, because recovery is restricted to certain specified categories of damages in the absence of a demand.  *See, e.g.*, Mich. Comp. Laws § 600.2911(2)(b) (disallowing exemplary and punitive damages in libel actions if no notice is given to "the defendant to publish a retraction"); *Hope-Jackson v. Washington*, 877 N.W.2d 736, 750 (Mich. App. 2015) ("MCL 600.2911(2)(b) expressly prohibits an award of exemplary damages unless the plaintiff gives notice to the defendant to publish a retraction."); *see also* Rodney Smolla, *Law of Defamation*, §§ 9:70 – 9:74 (2021 update edition) (explaining that prelitigation defamation retraction, correction, and notice statutes exist in at least 33 states). These statutes are all designed to ***protect*** freedom of speech while providing a potentially swift remedy to cure or mitigate damage to reputation, as well as serving the public interests in correcting the record and encouraging truth in public discourse.  *See Bongino v. The Daily Beast Co.*, 477 F. Supp. 3d 1310, 1316 (S.D. Fla. 2020) ("The purpose of this notice provision is to provide newspapers an 'opportunity in every case to make a full and fair retraction,' thus mitigating potential damages and protecting the all-important 'interest in the free dissemination of news.'") (quoting *Ross v. Gore*, 48 So. 2d 412, 415 (Fla. 1950)).  Under the Plaintiffs'

perverse logic, however, these statutes incentivize or require violations of the First Amendment.

Any First Amendment concerns regarding Dominion's document preservation letters and lawsuits against non-parties are already baked into defamation law. No rights have been violated.

## B.  No viewpoint-based discrimination.

Plaintiffs' equal protection claim further highlights why their Section 1983 claims are illogical.  The claim combines First Amendment and equal protection concepts in asserting that Dominion engaged in viewpoint-based discrimination because it sent letters to a certain class of voters (*i.e.*, conservative voters) and not others.  (*See* Am. Compl., ¶ 113.)  A viewpoint-based discrimination claim, though, requires allegations that the government or a state actor excluded speech or speakers from a forum on the basis of viewpoint.  *See Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928–30 (2019) (holding that a private entity providing a forum for speech does not engage in viewpoint-based discrimination, and thus may exercise editorial discretion over the speech and speakers, unless it is deemed a state actor).  Plaintiffs' allegations simply do not fit this claim.  Not only is Dominion not a state actor, but Dominion has not regulated speech or even provided a forum for speech such that it could possibly be considered a state actor.  Neither the sending of the letters, which are at issue here, nor the provision of voting systems to governments regulate speech in any particular forum.  *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985) (explaining that in assessing viewpoint discrimination, the court must "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic").  The general sphere of "public debate" or "national discussion," as alleged in the Amended Complaint, is not a forum.  (*See* Am. Compl., ¶¶ 1, 47, 78, 86 89.)  Holding otherwise would

allow viewpoint-based discrimination claims to be lodged against a private company that contracts with the government whenever that company seeks to protect itself against defamation.

Moreover, to the extent Plaintiffs allege that Dominion violated their equal protection rights on the basis that sending the documents preservation letters is unlawful speech, that avenue is likewise foreclosed.  The government speech doctrine is clear that once speech is categorized as the government's, which Plaintiffs advocate for here on the basis that Dominion is a state actor, the First Amendment does not apply.  *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) ("[G]overnment actions and programs that take the form of speech[ ] do not normally trigger . . . First Amendment rules"); *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017) ("[O]ur cases recognize that '[t]he Free Speech Clause . . . does not regulate government speech.'").  Even if Plaintiffs sincerely believe that Dominion sent them letters because of their political leanings, that belief would not equate to an equal protection violation.

### c.  Plaintiffs fail to state a civil conspiracy claim.

Plaintiffs' final claim—civil conspiracy—alleges that Dominion conspired with Clare Locke and HPS to deprive Plaintiffs of their constitutional rights.  (*See* Am. Compl., ¶¶ 119–22.)  Plaintiffs fail to plausibly allege such a claim for many of the same reasons described above.

