## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| **JENNIFER L. COOPER, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 1:21-cv-02672-PAB-STV** |
| | ) | |
| **US DOMINION, INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### PLAINTIFFS'[1] COMBINED RESPONSE TO DOMINION'S[2] AND HPS'[3] MOTIONS TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT

Defendants invoke guilt-by-association by asking this Court to look outside the First Amended Complaint to prejudge—and dismiss—the serious claims raised by *these* Plaintiffs in *this* case, just because a *different* court rejected *different* claims by *different* parties suing Dominion through *different* lawyers over *different* issues arising from the 2020 General Election. Rather than defend the illegal campaign of threats and intimidation they have waged against *these* Plaintiffs and members of the proposed Class, Defendants instead ask this Court to skip to the merits and construe Dominion and HPS' nationwide Lawfare campaign as nothing more than ordinary pre-litigation behavior. Defendants will have an opportunity to make that unconvincing argument. But at this stage of litigation—the motion-to-dismiss stage—they may not inveigh against the truthfulness of Plaintiffs' allegations. Because the allegations, when taken as true, plausibly state a justiciable claim for relief on all four Counts, the Motions should be denied.

---

[1] "Plaintiffs" refers to Plaintiffs Jennifer L. Cooper, Eugene Dixon, Francis J. Cizmar, Anna Pennala, Kathleen Daavettila, Cynthia Brunell, Karyn Chopjian, and Abbie Heminen, on behalf of themselves and all others similarly situated.

[2] ECF Dkt. 40. "Dominion" refers collectively to Defendants US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation.

[3] ECF Dkt. 41. "HPS" refers to Defendant Hamilton Place Strategies, LLC. Dominion and HPS are collectively referred to as "Defendants," and the motions to dismiss as the "Motions."

Plaintiffs allege, among other things, that Defendants sent over 150 Letters to Plaintiffs and other similarly situated individuals, demanding that they (1) cease and desist from mentioning Dominion, which Defendants knew these Plaintiffs had not done; (2) retract their "defamatory" statements about Dominion, which did not exist; and (3) preserve all evidence related not only to Dominion, but to the Election generally, which implicitly conceded Defendants' own view of Dominion as a state actor. The Letters ominously threatened "imminent" litigation along with these outrageous demands. (Compl. at 4). Defendants then publicized this Lawfare campaign "on a national scale," as they acknowledge in their own Motions. (Dkt. 41 at 10).

Make no mistake—these Plaintiffs are not contesting the 2020 Election. Instead they seek relief for the injuries they have suffered. The First Amended Complaint shows that (1) Defendants' threatening conduct has created a culture of fear and intimidation for Plaintiffs and other witnesses to irregularities in the 2020 Election; (2) Defendants' conduct was designed to—and did—wrongfully restrict Plaintiffs' and others' First Amendment rights; and (3) Defendants accomplished their intended improper purpose not only by sending the Letters, but also by appearing on news programs promising to sue individuals for billions of dollars, and by then actually initiating billion-dollar lawsuits against people and organizations *pour encourager les autres*. (Compl. ¶¶ 4–11, 14–15, 17–18, 20–21, 23, 25–29, 78–81, 83–87, 105, 122.).

Explicitly or impliedly threatening to subject someone to an objective abuse of legal process is itself illegal, even if the threat is cloaked in the form and language of an ordinary pre-litigation hold or cease-and-desist letter. For a giant company that performs core governmental functions to direct such conduct at ordinary people is a brazen abuse of the First Amendment by a state actor. Because Plaintiffs have pled sufficient facts to state a claim for relief from the damages of such conduct, Defendants' Motions should be denied.

2

## I.   PLAINTIFFS' SUFFICIENTLY STATE A PRIMA FACIE CLAIM FOR RELIEF ON EACH OF THE FOUR COUNTS.

The Motions should be denied because Plaintiffs adequately plead causes of action against Dominion for violation of 42 U.S.C. § 1983, and against Dominion and HPS for violations of 18 U.S.C. § 1964(c) and civil conspiracy.

### A.   LEGAL STANDARD

Under Rule 12(b)(6), courts must assume all "allegations in the complaint are true, even if doubtful in fact." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (citations omitted). A complaint is not required to allege "detailed factual allegations" or "set forth a prima facie case for each element" of a claim; instead, it must only contain sufficient facts, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also George v. Urban Settlement Serv.*, 833 F.3d 1242, 1247 (10th Cir. 2016) (citations omitted). Dismissal must be denied when a complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Hogan v. Winder*, 762 F.3d 1096, 1104 (10th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

When deciding a 12(b)(6) motion, the district court cannot review matters outside of the complaint unless (1) the complaint incorporates the document by reference or (2) the documents are (a) referred to in the complaint, (b) the parties do not dispute their authenticity, and (c) they are central to the plaintiff's claim. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010); *Hakeem v. Denver Pub. Sch.*, No. 20-cv-00083-PAB-KLM, 2020 WL 4289422, at *1 n.6 (D. Colo. July 7, 2020), *report and recommendation adopted sub nom., Hakeem v. Denver Pub. Sch.*, No. 20-CV-00083-PAB-KLM, 2020 WL 4287191 (D. Colo. July 27, 2020).[4]

---

[4]Defendants improperly ask this Court to consider numerous documents extrinsic to the Complaint, including complaints in different lawsuits, news media articles, government websites, and

B.    **DOMINION VIOLATED PLAINTIFFS' FIRST AND FOURTEENTH AMENDMENT RIGHTS.**

Plaintiffs sufficiently allege two claims against Dominion for violations of their First and Fourteenth Amendment rights under 42 U.S.C. § 1983. (Compl. ¶¶ 16–29, 36–43, 78–90); *West v. Atkins*, 487 U.S. 42, 56 (1988); *Manhattan Cmty. Access Corp. v. Halleck*, 139 S.Ct. 1921, 1945 (2019). A § 1983 claim should survive a Rule 12(b)(6) motion if its legal assertions are supported by the pled facts—even if the legal assertions are conclusory and the factual assertions are equally consistent with a contrary conclusion. *See Revene v. Charles Cnty. Com'rs*, 882 F.2d 870, 873 (4th Cir. 1989).

A plaintiff successfully pleads a § 1983 claim if he alleges: (1) the violation of a right secured by the Constitution and laws of the United States; (2) by a person acting under color of state law, meaning the violation "has its source in state authority." *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 620 (1991) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939–41 (1982)). State authority may be shown through allegations that the deprivation is based on (i) a rule or privilege created by the state; (ii) a rule of conduct imposed by the state; or (iii) because the state was responsible for the defendant. *West*, 487 U.S. at 54. If a plaintiff alleges a Fourteenth Amendment violation under § 1983 against a private party, he must show, in addition to the above elements, "state action" through allegations that "the private party charged with the deprivation could be described in all fairness as a state actor." *Edmonson*, 500 U.S. at 620. State action may be shown through allegations that (a) the defendant is performing a traditional governmental function; (b) the defendant acted together with or obtained significant aid from state officials; or (c) "the injury caused is aggravated in a unique way by the incidents of

---

a podcast episode. (Dkt. 40 at 3–4; Dkt. 40-1; Dkt. 40-2.) Plaintiffs object to the consideration of these documents, which are irrelevant to determining the sufficiency of the claims as pled.

governmental authority." *Id.* at 622; *see also West*, 487 U.S. at 42, 49, 54. If a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, it is also action "under color of state law" for § 1983 purposes. *Id.* The nature and circumstances of the defendant's act are controlling and must be carefully scrutinized. *Monroe v. Pape,* 365 U.S. 167, 184–87 (1961), *overruled on other grounds, Monell v. Dept. of Soc. Serv.,* 436 U.S. 658 (1978).

### 1. Dominion is a state actor.

Plaintiffs plead facts sufficient to establish that Dominion is a state actor. Dominion's involvement in the Election and in public discussions concerning election integrity, and its subsequent Lawfare only arose because of Dominion's (1) special role in conducting elections, which has its source in state authority; (2) extensive use of government procedures with significant aid from the government; and (3) authority to perform a traditional and exclusive government function. (Compl. ¶¶ 36–43.); *Edmonson,* 500 U.S. at 614–15. Plaintiffs also plead facts sufficient to show Dominion is a state actor because (1) it acted together with or obtained significant aid from state officials, *or* (2) its conduct was otherwise chargeable to various States. (Compl. ¶¶ 36–43.)

The Elections Clause gives States the authority "to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right" to vote. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 834 (1995) (citations omitted); U.S. Const. art. I § 4, cl. 1. "The power to regulate the time, place, and manner of elections," however, "does not justify, without more, the abridgment of fundamental rights." *Tashjian v. Republican Party of Conn.,* 479 U.S. 208, 217 (1986). Due to their constitutional authority to regulate election procedures, States have an interest in protecting the integrity and regularity of the election process. *Thornton*, 514 U.S. at 835. Each State has legislation regulating elections with most States approving language which authorizes the outsourcing of various

aspects of their election regulatory authority to third parties. (Compl. ¶¶ 42–43.) Over 1,300 governmental jurisdictions outsourced their constitutional obligations under Article I, Section 4, Clause 1 to Dominion for the Election, including many "swing States" and every county in Georgia under a state-wide contract. (*Id*. at ¶¶ 36, 42.) Dominion obtained state authority to administer, collect, count, record, and audit ballot results through these contracts. (*Id*. at ¶¶ 42–43.) In exercising its state-granted authority, Dominion provides the States with an "End-To-End Election Management System" that "[d]rives the entire election project through a single comprehensive database." (*Id*. at ¶ 39.) Dominion "build[s] the election project" and provides technology and solutions for voting, tallying, reporting, and auditing the election. (*Id*.) With contracts in over half of the United States in 2020, Dominion exercised extensive authority over the administration of voting systems and services used to run election operations and programming in this country. (*Id*. at ¶¶ 40–43.)

While a State may outsource its duty to administer elections to a third party, (1) the state (a) remains responsible for that party's performance of the obligation and (b) retains the duty to protect the integrity of the election process through legislation; and (2) the outsourced obligation is still subject to constitutional protections against government abuse through state action. *See Thornton,* 514 U.S. at 835; *see also West*, 487 U.S. at 55 (a state cannot relieve itself of a constitutional obligation through contract with a private party). "Any part of the machinery for choosing officials becomes subject to the Constitution's constraints." *Edmonson*, 500 U.S. at 625 (quoting *Terry v. Adams*, 345 U.S. 461, 481 (1953)).