First, to the extent Plaintiffs are alleging a conspiracy to infringe on First Amendment and equal protection rights under Section 1985(3), that statute does not apply to alleged private conspiracies such as this one.  *See Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993) (explaining that the statute does not apply to private conspiracies that are aimed at a right that is, by definition, a right only against state interference).  Dominion, Clare Locke, and HPS are all private entities, (*see* Am. Compl., ¶¶ 30–34), and none of the alleged wrongdoing was committed

under color of law.  Only governments and state actors can be liable for such violations.  Thus, a conspiracy to violate Plaintiffs' rights under Section 1985(3) cannot form.

Second, a civil conspiracy under either Section 1985(3) or common law requires unlawful overt acts.  *See Tilton*, 6 F.3d at 686; *Walker v. Van Laningham*, 148 P.3d 391, 396 (Colo. App. 2006).  But here, the alleged unlawful acts are that Dominion engaged in litigation tactics to deprive Plaintiffs of their First Amendment and equal protection rights.  (*See* Am. Compl., ¶ 122.)  As already described, Plaintiffs' allegations cannot support such violations.  If the underlying alleged acts are not unlawful, then a conspiracy to commit them cannot be either.

Third, just like Dominion is not itself an "enterprise" for purposes of RICO, Dominion cannot conspire with itself to do actions within the scope of its business.  *See* 16 Am. Jur. 2d Conspiracy § 58 ("Ordinarily, because a corporation and its agents are a single person in the eyes of the law, a corporate entity cannot conspire with itself.").  Conspiracies require two or more persons, *see, e.g.*, *Walker*, 148 P.3d at 396, but the alleged co-conspirators in Plaintiffs' civil conspiracy claim—Clare Locke and HPS—are Dominion's defamation counsel and public relations team, respectively.  (*See* Am. Compl., ¶¶ 33–34.)  Per Plaintiffs' own allegations, the purported unlawful actions were Clare Locke sending the litigation preservation letters on behalf of Dominion, and HPS publicizing Dominion's separate defamation lawsuits against non-parties.  (*See id.* ¶¶ 4, 8.)  They thus acted pursuant to Dominion's direction as its agents.  *See* 16 Am. Jur. 2d Conspiracy § 58 ("Because a corporate entity cannot conspire with itself, a civil conspiracy is not legally possible when a corporation and its alleged coconspirators are not separate entities but rather stand in either a principal-agent or an employer-employee relationship with the corporation.").  There are no non-conclusory allegations that Clare Locke's and HPS's

actions were accomplished independently and outside of their scope of authority as agents of Dominion.  *See id.* (explaining that "a corporation cannot conspire with its agent when the agent is acting within the scope of their authority" and "not for any personal purpose of their own").[12] Therefore, Plaintiffs' civil conspiracy claim fails for this additional reason.

## II.      The Case Is Not a Justiciable Case or Controversy.

The inherent disconnect between Plaintiffs' allegations and the individual causes of action not only explain why they have failed to state a claim for relief but also demonstrate why their claims lack justiciability.  "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006). Foundational Article III "case or controversy" justiciability requirements require dismissal.

Plaintiffs' claims are unripe and lack concreteness.  As described above, in the normal course of defamation law, a plaintiff sues a defendant, and the defendant is entitled to raise First Amendment defenses against the backdrop of specific claims involving specific allegedly defamatory statements.  But here, Plaintiffs, who have never been sued by Dominion, ask this Court to grant them relief based on the nebulous theory that they have been harmed by receiving document preservation letters and the speculative possibility that they could be harmed in the future, such as by the filing of a defamation lawsuit.  This is insufficient.  As water cannot rise

---

[12] *See also* llon Kedem, Case Comment, *Can Attorneys and Clients Conspire?* Farese v. Scherer, *342 F.3d 1223 (11th Cir. 2003)*, 114 YALE L.J. 1819, 1819–20 (2005) (describing the push behind *Farese v. Scherer*, which held that it is impossible for a conspiracy that violates federal civil rights to exist between attorney and client); *Heffernan v. Hunter*, 189 F.3d 405, 412–13 (3d Cir. 1999) (holding that attorney-client conspiracy is impossible by analogy to the intracorporate conspiracy doctrine).

higher than its source, the threat of a defamation suit cannot possibly violate the First

Amendment if the actual *bringing* of a defamation suit does not violate the First Amendment.