In *Edmonson,* the Supreme Court held a private entity's exercise of peremptory challenges was pursuant to a course of state action. *Id*. at 618. The issue was whether a private litigant in a civil case may use peremptory challenges to exclude jurors on account of race. *Id*. at

616. Because racial discrimination violates the Constitution only when attributed to state action, the Court began a state-action analysis according to the framework established in *Lugar*—(1) "whether the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in state authority" and (2) "whether the private party charged with the deprivation could be described in all fairness as a state actor." *Id.* at 619–20 (cleaned up).

The Court held that the first part of the *Lugar* test was clearly satisfied. *Id.* at 620. Because peremptory challenges "are permitted only when the government, by statute or decisional law, deems it appropriate" to exclude people from service on a jury, the Court held that the private party defendant "would not have been able to engage in the alleged discriminatory acts" without specific government authorization. *Id.* at 620–21. In determining the second part of the *Lugar* test, the Court held it relevant to examine "the extent to which the actor relies on governmental assistance and benefits, whether the actor is performing a traditional governmental function, and whether the injury caused is aggravated in a unique way by the incidents of governmental authority." *Id.* at 620–22 (cleaned up). State action exists, the Court explained, "when private parties make extensive use of state procedures with overt, significant assistance of state officials." *Id.* at 622 (citations omitted). Because the peremptory challenges in *Edmonson* were used to select the jury, a body that ultimately exercises the power of the court and the government, the Court held that the private litigant's exercise of those peremptory challenges was state action. *Id.* at 624. The Court held that "[i]f a government confers on a private body the power to choose the government's employees or officials, the private body will be bound by" constitutional mandates. *Id* at 625. Although the private entity lacked a contractual relationship with the government, the Court still held that when the government and private entity "work for the same end," the private

entity's involvement in a "unique governmental function" delegated to it by the government is "attributable to the government for purposes of invoking constitutional protections." *Id.* at 627.

Here, the Complaint alleges sufficient facts to support a reasonable inference that Dominion is a state actor. Under the first part of the *Lugar* test, Dominion's conduct was only possible because "the government, by statute or decisional law, deem[ed] it appropriate." *Edmonson*, 500 U.S. at 620. Dominion is authorized by statute in over half of the States to perform the constitutional obligation to administer elections which Dominion did for the Election. (Compl. ¶¶ 36, 41.) Following the Election, Plaintiffs drafted affidavits detailing issues they witnessed while volunteering as poll watchers and challengers at voting locations in Michigan. (*Id.* at ¶¶ 5, 16–28.) Plaintiffs' affidavits were attached as exhibits to two lawsuits filed in Michigan concerning potential election irregularities. (Dkt. 40 at 1.) While no Plaintiff made any statement concerning Dominion in these affidavits, Dominion presumed to send Letters to Plaintiffs demanding that they stop "defaming Dominion." (Compl. at p.4, ¶¶ 16–28, 78–80.) Dominion's conduct is a transparent assault on freedom of speech; the First Amendment guards against retaliation not only by the government but also by state actors, including the Lawfare campaign waged by Defendants. (*Id.* ¶¶ 81-91.)

Dominion's conduct arose directly from its exercise of state-delegated authority to administer elections. The fact that Dominion believes general statements about observed election irregularities—which do not mention Dominion—somehow defame Dominion emphasizes that Dominoin itself recognizes its own role as a state actor. Had the States not contracted with Dominion to administer the Election, then Dominion could not possibly perceive any defamation in private citizen's expressions of skepticism about the Election's integrity, results, and administration. Dominion could not administer elections without state authority to do so. (*Id.* at ¶¶ 36, 39,

41–43.) The States' delegation of their own authority to Dominion explains why Dominion presumed both to send over 150 Letters to people publicly questioning the Election's (not Dominion's) integrity and to file defamation lawsuits against high-profile speakers. (*Id.* at ¶¶ 36–43.) Dominion's conduct is only explained by state authority, approval, action, and involvement.

Plaintiffs further plead facts supporting each factor under the second part of the *Lugar* test. Dominion made extensive use of significant government participation both in administering elections and invoking the judicial system to silence viewpoint-based speech regarding the Election. (*Id.*) Dominion had contracts with over 1,300 jurisdictions to administer, collect, count, record, and audit ballot results for the Election. (*Id.* at ¶¶ 36.) "Those contracts are typically multi-year contracts and range from tens of thousands of dollars to over a hundred million dollars, depending on the jurisdiction and scope of the contract." (*Id.* at ¶ 42; *see* D.D.C. Case No. 1:21-cv-00445-CJN at Dkt. 1 ¶ 157). For example, Dominion received an initial $90,000,000 for its Georgia contract and profited from six weeks of "service" provided to Fulton County alone totaling $1,297,260.00. (Compl. ¶ 42.) Dominion exerted significant control over the Election working in conjunction with election officials. (*Id.* at ¶¶ 36–43.) In Maricopa County, Arizona, for example, only Dominion could program *and* operate its machines during the Election; officials lacked the necessary administrative passwords for access. (*Id.* at ¶ 40.) Even after the Election, Dominion refused to provide passwords to Maricopa officials so they could conduct an audit. (*Id.* at ¶¶ 39–40.) The very terms of Dominion's contracts with the States indicate the amount of control Dominion exercises over elections. For example, Dominion's Georgia contract states that the "State has relied, and will rely on, [Dominion's] experience and expertise in installing, implementing, and servicing the Solution purchased under this Agreement" —which includes

providing machines and personnel to administer election functions such as "counting, recording, and auditing ballots and election results." (*Id.* at ¶¶ 42–43.)

Dominion's conduct involves a traditional and exclusive public function—the conduct and administration of elections. (*Id.* at ¶¶ 10, 36–43, 111.) A function qualifies "as a traditional, exclusive public function within the meaning of our state-action precedents" when "the government … traditionally and exclusively performed the function." *Halleck,* 139 S.Ct. at 1928–29 (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982)); *Evan v. Newton*, 382 U.S. 296, 300 (1966). "Under the Court's cases, those functions include, for example, running elections." *Halleck*, 139 S.Ct. at 1929 (citing *Terry*, 345 U.S. at 468–70); *Nixon v. Condon*, 286 U.S. 73, 84–89 (1932).

Dominion's relationship with state and local governments is "an integral part ... of the elective process that determines who shall rule and govern." *See Terry*, 345 U.S. at 469. Dominion provides required election support and services and serves the same role as local county election officials at precincts leading up to, during, and after an election. (Compl. ¶¶ 36–43.) Dominion updates, fixes, and patches software for its voting machines, and releases these updates through means selected at its own discretion, including via the Internet. (*Id.* at ¶ 37.) Dominion designs the election processes centered around its hardware and software products. (*Id.* at ¶ 38.) Finally, Dominion's authority does not end on election day but extends to the conduct of post-election audits and installation of rolling software updates. (*Id.* at ¶ 43.)

Like in *Edmonson*, Dominion exercised the power to select and build all aspects of the machines which ultimately performed the essential state function of election administration. *See Edmonson*, 500 U.S. at 625. Because it is part of the "machinery for choosing officials," Dominion is subject to the Constitution's restraints against viewpoint-based discriminatory speech

restrictions on matters regarding the election of public officials. *Id*; *see also Lee v. Katz*, 276 F.3d 550, 556 (9th Cir. 2002) (supporting argument that when a private party performs a traditional and exclusive public function, it may not regulate speech regarding that function); (Compl. ¶¶ 36–43.) While Dominion's pretextual motive for initiating the Lawfare campaign and filing defamation lawsuits "may have been to protect a private interest, the objective of" the Lawfare campaign in reality was to silence speech critical of the Election's integrity. (Compl. ¶¶ 125–39, 169–79); *Edmonson,* 500 U.S. at 626. Because Dominion exercised the state-delegated responsibility to administer public elections—a core governmental function—Dominion was a state actor when it undertook to silence criticism of how the Election had been conducted through its Lawfare campaign, which Dominion initiated with the connivance of HPS and Clare Locke. (*Id*. at ¶¶ 4–12, 78–90, 125–39, 169–79.) Dominion misused the authority given to it by the States, and in so doing caused Plaintiffs' constitutional deprivations. Therefore, Dominion "may fairly be said to be a state actor" acting under color of law. *West,* 487 U.S. at 54–55 (citing *Lugar,* 457 U.S. at 937).

### 2. Dominion violated Plaintiffs' constitutional rights.

In addition to alleging state action, a plaintiff asserting a § 1983 violation against a private defendant must "allege the violations of a right secured by the Constitution and laws of the United States." *Id.* at 48; *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978). A plaintiff does so by alleging the defendant's conduct violated specific constitutional rights. *Id*. at 45, 48 (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)). Here, Plaintiffs plead facts sufficient to show Dominion violated their First and Fourteenth Amendment rights.

### i.   *Dominion deprived Plaintiffs of their First Amendment rights through retaliation.*

To establish a claim for retaliation under the First Amendment, a plaintiff must allege that (1) he "engaged in constitutionally protected activity"; (2) the defendant's actions caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) the "defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Worrell v. Henry,* 219 F.3d 1197, 1212 (10th Cir. 2000), *cert. denied,* 533 U.S. 916 (2001); *see also, McCook v. Spriner Sch. Dist.*, 44 F. App'x. 896, 904 (10th Cir. 2002).

### a.   *Plaintiffs' statements receive First Amendment protection.*

All speech is protected by the First Amendment unless it falls into one of the few, traditional areas in which the Supreme Court has held speech may be restricted. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 383–85 (1992). "Discussion of public issues ... [is] integral to the operation of the system of government established by our Constitution." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995). As a result, "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs," *id.* at 346 (citations omitted), which includes discussion on "the manner in which government is operated ... and all such matters relating to political processes." *Mills v. Alabama*, 384 U.S. 214, 218–19 (1966). Such public issue speech is at the core of First Amendment protections. *See id.*; *Buckley v. Valeo,* 424 U.S. 1, 14–15 (1976); *New York Times Co. v. Sullivan,* 376 U.S. 254, 269–70 (1964). "[T]he First Amendment safeguards an individual's right to participate in the public debate through political expression and political association." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 203 (2014). Courts must "err on the side of protecting political speech rather than suppressing it." *Id*. at 209.