The constitutional requirement of ripeness is grounded in Article III's mandate that

federal courts hear only cases or controversies.  *United States v. Cabral*, 926 F.3d 687, 693 (10th

Cir. 2019).  "The purpose of the ripeness doctrine is to prevent the premature adjudication of

abstract claims."  *Tex. Brine Co. v. Occidental Chem. Corp*., 879 F.3d 1224, 1229 (10th Cir.

2018).  "Because federal courts cannot give advisory opinions, the matter must come to the court

in 'clean-cut concrete form.'"  *Cabral*, 926 F.3d at 693 (quoting *New Mexicans for Bill

Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995)).  As a result, courts in this Circuit

are clear that to avoid a constitutionally impermissible advisory opinion, there must be "the

settling of some dispute that affects the *behavior* of defendant toward plaintiff."  *Phelps v.

Hamilton*, 934 F. Supp. 373, 376 (D. Kan. 1996), *aff'd*, 113 F.3d 1246 (10th Cir. 1997) (citing

*Hewitt v. Helms*, 482 U.S. 755, 761 (1987)).  Indeed, the *Phelps* court, in holding that claims

brought by a plaintiff who sought prospective declaratory and injunctive relief to prevent

prosecution under a Kansas criminal defamation statute to be unripe, explained that while it

"does not doubt that the controversy between plaintiff and defendant is live and ongoing from a

political rhetorical point of view, plaintiff's burden is to allege facts which demonstrate that

judicial resolution of the dispute is properly invoked."  *Id.* at 376–77.  Like the plaintiff in

*Phelps*, Plaintiffs here are impermissibly grounding their claims on "uncertain or contingent

events that may not occur as anticipated, or indeed may not occur at all."  *Id*. at 377.  An opinion

in this case would have no effect on Dominion's behavior, as it has not sued Plaintiffs.  There is

no hardship to Plaintiffs if this Court does not intervene.  The "dispute" is all political rhetoric.

Allowing such an anticipatory "I might get sued" cause of action also does not comport with the Article III's standing requirement.  *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2212 (2021) (holding that the speculative risk of future harm does not satisfy the concrete harm prong of Article III standing).  To have standing, Plaintiffs' injuries in fact must be "concrete"—that is, "real, and not abstract."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (internal quotation marks omitted).  Article III standing does not exist, however, when the only claimed "harm" is a demand that the recipient of a letter preserve documents that may be germane to future litigation—litigation in which the recipient of the letter may well not even be a defendant. *See id.* (reasoning that a concrete injury "must actually exist").  Such "harm" has never been recognized by American courts.  *See id.* at 341 (instructing that courts should assess whether the alleged injury to the plaintiff has a "close relationship" to a harm "traditionally" recognized as providing a basis for a lawsuit in American courts).  The alleged risk of harm lacks concreteness.

This Case therefore lacks the ripeness and specificity required for the Court to adjudicate a concrete claim and must be dismissed pursuant to Rule 12(b)(1) for this independent reason.

## CONCLUSION

For the foregoing reasons, Dominion respectfully requests that this Court dismiss this case in its entirety.

Dated: February 25, 2022

BROWNSTEIN HYATT FARBER SCHRECK, LLP

By: s/ *Stanley L. Garnett*
    Stanley L. Garnett, Colo. Bar No. 12282
    David B. Meschke, Colo. Bar No. 47728
    Bridget C. DuPey, Colo. Bar No. 53958

By: s/ *Rodney Smolla*
    Rodney Smolla

Attorneys for Dominion

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 25th day of February, 2022, I electronically filed a true and correct copy of **DOMINION'S MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT** with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s Stanley L. Garnett* _____
Stanley L. Garnett