The Complaint alleges that Plaintiffs drafted affidavits regarding the issues they observed as poll watchers and challengers during the Election. (Compl. ¶¶ 6–28, 78–80). Such speech concerns "the manner in which government is operated ... and all such matters relating to political processes" and is, therefore, afforded the highest First Amendment protection. *See Mills*, 384 U.S. at 218–19; *Buckley,* 424 U.S. at 14–15.

Dominion argues that the First Amendment retaliation claim has no merit because defamation law already contains procedural protections for speech on matters of public concern. (Dkt. 40 at 22–23). But, as Dominion later admits, Dominion has not sued Plaintiffs for defamation, and the proposed Class expressly excludes individuals who were in pending litigation with Dominion as of September 29, 2021. (*Id*. at 22). This is not a counterclaim to another one of Dominion's defamation lawsuits. Rather, the claims here are based solely on Dominion's conduct towards Plaintiffs and the proposed Class because of statements they made on matters of public concern—an issue squarely within the confines of First Amendment retaliation jurisprudence. *See McCook*, 44 F. App'x. at 904. Dominion's "simplistic, all-or-nothing-at-all approach to First Amendment protection is at odds with common sense and with our jurisprudence as well"—and ignores the well-pled allegations in the Complaint regarding Dominion's unrestricted Lawfare campaign to suppress criticism of how the 2020 Election was conducted. (Compl. ¶¶ 2–3, 5–6, 8, 10, 12, 46–47, 76–77, 81–90); *R.A.V*, 505 U.S. at 385.

   b.   *Dominion's conduct would chill a person of ordinary firmness.*

The Complaint also alleges facts sufficient to show threatening conduct by Dominion toward Plaintiffs that would chill a person of ordinary firmness from openly discussing the integrity of the 2020 Election. The ordinary-firmness test is not subjective, but instead asks "whether a *person of ordinary firmness* would be chilled, rather than whether the particular plaintiff is

chilled." *Smith v. Plati*, 258 F.3d 1167, 1177 (10th Cir. 2001) (emphasis in original); *see also*

*McCook*, 44 F. App'x. at 905. "There is no reason to 'reward' government officials for picking on

unusually hardy speakers." *Bennett v. Hendrix,* 423 F.3d 1247, 1251–52 (11th Cir. 2005).

Plaintiffs received the Letters because they drafted affidavits relating their direct observa-

tions during Election Day. (Compl. ¶¶ 16–28). The Letters noted that Dominion had retained def-

amation counsel, was ready to "defend its good name and set the record straight," and had sent

similar letters to "Sidney Powell and various media entities." (*Id*. at p.4). The Letters threatened

that litigation was "imminent" if Plaintiffs failed to stop "defaming" Dominion. (*Id*.) Dominion's

website provided public updates on billion-dollar lawsuits against high-profile individuals like

Powell and media networks. (*Id*. at ¶ 81). At the same time, HPS was broadcasting a nationwide

media campaign touting Dominion's lawsuits against and maligning anyone associated with the

defendants as spreaders of "disinformation." (*Id*. at ¶¶ 82–90). A person of ordinary firmness,

faced with such threatening conduct, would not only mute his previous statements—he would

reasonably self-censor any additional speech. (*Id*. at ¶ 29). A person of ordinary firmness would

rightfully fear the financially ruinous defense costs, not to mention a potentially unwarranted

judgment, that could arise from being named in a billion-dollar lawsuit. Dominion's heavy-

handed threats would objectively squelch almost any person of ordinary firmness from continu-

ing to publicly question the integrity of the Election. (*Id*. at ¶¶ 16–29, 78–90).

      c.  *Dominion sent the Letters in response to Plaintiffs' statements regard-
          ing the Election.*

Finally, Plaintiffs sufficiently plead that, (1) but for Dominion's role in the Election, Do-

minion could not have perceived that any of the "defamatory" statements by Plaintiffs and the

proposed Class were even directed at Dominion, and (2) but for comments like those by Plain-

tiffs and others about the Election, Dominion would not have retaliated against them by sending

threatening Letters. (*Id.* at ¶¶ 78–90). Dominion admits as much in the Letters, each of which specifically asserts that it was sent in response to the recipient's alleged involvement in the "ongoing misinformation campaigns falsely accusing Dominion of somehow rigging or otherwise improperly influencing the outcome of the November 2020 U.S. presidential election." (*Id.* at p.4). Accordingly, "but for" Dominion's role in the Election and "but for" Plaintiffs' and the proposed Class members' statements regarding the Election, Dominion would not have sent the Letters at all.

### ii. *Dominion deprived Plaintiffs of Equal Protection and Due Process under the Fourteenth Amendment.*

Plaintiffs sufficiently allege that Dominion's actions violated their right to equal protection and due process of the law under the Fourteenth Amendment. The Complaint alleges that Dominion's retaliatory and threatening conduct constituted "disparate treatment on the basis of a classification forbidden by the Equal Protection Clause." *Wilcox v. Lyons*, 970 F.3d 452, 460 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2754 (2021) (allegations that defendant was actually motivated to treat plaintiff differently in retaliation for his speech and had no rational basis for treating him differently—as opposed to a "pure or generic retaliation claim"—properly asserts violations of the Equal Protection and Due Process Clauses).

#### a. *Dominion's conduct violated the Equal Protection Clause.*

The Fourteenth Amendment guarantees that no state may deny any person equal protection of the law. U.S. CONST. amend. XIV, § 1. "[S]tates cannot make distinctions among citizens that burden the exercise of a fundamental right guaranteed by the Constitution." *Vacco v. Quill,* 521 U.S. 793, 799 (1997); *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000) (per curiam). The Equal Protection Clause "protects against invidious discrimination among similarly-situated individuals or implicating fundamental rights." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470

F.3d 250, 260–61 (6th Cir. 2006) (citing *Zablocki v. Redhail*, 434 U.S. 374, 383 (1978)). States are required to "allow speech on matters of public concern on an equal basis with all other citizens." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972).

Here, Dominion's disparate treatment of Plaintiffs and others like them is based solely on an impermissible classification of speech based upon a particular viewpoint. (Compl. ¶¶ 78–90, 113). The guarantee of equal treatment under the law has "a firmer foundation than the whims or personal opinions of a local governing body." *Niemotko v. Maryland*, 340 U.S. 268, 272 (1951). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989); *see also*, *e.g.*, *Hustler Mag., Inc. v. Falwell,* 485 U.S. 46, 55–56 (1988); *City Council of L.A. v. Taxpayers for Vincent,* 466 U.S. 789, 804 (1984); *Carey v. Brown,* 447 U.S. 455, 462–63 (1980); *Buckley,* 424 U.S. at 16–17; *Grayned v. Rockford,* 408 U.S. 104, 115 (1972); *Police Dept. of Chi. v. Mosley,* 408 U.S. 92, 95 (1972); *United States v. O'Brien,* 391 U.S. 367, 382 (1968); *Stromberg v. California,* 283 U.S. 359, 368–69 (1931).

The Complaint adequately alleges an Equal Protection Clause violation based on Dominion's discriminatory threatening of speakers expressing specific content or a particular viewpoint about the Election while giving a pass to others who did not express that content or viewpoint or who expressed the same content and viewpoint, but only in the context of other elections. (Compl. ¶¶ 47, 77, 109–13). Content and viewpoint-based discrimination are two concepts rooted in the First Amendment's bar against censorship. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 59 (1983) (Brennan, J., dissenting). "[T]he content neutrality principle is invoked when the government has imposed restrictions on speech related to an entire subject

area," while the viewpoint discrimination concept "strike[s] down government restrictions on speech by particular speakers." *Id.* Prohibitions against viewpoint discrimination are at the very core of the First Amendment protections. *Id.* "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *See R.A.V.,* 505 U.S. at 391. "Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829 (1995) (citing *Perry*, 460 U.S. at 46). The government may not regulate speech based on its substantive content or message it conveys. *See id.* at 828; *Mosley*, 408 U.S. at 96. Discrimination against speech because of its message is *presumed* to be unconstitutional. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641–43 (1994).

The Complaint sufficiently alleges facts showing that Dominion's conduct violated the Equal Protection Clause in two ways—through blatant viewpoint discrimination and through imposition of improper financial burdens on those expressing that viewpoint. *See Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115, 116 (1991). First, Defendants aimed the Lawfare campaign only at a particular viewpoint regarding the Election—that the results were suspect. (Compl. ¶¶ 10, 12, 19, 78–90, 125–39.) Second, the Lawfare campaign imposed viewpoint-based financial burdens when Dominion threatened expensive "imminent" litigation only against individuals espousing that viewpoint. (*Id.* at p.4.) When every speaker targeted apparently shares the same perceived viewpoint, "a significant danger of idea or viewpoint discrimination exists." *R.A.V.,* 505 U.S. at 388. Dominion, being a state actor with the motive to

17

suppress debate about the integrity of the Election, cannot constitutionally pick or choose whose criticism and which viewpoints it seeks to stifle.

Dominion justified sending threatening Letters to Plaintiffs and the proposed Class because their affidavits were attached (by others, not them) to two lawsuits (brought by others, not them) challenging Election results. (Dkt. 40 at 1–2.) Despite Plaintiffs not knowing their affidavits would be used in any lawsuits, Dominion persists in its accusation that Plaintiffs are "active participants in a disinformation campaign" against Dominion. (Dkt. 40 at 2.) But none of the Plaintiffs' affidavits mentioned Dominion; they only attested to voting irregularities and potential fraud the Plaintiffs personally witnessed. (Compl. ¶¶ 78–90.) Dominion's actions toward Plaintiffs and the proposed Class members clearly reveal the motivation behind Dominion's Lawfare campaign—to silence speech questioning the integrity of the Election, not speech that "defames" Dominion. Dominion's Letters to Plaintiffs targeted people who had not even *mentioned* Dominion, but whose affidavits *were* included in lawsuits highlighting election irregularities. Dominion's threats "plainly impose[d] a financial disincentive only on speech of a particular content," *Simon*, 502 U.S. at 116, but not on content of a defamatory nature. Indeed, Dominion and other electronic voting machines manufactures have long been directly criticized, by name, for the lack of security of their voting systems and for allowing the manipulation of votes in elections prior to November 2020. (Compl. ¶¶ 3, 47–72.) But it was only in connection with the 2020 General Election that Dominion saw fit to embark on a massive Lawfare campaign designed to suppress public debate about election integrity. The Complaint pleads sufficient facts to plausibly suggest Dominion sought to silence a particular viewpoint in violation of the Equal Protection Clause.

*b.   Dominion's conduct violated the Due Process Clause.*

The Fourteenth Amendment further guarantees that the state will not "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. The Due Process Clause prevents irrational or arbitrary actions by government officials. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *Schware v. Bd. of Bar Examiners*, 353 U.S. 232, 239 (1957). Official action violates the Due Process Clause when it is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience'" or "interferes with the concept of ordered liberty." *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 528 (10th Cir. 1998) (quoting *Lewis*, 523 U.S. at 847 n.8); *United States v. Salerno*, 481 U.S. 739, 746 (1987). Official action meets this standard when it is "arbitrary in the constitutional sense," meaning defendant's conduct was intended to "injure in some way unjustifiable by any government interest." *Lewis*, 523 U.S. at 847, 849. A plaintiff successfully pleads arbitrary conduct if the defendant was solely motivated to retaliate against the plaintiff based on discriminatory reasons. *Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886, 898 (1961) (discriminatory treatment of an individual because she is "a Democrat or a Methodist" is "patently arbitrary").

The Complaint sufficiently alleges that Dominion deprived Plaintiffs and members of the proposed Class of their right to free speech without due process of law in violation of their substantive due process rights. (Compl. ¶¶ 4–12, 78–90, 109–18); *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) ("[t]he fundamental concept of liberty embodied in [the Fourteenth] Amendment embraces the liberties guaranteed by the First Amendment"). The statements in Plaintiffs' affidavits are protected First Amendment speech on matters of public concern. (Compl. ¶¶ 78–80, Ex. 1–16.) Dominion sent over 150 Letters to people challenging Election integrity under the pretext of protecting its private interest against defamation and attempted to misuse the litigation process

to suppress Plaintiffs' and the proposed Class members' freedom of speech and expression of a disfavored political viewpoint. (*Id.* at ¶¶ 4–12, 78–90.) Dominion's discriminatory conduct was intended to silence only certain dissenting viewpoints regarding the Election. (*Id.*) Dominion, in its capacity as a state actor, lacks any legitimate state interest that would justify its conduct, but instead admits that Plaintiffs' "affidavits include no allegations of issues involving Dominion's systems." (Dkt. 40 at 4.) How Dominion can claim to be protecting itself against defamation in light of this concession is a mystery. Because the Complaint alleges Dominion's conduct was both discriminatory and arbitrary on these grounds, Dominion's conduct "rise[s] to the conscience-shocking level." *Lewis*, 523 U.S. at 849.

## C.   PLAINTIFFS ADEQUATELY PLEAD RICO VIOLATIONS AGAINST DEFENDANTS.

The Complaint's allegations plausibly establish all the required elements of a RICO violation under § 1962(c) because they show that Defendants "each (1) conducted the affairs (2) of an enterprise (3) through a pattern (4) of racketeering activity" and that (5) the plaintiffs' business or property was injured (6) as a result of Defendants' violations. *Safe St. All. v. Hickenlooper*, 859 F.3d 865, 881–82 (10th Cir. 2017) (citing 18 U.S.C. § 1962(c)). Plaintiffs also plausibly allege violations of § 1962(d) by stating Defendants conspired to conduct the affairs of an enterprise through a pattern of "racketeering activity," i.e., conspired to violate § 1962(c). *United States v. Norton*, 867 F.2d 1354, 1358 (11th Cir. 1989).

Plaintiffs allege that Defendants and Clare Locke conspired to silence election integrity critics nationwide concerning the integrity of the Election by conducting the enterprise through a pattern of racketeering activity, including extortion, mail fraud, and witness intimidation. (Compl. ¶¶ 99–108). The Court must determine whether Plaintiffs' "allegations are sufficient to withstand a motion to dismiss—not whether the plaintiffs can ultimately establish that

[Defendants] conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs sufficient to satisfy 18 U.S.C. § 1962(c)." *See George*, 833 F.3d at 1253. Even if Plaintiffs' allegations "require fleshing out at the discovery stage," the Complaint is "sufficient to withstand dismissal." *Id.*

### 1. Plaintiffs assert damage to their property caused by Defendants' conduct.

To meet § 1964(c)'s damages allegation requirement, a plaintiff need only allege that the defendant's conduct caused damage to the plaintiff's business or property. *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002). For example, in *NOW v. Scheidler,* the Supreme Court held that the plaintiffs' allegations that the RICO conspiracy "ha[d] injured the [plaintiffs'] business and/or property interests" was sufficient at the motion to dismiss stage. 510 U.S. 249, 256 (1994) ("[n]othing more is needed to confer standing on [plaintiffs] at the pleading stage"); *see also Robbins*, 300 F.3d at 1211 (complaint which made "several references to business or property damage which allegedly resulted from defendants' activities" was "sufficient to show standing especially at [the motion to dismiss] stage of litigation").

Here, Plaintiffs adequately plead property damage caused by Defendants' actions sufficient to meet this pleading standard. Like *Scheidler*, the Complaint states several times that Defendants' Lawfare campaign caused damage to Plaintiffs' property. (Compl. ¶¶ 18, 20–21, 23, 25–28, 108). Plaintiffs also properly plead causation by specifically alleging that they "have been intimidated from participating in the debate [regarding the Election] ... because of Dominion, Clare Locke, and HPS' Lawfare" and, that as a result of the publicity and hostility surrounding the enterprise's Lawfare campaign, Plaintiffs feared for their safety and purchased security equipment for their homes. (*Id*. at ¶¶ 5, 18, 20, 23, 26–27). These were the natural, foreseeable, and intended damages of the enterprise's Lawfare campaign carried out by Defendants' and Clare

Locke's attempts to commit extortion, mail fraud, and witness intimidation and tampering. (*Id.*) Plaintiffs' allegations of damages and causation sufficiently assert standing to bring civil RICO violations under 18 U.S.C. § 1964(c). Any further argument by Defendants that Plaintiffs lack standing to bring these claims is a "surreptitious effort to challenge the merits of the class claims, which are not at issue at" this stage. *CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1099 (10th Cir. 2014).

### 2. Plaintiffs adequately allege predicate acts.

In addition to alleging the right type of damage, Plaintiffs must show a RICO predicate offense[5] was the direct cause of their harm. *Hemi Grp. v. City of New York,* 559 U.S. 1, 9 (2010); *see also CGC Holding*, 773 F.3d at 1099.

#### i. Plaintiffs adequately allege extortion under Colorado and federal law.

A defendant commits extortion in Colorado, if, "without legal authority and with the intent to induce another person against that other person's will to ... refrain from performing a lawful act," the defendant "makes a substantial threat to confine or restrain, cause economic hardship ... to, or damage the ... reputation of[] the threatened person or another person" and the defendant threatens to cause these results by "[p]erforming or causing an unlawful act to be performed or [i]nvoking action by a third party, including ... the state or any of its political subdivisions, whose interests are not substantially related to the interests pursued by the person making the threat." COLO. REV. STAT. ANN. § 18-3-207(1). A defendant's threat is "substantial" if it is "reasonably likely to induce a belief that the threat will be carried out and is one that threatens that significant confinement, restraint, injury, or damage will occur." *Id.* at § 18-3-207(3).

---

[5] Allegations that at least one defendant member of the enterprise committed a predicate act which caused the plaintiff's injuries sufficiently confers jurisdiction under both 18 U.S.C. § 1962(c) and (d). *CGC Holding*, 773 F.3d at 1088 (conspirator defendants may be liable under § 1962(d) even if they do not commit a predicate act and are not liable under § 1962(c)).

Even though Plaintiffs never mentioned Dominion, Defendants sent Letters to each Plaintiff demanding they "cease and desist in defaming Dominion" and threatening "imminent litigation" if they failed to do so. (Compl. at p.4). Defendants intended, without legal authority, to induce Plaintiffs and the proposed Class against their will to "refrain from performing a lawful act"—exercising their constitutional right to free speech regarding public issues like election security, irregularities, and potential fraud they personally witnessed. (*Id.* at ¶¶ 4–12, 78–90.) Defendants threatened litigation that carried with it potential enormous economic harm and damage to Plaintiffs' reputations. *See* COLO. REV. STAT. ANN. § 18-3-207(1). Defendants threatened to cause this harm to Plaintiffs and the proposed Class through sham defamation litigation that could not be based on any allegedly defamatory statements by Plaintiffs and the proposed Class and publicizing such lawsuits through Dominion's website administered by third parties and third-party network television broadcasts. (Compl. ¶¶ 5–10, 81–90.) Such threats by Defendants were "reasonably likely to induce a belief that the threat" would be carried out as Dominion's own CEO stated in a nationally televised interview on CNBC that its "legal team is looking at frankly everyone, and we're not ruling anybody out," and noting that Dominion's previous lawsuit was "definitely not the last lawsuit" it would be filing. (*Id.* at ¶ 84); COLO. REV. STAT. ANN. at § 18-3-207(3).

A defendant violates the Hobbs Act, 18 U.S.C. § 1951, if it attempts to, conspires to, or actually affects commerce in any way through extortion. *See United States v. Jannotti*, 673 F.2d 578, 594 (3d Cir. 1982). Extortion means "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, *or under color of official right*." 18 U.S.C. § 1951(b)(2) (emphasis added)[6]; *Chevron Corp. v. Donziger*, 871 F.

---

[6] Defendants omitted the state action component from their definition of extortion. (Dkt. 40 at 10.)

Supp. 2d 229, 248 (S.D.N.Y. 2012) (defendant need not actually obtain "transferred property;" the "Hobbs Act proscribes attempted extortion as well."). "The fact that the RICO Defendants have not succeeded in obtaining the desired payoff is immaterial to the question whether [the complaint] sufficiently has alleged Hobbs Act extortion as a RICO predicate act." *Chevron*, 871 F. Supp. 2d at 248. The Hobbs Act covers situations where a defendant's attempt to obtain "the property itself would be 'wrongful' because" it "has no lawful claim to that property." *Hall Am. Ctr. Assoc. Ltd. P'ship v. Dick*, 726 F. Supp. 1083, 1095 (E.D. Mich. 1989) (citing *United States v. Enmons,* 410 U.S. 396, 400 (1973)); *United States v. Clemente,* 640 F.2d 1069, 1077 (2d Cir. 1981) (the "wrongfulness" element is satisfied if defendants employed "fear of economic loss ... to obtain money to which they were not lawfully entitled").

Threats of litigation may constitute extortion under the Hobbs Act if the defendant subjectively knew "she had no claim for the property that she allegedly sought to extort." *United States v. Sturm*, 870 F.2d 769, 774 (1st Cir. 1989); *Hall*, 726 F. Supp. at 1096 ("the threat to sue may constitute extortion under the Hobbs Act."). In *Sturm,* the First Circuit held that the term "wrongful" in the Hobbs Act required "proof, in cases involving extortion based on economic fear, that the defendant knew that he was not legally entitled to the property that he received." *Sturm*, 870 F.2d at 774. Other courts have found threats of litigation in combination with other wrongful conduct constitutes extortion under the Hobbs Act. *Chevron*, 871 F. Supp. 2d at 247–48 (defendants' extortionary scheme of threatening and filing frivolous litigation and coordinating "a wide-ranging campaign of public attacks based on false and misleading statements" involved "the wrongful use of actual or threatened force, violence, or fear (including fear of economic loss)" to attempt to take the plaintiff's property); *Hall*, 726 F. Supp. at 1092–93 (plaintiff sufficiently pled extortion under Hobbs Act with allegations that defendants' scheme involved filing

24

federal and state court lawsuits and an "improper campaign of threats of financial harm, intimidation and harassment").

The Complaint adequately pleads property that can be extorted under the Hobbs Act. While silence is the ultimate goal of the enterprise, Defendants sought to obtain transferrable property from Plaintiffs and other individuals and directly affected commerce in doing so.[7] The Complaint alleges that Defendants, including Dominion in its capacity as a state actor (i.e., under color of official right), sought documents from Plaintiffs and proposed Class members in over 150 Letters sent to Plaintiffs and the proposed Class all over the country; conspired to obtain money damages from individuals and entities through Dominion's billion-dollar lawsuits filed in D.C., Delaware, and New York; threatened similar litigation against Plaintiffs; and coordinated a massive public relations campaign where they publicly vilified and discredited anyone expressing what they deemed "disinformation" regarding election integrity and security following the Election. (Compl. ¶¶ 5–10, 81–90). Money and documents "capable of passing from one person to another" can be extorted under the Hobbs Act as "property." *Sekhar v. United States*, 570 U.S. 729, 734, 737 (2013). The Complaint further adequately pleads that Defendants made "threats" which constitute extortion under the Hobbs Act. Defendants admit that "Plaintiffs' own affidavits include no allegations of issues involving Dominion's systems." (Dkt. 40 at 4). Thus, by Defendants' own admissions, they were subjectively aware[8] that Dominion was not motivated by the

---

[7] Neither the RICO enterprise nor predicate acts must be motivated by an economic purpose. *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 260 (1994).

[8] The Complaint need only allege that Dominion knew it did not have a legitimate defamation claim against Plaintiffs to survive dismissal. Whether Dominion subjectively thought it was legally entitled to the property it attempted to extort from Plaintiffs is an issue for the jury. *Sturm,* 870 F.2d at 774 n.6.

prospect of obtaining any money damages related to any purported defamation claims by sending the Letters to Plaintiffs and members of the proposed Class. (*Id*.)

> ### ii. Plaintiffs adequately plead witness intimidation, retaliation, and tampering.

Plaintiffs also allege that Defendants violated 18 U.S.C. § 1512. A plaintiff pleads witness intimidation and tampering under § 1512 by alleging the defendant either attempted to or did knowingly intimidate, threaten, or corruptly persuade another person, intending to "influence, delay, or prevent the testimony of any person in an official proceeding" or "cause or induce any person to ... withhold testimony, or withhold a record, document, or other object, from an official proceeding; ... evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or be absent from an official proceeding to which such person has been summoned by legal process." 18 U.S.C. § 1512(b). A defendant also violates § 1512 by attempting to or intentionally harassing another person which then hinders, prevents, or dissuades any person from "attending or testifying in an official proceeding ... or reporting to a ... judge of the United States the ... possible commission of a [f]ederal offense." 18 U.S.C. § 1512(d). Under the federal statute, an official proceeding includes civil proceedings before a federal court and need not be pending when the tampering occurs. *Id.* at § 1512(f); *United States v. Ahrensfield*, 698 F.3d 1310, 1324 (10th Cir. 2012). Defendants who conspire to commit either § 1512(b) or (d) are also liable. 18 U.S.C. § 1512(k).

The Complaint alleges that the enterprise sent Letters threatening Plaintiffs and the proposed Class with ruinous litigation unless they recanted previous statements and ceased further public expression regarding evidence of potential fraudulent manipulation of voting machines or their use in tampering with and altering the outcome of the Election. (Compl. ¶¶ 81–90.) HPS, authorized as Dominion's spokesperson, publicized the Lawfare campaign initiated by Dominion

and Clare Locke to further intimidate and silence viewpoint-based dissent regarding the Election. (*Id*. at ¶¶ 84–90.) As a state actor, Dominion is not privileged to threaten and initiate litigation on a discriminatory basis motivated by the purpose of silencing a particular, dissenting viewpoint concerning its administration of a traditional and exclusive government function.

As Defendants specifically identify in their Motions and exhibits, an official proceeding, *King v. Whitmer*, was pending in the Eastern District of Michigan when Defendants initiated their Lawfare campaign against Plaintiffs and the proposed Class. (E.D. Mich. Case No. 2:20-cv-13134.) The *King* complaint, filed on November 25, 2020, raised concerns of election fraud and included each Plaintiff's declaration, wherein they recounted their observations on Election Day, as an exhibit. (*See id*. at Dkt. 1.) The Supreme Court denied certification of *King* on February 22, 2021. (*Id*. at Dkt. 114.) By that time, however, Defendants had already sent the Letters to each Plaintiff identifying Clare Locke as Dominion's defamation counsel, warning that Dominion would "defend its good name and set the record straight," and threatening "imminent" litigation if Plaintiffs failed to stop "defaming" Dominion. (Compl. at p.4, Ex. 1–16.) Because Plaintiffs received the Letters while *King* was still pending, the Court may infer that Defendants sent the Letters attempting to either prevent Plaintiffs from testifying in *King* or at least cause them to withhold their testimony. 18 U.S.C. § 1512(b). Further, Defendants began their publicity campaign soon after the Election and had already appeared on national television to mock and discredit certain high-profile individuals' political speech regarding the Election before *King* was ultimately dismissed. (Compl. ¶¶ 81–84.) From these allegations, the Court may infer that Defendants intentionally harassed these high-profile individuals in an attempt to dissuade Plaintiffs from "attending or testifying in an official proceeding," i.e., *King*, also in violation of § 1512(d).

Even if *King* had not been pending when Defendants sent the Letters, the Complaint still alleges violations of the federal statute because an official proceeding does not have to actually be pending at the time of the obstruction. 18 U.S.C. § 1512(f). It is only necessary that Plaintiffs allege that Dominion could foresee that the individuals and media networks it ultimately sued, like Powell, might call at least some of the Plaintiffs as witnesses in defense of Dominion's claims against them. *Ahrensfield*, 698 F.3d at 1321–22. The Complaint alleges that at the time Defendants sent the Letters and publicized their Lawfare campaign, they were aware that the Plaintiffs witnessed election irregularities (Compl. at p.5); that there was a "misinformation campaign falsely accusing Dominion of somehow rigging ... the ... election" (*id*. at p.4); and that Dominion, prepared for "imminent" litigation "to defend its good name," had already hired its "defamation counsel," Clare Locke. (*Id*.)

Defendants even attempted to secure "all affidavits or declarations" each Plaintiff "submitted in litigation related to Dominion or the November 2020 presidential election." (*Id*. at p.5.) Defendants were aware that governmental bodies, state and local officials, and the public generally were questioning the integrity of the Election results. (*Id*. at ¶¶ 47, 49, 51–52, 56, 73–77.) Defendants were also aware of lawsuits and audits in specific states and counties to verify the elections results. (*Id*. at ¶¶ 74–76.) Dominion, aware of these potential official proceedings and investigations, and with full knowledge that it would file defamation lawsuits against many outspoken critics, coordinated with Clare Locke and HPS to send the Letters and publicize all efforts to silence viewpoint-based speech. (*Id*. at p.4.) Dominion then filed multiple lawsuits for defamation in federal court—all "official proceedings" under § 1512. (*Id*. at ¶ 81.) From these allegations, the Court may infer that Defendants anticipated Plaintiffs might be called as defense witnesses, supporting the affirmative defense of "truth," in Dominion's defamation lawsuits.

### iii.  *Plaintiffs adequately allege mail fraud.*

A defendant commits mail fraud under 18 U.S.C. § 1341 if it devised a scheme to defraud and used the mails in furtherance of this scheme regardless of whether the defendant actually succeeded in obtaining money or property from the plaintiff. *United States v. Curtis,* 537 F.2d 1091, 1095 (10th Cir. 1976), *cert. denied,* 429 U.S. 962 (1976); *see also United States v. Aigbevbolle*, 827 F.2d 664, 666 (10th Cir. 1987) (18 U.S.C. § 1341 "does not require the successful completion of the scheme to defraud."); *United States v. King,* 860 F.2d 54 (2nd Cir. 1988) (plaintiffs are not required to allege they actually relied on the defendants' misrepresentations or that they suffered actual pecuniary losses from the scheme). The mailings do not have to contain false statements if they are sent in furtherance of a "scheme to defraud." *See Schmuck v. United States*, 489 U.S. 705, 712, 715 (1989). When the plaintiff does not allege the communications are misleading, a complaint satisfies Rule 9(b)'s pleading requirements through "a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications."[9] *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998); *Moy v. Adelphi Inst., Inc.,* 866 F. Supp. 696, 703 (E.D.N.Y. 1994) (complaint is sufficient if it "amply details the scheme" and "reveals that harm and injury to Plaintiffs was contemplated by the defendants' plan").

Plaintiffs sufficiently allege that Defendants devised a scheme to defraud Plaintiffs and members of the proposed Class of money and used the mail to further this scheme as necessary to state a claim under 18 U.S.C. § 1341. *See supra* § 2.i., ii; (Compl. ¶¶ 4–6, 8, 78–81, 85–86;

---

[9] In any event, the Complaint alleges that Dominion made false statements including that its voting machines were not connected to the Internet during the Election and that its voting machines are not hackable. (Compl. ¶ 63.)

Dkt. 40 at 4.) The Letters that Dominion and Clare Locke sent to Plaintiffs are attached as exhibits to the Complaint. (Compl. at Ex. 1–16.)

### 3. Plaintiffs adequately allege an association-in-fact enterprise.

Plaintiffs adequately plead an "association-in-fact" enterprise among Defendants. RICO defines "enterprise" to include "'any union or group of individuals associated in fact although not a legal entity.'" *George*, 833 F.3d at 1248 (quoting 18 U.S.C. § 1961(4)). An "association-in-fact enterprise is a group of persons associated together for a common purpose of engaging in a course of conduct." *Hickenlooper*, 859 F.3d at 882–83 (citing *Boyle v. United States*, 556 U.S. 938, 946 (2009)). A plaintiff sufficiently alleges an association-in-fact enterprise through facts showing: (1) a purpose, (2) "relationships among those associated with the enterprise," and (3) "longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 883

First, the Complaint alleges activities by Defendants and Clare Locke that were "coordinated to serve common goals, and that is all that is required" to meet the common purpose requirement of an enterprise. *United States v. Applins*, 637 F.3d 59, 78 (2d Cir. 2011); (Compl. ¶¶ 1, 4–9, 78–90.)

Second, the Complaint alleges facts showing Defendants and Clare Locke are both related yet sufficiently distinct to form a RICO association-in-fact enterprise. While true that "a single person cannot be both the RICO enterprise and the RICO defendant," Plaintiffs do not allege that Defendants developed a scheme to defraud anyone through Dominion's regular business affairs, i.e., administering the Election. *Hickenlooper*, 859 F.3d at 883; *Reves v. Ernst & Young,* 507 U.S. 170, 185 (1993). Instead, the Complaint specifically alleges an association-in-fact enterprise among Dominion, HPS, and Clare Locke, working in concert to "intimidate

anyone who might speak out regarding election integrity and security concerns, whether such speech is related to Dominion or not." (Compl. ¶ 12.)

Plaintiffs sufficiently allege that Dominion is distinct from the enterprise and the other members—HPS and Clare Locke. *See CGC Holding*, 974 F.3d at 1212–13 ("RICO requires no more than the formal legal distinction between 'person' and 'enterprise' (namely, incorporation)"). Defendants undermine their own argument that they lack the required "distinctness" to form an enterprise by citing only cases that assess "distinctness" between parent corporations and their wholly owned subsidiaries. (Dkt. 40. at 14–15.)[10] Plaintiffs, however, do not allege that the Dominion Defendants are the only members in the enterprise, or that HPS and Clare Locke are Dominion's subsidiaries. In *George v. Urban Settlement Services,* the 10th Circuit distinguished *Brannon v. Boatman's First National Bank of Oklahoma*, where allegations of "a parent-subsidiary corporate relationship standing alone" were not enough to "invoke RICO liability,"[11] from the *George* complaint which sufficiently alleged an association-in-fact enterprise through allegations that "two separate legal entities joined together, along with several other entities, to form and conduct the affairs" of the enterprise. 833 F.3d at 1250.

In addition, the 10th Circuit held that the *George* complaint sufficiently distinguished the RICO person from the enterprise by alleging that the RICO person was not simply conducting its own affairs, but "act[ed] in concert with ... other members of the enterprise" to achieve the enterprise's common purpose. *Id.* The 10th Circuit held that even though the defendant-entity identified as the "RICO person" contracted with the other member defendant to perform certain

---

[10] In support of their "lack of distinction" argument, Defendants cite *Brannon v. Boatmen's First Nat. Bank of Okla.*, 153 F.3d 1144, 1145–46 (10th Cir. 1998) which involved RICO allegations that a bank holding company was the RICO enterprise and the holding company's subsidiary was the RICO person conducting the enterprise's affairs.
[11] *Brannon*, 153 F.3d at 1145–49.

services, the complaint did not allege that either a parent corporation or its subsidiary corporation was the enterprise, but rather that "two separate legal entities [,] joined together, ... to form and conduct the affairs of the ... association-in-fact enterprise." *Id.*; *see also Cedric Kushner Promo., Ltd. v. King*, 533 U.S. 158, 162 (2001) (a RICO enterprise may exist as long as members are "legally different entit[ies] with different rights and responsibilities due to [their] different legal status[es]. [N]othing in the statute ... requires more 'separateness' than that."). Similarly here, Clare Locke and HPS are not (1) wholly owned subsidiaries of, (2) legally identical to, (3) part of the same corporate structure as, or (4) operating with the same corporate conscience as Dominion. Plaintiffs in fact plead the opposite, that Defendants and Clare Locke are separate legal entities joined together to form and conduct the affairs of an association-in-fact enterprise. (Compl. ¶¶ 30–34.) The Complaint, therefore, alleges a RICO enterprise separate from its defendant-members.

Plaintiffs also adequately state a claim specifically against HPS under 18 U.S.C. § 1962(c) because the Complaint alleges HPS was an active member in the enterprise whose members sent the Letters, filed lawsuits, and publicized the enterprise's Lawfare campaign. (*Id.* ¶¶ 1, 4–5, 29, 77, 81, 84, 87.) A plaintiff must only show that the defendant "participate[d] in the operation or management of the enterprise itself" to maintain a claim under § 1962(c). *George*, 833 F.3d at 1251 (citing *Reves*, 507 U.S. at 185). A plaintiff can easily satisfy this requirement by alleging the "member played some part—even a bit part—in conducting the enterprise's affairs." *Id.* at 1253; *see also Ouwinga v. Benistar 419 Plan Serv., Inc.*, 694 F.3d 783, 791–93 (6th Cir. 2012) (complaint survived 12(b)(6) motion where plaintiffs alleged that, even though defendants did not design the enterprise's fraudulent plan, they conducted the enterprise's affairs by knowingly marketing, misleading, and misrepresenting a tax-benefit plan to investors; whether

defendants did more than conduct their own affairs was "a matter to be fleshed out in discovery").[12] While HPS claims it had no part in drafting or sending the Letters, it admits to publicizing Dominion's litigation efforts. (Dkt. 41 at 7).

Specifically, the Complaint details that HPS was hired to publicize the enterprise's Lawfare campaign which furthered the enterprise's goal to silence and intimidate individuals, including Plaintiffs and members of the proposed Class, from continuing viewpoint-based dissenting speech. (Compl. ¶¶ 4, 8, 15, 78, 81.); *see George*, 833 F.3d at 1253 (complaint survived 12(b)(6) motion where it offered "specifics regarding [defendant's] actions to further the enterprise's goals"). HPS appeared on CNN on February 7, 2021, threatening lawsuits by Dominion against individuals. (*Id.* at ¶ 4.) In any event, Plaintiffs sufficiently allege a claim against HPS for RICO conspiracy under 18 U.S.C. § 1962(d) because even those defendants who play a supporting role in the enterprise are "as guilty as the perpetrators." *See CGC Holding*, 974 F.3d at 1211.

Finally, Plaintiffs plead that the enterprise existed for a sufficient amount of time to accomplish its purpose. The Complaint alleges that beginning in December 2020, shortly after the Election, the enterprise began initiating Lawfare to silence speech regarding election integrity. (Compl. ¶¶ 17, 20–21, 23, 25–28.) Defendants continue to conduct the enterprise's affairs today—over a year later— through aggressive litigation.[13] Such allegations are sufficient to support the longevity requirement of an association-in-fact enterprise. *See Hickenlooper*, 859 F.3d at 883 (complaint sufficiently alleged association-in-fact enterprise with allegations that defendants conducted the affairs of their enterprise "for over a year").

---

[12] In *George*, the 10th Circuit cites and discusses *Ouwinga* as "instructive." 833 F.3d at 1252–53.
[13] *See e.g.*, Cause No. 1:21-cv-00445-CJN, pending in District Court in D.C.

### 4. The enterprise affected interstate commerce.

Plaintiffs adequately plead that the activity of the enterprise affected interstate commerce. Dominion, whose principal place of business is in Colorado, hired Clare Locke, based in Virginia, as defamation counsel. (Compl. ¶¶ 30–34.) Clare Locke sent over 150 Letters to Plaintiffs, who reside in Michigan, and members of the proposed Class located all over the country. (Compl. ¶¶ 16–29.) Dominion also coordinated with HPS, based in D.C., to create and nationally disseminate a publicity campaign broadcasting the enterprise's Lawfare campaign and threatening American citizens with expensive litigation for continuing to participate in political speech. Compl. ¶¶ 33, 35. Dominion then initiated lawsuits against several high-profile individuals in D.C., Delaware, and New York. (Compl. ¶ 81.) Because only a slight effect on interstate commerce is required, allegations that the enterprise made a "concerted effort to establish national ... influence" are sufficient. *United States v. Beasley*, 72 F.3d 1518, 1526 (11th Cir. 1996) (plaintiff's allegations that the enterprise "reached out to other states ... in an attempt to spread its influence" and distributed "publications and tapes ... throughout the United States ... by mail" were sufficient to show an effect on interstate commerce). Plaintiffs' allegations sufficiently show that the enterprise "reached out to other states ... in an attempt to spread its influence" which affected interstate commerce. *Id.*

### 5. Plaintiffs adequately plead a RICO conspiracy under 18 U.S.C. § 1962(d).

The Complaint also alleges that Defendants conspired to violate RICO. A defendant violates 18 U.S.C. § 1962(d) if it adopted "the goal of furthering or facilitating" the purpose of the enterprise even if the defendant does not commit or agree to commit the predicate acts required under § 1962(c). *Salinas v. United States*, 522 U.S. 52, 65 (1997) (affirming defendant's RICO conspiracy conviction under § 1962(d) even though he was acquitted of a RICO substantive offense under § 1962(c)). A defendant is liable for the acts of his other co-conspirators under

§ 1962(d) even if he "does not agree to commit or facilitate each ... part of the substantive of-fense," as long as the members "agree[d] to pursue the same criminal objective." *Id.* at 63–64 (citations omitted). A defendant can even violate § 1962(d) when he "is unaware of the identifies of the other co-conspirators and of all details of the conspiracy." *United States v. Fattah*, 914 F.3d 112, 166 n.19 (3d Cir. 2019). Under § 1962(d), if a plan "calls for some conspirators to per-petrate the crime and others to provide support, the supporters are as guilty as the perpetrators." *Salinas,* 522 U.S. at 64.

For the reasons discussed above and incorporated by reference here,[14] Plaintiffs properly plead RICO conspiracy liability against both Dominion and HPS for the support and involve-ment each contributed in furtherance of the ultimate goal of the enterprise. (Compl. ¶¶ 4–12, 78–90.) Even if HPS was completely unaware of the Letters or Clare Locke's involvement, HPS was aware of and agreed to further the overall goal of the enterprise to silence political speech through Lawfare and did so through its nationwide public relations campaign. (*Id.*); *Fattah*, 914 F.3d at 166 (allegations sufficiently showed all defendants agreed to participate in enterprise's plan where one defendant, at the center of an association-in-fact enterprise, knew all co-conspira-tors despite other co-conspirators potentially being unfamiliar with each other).

## D.   PLAINTIFFS ADEQUATELY PLEAD A CIVIL CONSPIRACY CLAIM.

Plaintiffs properly state a claim for civil conspiracy. In Colorado, a civil conspiracy claim requires proof of five elements: "(1) two or more persons," which includes a corporation; "(2) an object to be accomplished; (3) a meeting of the minds on the object or course of action to be taken; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *See Walker v. Van Laningham*, 148 P.3d 391, 396 (Colo. App. 2006).

---

[14] *See supra* § C, 1-4.

Plaintiffs plead sufficient facts to state a claim that is plausible on its face in support of each element. *See George*, 833 F.3d at 1247 (claim is facially plausible if plaintiff pleads facts from which the court may reasonably infer defendant is liable for the misconduct alleged). Here, Plaintiffs plead facts to support a civil conspiracy between Defendants and non-party Clare Locke. (Compl. ¶¶ 4, 119–22.) Together, Defendants and Clare Locke had a meeting of the minds on the object to be accomplished, which was to further a nation-wide civil conspiracy to silence viewpoint-based speech regarding the integrity and reliability of the Election. (*Id*. at ¶¶ 4, 7–8, 29, 35, 47, 78, 81, 85–89, 119–22.) Defendants' objective was supported by launching a campaign of Lawfare intended to intimidate into silence those who spoke about Election irregu- larities. (*Id*. at ¶¶ 1–12, 29, 35, 78.) This included Clare Locke, who drafted and sent over 150 Letters to Plaintiffs and the proposed Class for speaking about election integrity or security. (*Id*. at ¶¶ 4–5, 17, 20– 22, 24, 26–28, 79, 81, 105.) The Letters demanded the recipients stop "defam- ing Dominion" and that they "retract" their statements regardless of whether the recipients, such as the Plaintiffs, even mentioned Dominion. (*Id*. at ¶¶ 4–7, 11, 17, 20–22, 24, 26–28.) In turn, Dominion filed billion-dollar defamation claims against those with the deepest pockets who made statements about the Election with whom Dominion disagreed. (*Id*. at ¶¶ 4, 6, 8, 78, 81, 84–86.) In tandem, HPS worked to publicize Dominion's efforts through a well-orchestrated publicity campaign designed to spread Dominion's allegations to as many people as possible to silence their speech and publicly intimidate and threaten similar litigation against anyone who continued to discuss the Election. (*Id*. at ¶¶ 4, 8, 29, 78, 82, 84.) Defendants committed unlawful, overt acts that included abuse of process, threats, and intimidation including extortion, mail fraud, and witness intimidation for the purpose of intimidating the Class into silencing their own constitutionally protected political speech in opposition to Defendants' point of view. (*Id*. at

¶¶ 100–13, 122.) In addition, Dominion, as a state actor, deprived Plaintiffs and the proposed Class of their rights under the First Amendment and Equal Protection and Due Process Clauses by threatening sham and potentially ruinous litigation against the Class based on their political viewpoints and speech in violation of 42 U.S.C. § 1983. (*Id.* at ¶¶ 114–118.) Finally, Plaintiffs adequately allege that they and other members of the proposed Class suffered actual damages as a proximate cause of Defendants' and Clare Locke's Lawfare campaign, including damages to their property and purchasing security equipment to protect themselves from potential further threats or harm. (*Id.* at ¶¶ 18, 20–21, 23, 25–28, 122.)

Courts have routinely denied motions to dismiss where a plaintiff pleads civil conspiracy involving fraudulent demand letters where the complaint details the parts of the scheme, as the Class did here. *See, e.g., Wyndam Vacation Ownership, Inc. v. Clapp Business Law, LLC*, 411 F. Supp. 3d 1310, 1320 (M.D. Fla. 2019) (denying motion to dismiss civil conspiracy claim where complaint detailed 200+ boilerplate fraudulent demand letters sent by law firm to Wyndam on behalf of Wyndam timeshare owners demanding recission of timeshare contracts but failing to negotiate with Wyndam after sending letters).

Dominion offers three challenges: (1) if the Complaint alleged a conspiracy to infringe on First Amendment and equal protection rights under 42 U.S.C. § 1985(3), then it does not apply to private conspiracies; (2) the Complaint did not allege sufficient unlawful overt acts; and (3) Dominion cannot conspire with itself to do actions within the scope of its business, as well as Dominion's agents, Clare Locke and HPS. Similar to Dominion's third argument, HPS offers one challenge: HPS' actions did not go beyond the agency relationship between HPS and Dominion. None of these arguments have merit. Dominion's first challenge is easily dismissed because the Complaint alleged civil conspiracy under Colorado law, not § 1985(3). (Compl. ¶¶ 119–22.)

### 1.   Plaintiffs sufficiently allege unlawful overt acts in support of civil conspiracy.

The Complaint alleges unlawful overt acts including: (1) threats and intimidation that include extortion, mail fraud, and witness intimidation for the purpose of chilling Plaintiffs into silencing their own constitutionally protected political speech in opposition to Defendants' point of view; and (2) civil rights violations under 42 U.S.C. § 1983 based on Dominion's conduct as a state actor depriving Plaintiffs and members of the proposed Class of their rights under the First and Fourteenth Amendments by threatening sham and potentially ruinous litigation against them based on their political viewpoints and, specifically as to Plaintiffs, the mere fact that they observed inconsistencies in the Election—despite never mentioning Dominion in their affidavits. (*Id*. at ¶¶ 76–77.) Each of these overt unlawful acts have previously been discussed in depth. *See supra* at § C, 2.i.–iii.

### 2.   Clare Locke and HPS acted outside their agency relationship with Dominion.

Dominion claims that because Clare Locke and HPS are its agents and were acting at Dominion's direction, there cannot be a civil conspiracy. (Dkt. 40 at 27.) HPS also argues that its actions did not go beyond the scope of the agency relationship. (Dkt. 41 at 14.)

HPS relies on *Kelly v. Palmer, Reifler & Assocs., P.A*., which involved a law firm that represented retail stores to recover damages under civil theft recovery statutes. 681 F. Supp. 2d 1356, 1379 (S.D. Fla. 2010). A lawsuit was filed against the law firm for RICO violations alleging that the firm went beyond providing traditional legal services and actively directed an enterprise that included charging attorneys' fees for work that was not performed and applied attorney names to hundreds of boilerplate, computer-generated demand letters across the country where the signatory had no access to see the file. *Id.* at 1380. The court concluded that the law firm's tactics "even if deceptive or extortionate, were not separate and apart from its corporate client seeking to obtain a civil recovery from the plaintiffs." *Id*. The law firm "did not go beyond

rendering traditional legal services to its clients" even though the services likely fell below the standard of care for attorneys. *Id.* at 1381. Therefore, the law firm was acting toward a legitimate representational goal (recovering money for its clients) within the scope of the agency. *Id.*

In contrast, here, Clare Locke and HPS never acted towards a legitimate representational goal. Instead, they coordinated with Dominion to harass and intimidate Plaintiffs and the proposed Class through baseless preservation letters, threats of litigation, and an extensive media campaign. (Compl. ¶ 84.) Specifically, Clare Locke acted outside its agency relationship when it sent the baseless so-called "litigation preservation letters" and retraction demands to Plaintiffs and members of the proposed Class regardless of whether they made specific statements about Dominion. (*Id.* at ¶¶ 16–28.) Likewise, HPS acted outside of its agency relationship when it extensively promoted these baseless retraction demands and billion-dollar lawsuits on websites and in interviews. (*Id.* at ¶¶ 81–90.) HPS also gave the Letters and a list of the people who received them to news outlets such as the Washington Post to be featured in an article, and orchestrated interviews featuring Dominion CEO John Poulos announcing, "Our legal team is looking at frankly everyone, and we're not ruling anybody out." (*Id.*) This campaign amplified the falsehood and intimidation initially intended in the Letters. Together, this conduct was outside the scope of a legitimate agency relationship and amounts to harassment, intended to intimidate and silence Plaintiffs and members of the proposed Class. (*Id.* at ¶¶ 87, 89). Intimidation for the sake of intimidation is not a legitimate legal end and should not be considered within the scope of the attorney-client relationship. If it were, a client could simply hire an attorney to commit any wrongful act on his behalf and be shielded from liability. To the extent Defendants' Motions advocate for application of the intra-corporate conspiracy doctrine (mentioned only in a footnote) (Dkt. 40 at 28 n.12), the 10th Circuit has held that the doctrine does not apply to civil rights

claims including 42 U.S.C. § 1983 as pled in the Complaint. (Compl. ¶¶ 109–13.); *Brever v. Rowckwell Intern. Corp.*, 40 F.3d 1119, 1126–27 (10th Cir. 1994).

## II.    THIS COURT HAS PERSONAL JURISDICTION OVER HPS.

The Complaint's well-pled allegations, which this Court must accept as true, establish the Court's personal jurisdiction over HPS under both Colorado's long-arm statute and 18 U.S.C. § 1965. *See Goodwin v. Hatch*, No. 16-CV-00751-CMA-KLM, 2018 WL 3454972, at *8 (D. Colo. July 18, 2018), *aff'd*, 781 F. App'x. 754 (10th Cir. 2019); *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.,* 514 F.3d 1063, 1070 (10th Cir. 2008).

The Court has personal jurisdiction over HPS pursuant to 18 U.S.C. § 1965 which provides jurisdiction over all defendants involved in a civil RICO action as long as (1) personal jurisdiction is established over at least one defendant, (2) the "ends of justice" require nationwide service, and (3) the exercise of jurisdiction comports with due process. *Cory v. Aztec Steel Bldg.*, 468 F.3d 1226, 1231 (10th Cir. 2006) (nationwide service of process, i.e., summons, is a means of establishing a court's jurisdiction over a defendant); *see also Gibbs-Squires v. Urban Settlement Serv.*, No. 14-CV-00488-MSK-CBS, 2015 WL 196217, at *4 (D. Colo. Jan. 14, 2015), *aff'd*, 623 F. App'x. 917 (10th Cir. 2015). The "ends of justice" analysis is a "flexible concept uniquely tailored to the facts of each case." *Greenway Nutrients, Inc. v. Blackburn*, 33 F. Supp. 3d 1224, 1248 (D. Colo. 2014) (citing *Cory*, 468 F.3d at 1229–31).

The Court has personal jurisdiction over at least two Defendants—US Dominion, Inc. and Dominion Voting Systems, Inc.—due to their continuous and systematic contacts with Colorado since both entities have their principal place of business in the State. (Compl. ¶ 15, 30–31.) The Complaint properly pleads RICO conspiracy liability against Dominion and HPS for their coordinated conduct in furtherance of the enterprise's ultimate goal—to silence viewpoint

election speech through Lawfare. (*Id*. at ¶¶ 78–90.) HPS agreed to participate in and support the enterprise in achieving its common goal through a nationwide public relations campaign. (*Id*. at ¶¶ 4, 6, 84.) As such, the ends of justice require nationwide service on HPS. *See Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.*, 815 F. Supp. 1403, 1413 (D. Colo. 1992) (nationwide service was proper where complaint alleged that defendants participated in nationwide fraudulent scheme in violation of RICO). The exercise of jurisdiction comports with due process because, "while litigating long distance is expensive for any party," it is less expensive for HPS to defend this case in Colorado "where the events giving rise to the claims primarily occurred" and "is also where a majority of the Defendants reside." *See Goodwin*, 2014 WL 4244214, at *8. HPS is a co-conspirator in the RICO enterprise based out of Colorado. (Compl. ¶¶ 88, 103–04.) Hired by Colorado-based Dominion, HPS furthered the enterprise's Lawfare campaign through nationwide public advertising and television interviews. (*Id*. at ¶¶81, 88, 103–04.) HPS cannot, therefore, reasonably suggest that defending suit in Colorado based on its involvement in the Lawfare campaign was unexpected. *See Cory*, 468 F.3d at 1230–31.

In addition to jurisdiction under § 1965, Colorado's long-arm statute extends jurisdiction to the fullest extent permitted by the Constitution. *See Goodwin*, 2018 WL 3454972, at *8. A defendant is subject to personal jurisdiction in Colorado (1) when its affiliations with the State are so continuous and systematic as to render it essentially at home in the forum (i.e., general jurisdiction), *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); or (2) concerning any cause of action arising from any business it transacts within the state (i.e., specific jurisdiction). COLO. REV. STAT. ANN. § 13-1-124; *see also Wenz v. Memery Crystal*, 55 F.3d 1503, 1508 (10th Cir. 1995).

A defendant is subject to general judication when it, for example, holds itself out as doing business in the forum state through advertisements or conducts substantial business in the state. *Goodwin*, 2018 WL 3454972, at *8. A defendant is subject to specific jurisdiction when it purposefully directs its activities at residents of the forum and the litigation arises from those activities. *Id.*

Here, the Complaint alleges general jurisdiction over HPS because it conducted substantial business within the state. Shortly after the Election, Dominion, based in Colorado, hired HPS to work in concert with Dominion and Clare Locke to publicize the Lawfare campaign through nationally broadcast interviews as Dominion's spokesperson. (Compl. ¶¶ 4, 12.) HPS' relationship with Dominion continues to this day. (*Id.* at ¶¶ 82–90.)

The Complaint also alleges specific jurisdiction over HPS because the causes of action arise out of HPS' business relationship with Colorado-based Dominion which has existed since at least November 2020. (*Id.* at ¶¶ 86–88.) HPS has doubtless made many telephone, email, and Zoom video communications with Dominion creating and coordinating the HPS publicity campaign surrounding Dominion's litigation. *See String Cheese Incident Ticketing, LLC v. Stylus Shows, Inc.*, No. CIVA05-CV01934LTBPAC, 2006 WL 994239, at *3 (D. Colo. Apr. 14, 2006) (allegations that defendant communicated via telephone and email with its Colorado resident client for two years and the cause of action resulted from defendant's relationship with that client established minimum contacts). The Complaint alleges causes of action for civil conspiracy and RICO against HPS based entirely on its role as a co-conspirator and member of the RICO enterprise arising out of its business relationship with Dominion. (Compl. ¶¶ 99–108.) Such contacts sufficiently allege jurisdiction over HPS.

### III.    PLAINTIFFS' CLAIMS ARE JUSTICIABLE.

Defendants erroneously argue that Plaintiffs' claims are unripe and not concrete because, supposedly, Plaintiffs' injury-in-fact consists only of a "speculative" apprehension that in the future "I might get sued." (Dkt. 40, at 28, 30.) Defendants misunderstand Plaintiffs' injuries, which are neither abstract nor anticipatory, but which are instead quite tangible and have already been suffered, at least in part.

The Court has subject matter jurisdiction over Plaintiffs' claims because they allege an injury in fact that is ripe for review. "Article III standing requires the plaintiff to 'have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 871 (10th Cir. 2020) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual and imminent, not conjectural or hypothetical." *Id*. (citations omitted). A case is ripe for review if the plaintiff alleges that he has suffered injury—including economic injury—that is fairly traceable to the defendant's conduct. *Id*. Such an injury is "concrete" when it is "real" rather than "abstract." *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1190 (10th Cir. 2021).

Defendants argue that Plaintiffs' claims are unripe and not concrete. A case is not ripe for review if it "involves uncertain or contingent future events that may not occur as anticipated" or at all. *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995). In contrast, a claim is ripe for review when the plaintiff's alleged injury is already occurring at the time the lawsuit is filed. *See Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1097–98 (10th Cir. 2006) (plaintiff's alleged injury—that his First Amendment rights were chilled by

existence of statute—"[was] already occurring" and therefore, ripe for review). Defendants rely on cases involving an underlying, wrongful, *future* act that is speculative in nature compared to the Complaint, here, which alleges that Plaintiffs and members of the proposed Class have already in fact been harmed by Defendants' conduct. (Dkt. 40 at 28–29); *see, e.g.*, *Phelps v. Hamilton*, 934 F. Supp. 373 (D. Kan. 1996) (claim was unripe because there was no harm already occurring, only the threat of future harm (prosecution)). Defendants mischaracterize the alleged underlying wrongful acts as the "speculative possibility" of a future defamation lawsuit. (Dkt. 40 at 28.) In reality, the Complaint alleges damages from RICO violations, denial of equal protection, deprivation of First Amendment rights, and injuries arising from overt acts of a civil conspiracy, all of which flow from Defendants' coordinated Lawfare campaign directed against Plaintiffs and the proposed Class in order to silence a national debate over election security and voting system reliability. (Compl. ¶¶ 16–29, 81, 84, 86–87, 105, 107–08, 113, 118, 122.) Defendants threatened to bring spurious defamation litigation in Letters and in a nationwide public relations campaign soon after the Election. (*Id.*) These threats have already been made and caused concrete injury including property loss and economic damages to Plaintiffs and members of the proposed Class. (*Id.* at ¶¶ 16–28, 105, 107–08, 113, 118, 122.) Plaintiffs' claims arising from these injuries are plainly both ripe and justiciable.

## IV.    CONCLUSION

For the foregoing reasons, the Motions should be denied.

Respectfully submitted,

*/s/ Douglas A. Daniels*
Douglas A. Daniels
Texas State Bar No. 00793579
doug.daniels@dtlawyers.com
Heath A. Novosad
Texas State Bar No. 24037199

heath.novosad@dtlawyers.com
J. Christopher Diamond
Texas State Bar No. 00792459
chris.diamond@dtlawyers.com
DANIELS & TREDENNICK PLLC
6363 Woodway Drive, Suite 700
Houston, Texas 77057
(713) 917-0024 (Telephone)
(713) 917-0026 (Facsimile)

Robert A. McGuire, III
Colorado Reg. No. 37134
ram@lawram.com
ROBERT MCGUIRE LAW FIRM
1624 Market St. Suite 226 No. 86685
Denver, Colorado 80202-2523
(720) 420-1395 (Telephone)
(253) 267-8530 (Facsimile)

Kurt B. Olsen*
DC Bar No. 445279
ko@olsenlawpc.com
OLSEN LAW, P.C.
1250 Connecticut Avenue, NW, Suite 700
Washington, D.C. 20036
(202) 408-7025 (Telephone)
(202) 261-3508 (Facsimile)
*Admission Application Pending

***Counsel for Plaintiffs***

Alan Dershowitz
Massachusetts Bar No. 121200
1575 Massachusetts Avenue
Cambridge, Massachusetts 02138

***Of Counsel for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby attest that the foregoing was filed via the Court's CM/ ECF System and was, thereby, served on all parties at the time of filing.

/s/ Douglas A. Daniels
Douglas A. Daniels

45