**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. Case 1:21-cv-02672-STV

JENNIFER L. COOPER, et al.,

        Plaintiffs,

v.

US DOMINION, INC., et al.,

        Defendants.

---

**DEFENDANTS' REPLY IN SUPPORT OF MOTIONS TO DISMISS**
**THE FIRST AMENDED CLASS ACTION COMPLAINT**

---

## INTRODUCTION

Plaintiffs want us to imagine a judicial system where private companies and their hired public relations firms may be liable for racketeering and constitutional violations for sending prelitigation letters simply because they contract with state governments to perform tasks related to those traditionally undertaken by the state. We do not live in such a world. The consequences would be drastic, as private individuals would have constitutional protection to defame private companies that contract with the government and causes of action if they received any prelitigation correspondence (including required prelitigation letters under defamation law).

Plaintiffs' theories may be somewhat novel, but their claims lack sufficient allegations and legal support. Indeed, none of the cases Plaintiffs cite in their Response support their claims for relief. The sending of document preservation letters is not state action, a violation of the recipient's First Amendment and equal protection rights, or a predicate act supporting a claim for

racketeering.  And Plaintiffs cannot point to any allegation that they suffered injury to their business or property, or that Defendants' actions caused them to refrain from certain speech, which are required to assert standing under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and for First Amendment retaliation claims, respectively.  Rather, Plaintiffs present these theories as a means to punish Defendants US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation (collectively, "Dominion"), as well as its public relations firm, Hamilton Place Strategies, LLC ("HPS"), for invoking the rule of law to defend itself.  Plaintiffs' claims are factually lacking, and entirely contrary to the common law and constitutional law principles upon which this nation is founded. This case must be dismissed.

## ARGUMENT

### I.  Plaintiffs Fail to State a Plausible Claim for Relief.[1]

### a.  Plaintiffs' constitutional claims must be dismissed under Rule 12(b)(6).

#### i.  *Plaintiffs' state action argument lacks merit.*

Plaintiffs dedicate a significant portion of their Response to arguing that because Dominion provides election-related services, it acts under color of law in all actions it takes that bear some relationship to those services, such as sending the document preservation letters at issue in this case.  This novel theory, though, ignores a bedrock principle of the state action

---

[1] Plaintiffs argue that this Court may not consider documents referenced in the Motions to Dismiss that relate to Plaintiffs' affidavits, such as the lawsuits that attached these affidavits as exhibits. These documents provide this Court context as to the affidavits, which are attached to the Amended Complaint, and their consideration is not necessary to dismiss Plaintiffs' claims. "However, notwithstanding the usual rule that a court should consider no evidence beyond the pleadings on a Rule 12(b)(6) motion to dismiss, 'the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'" *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (citing *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)).

doctrine: the **challenged action** must be attributable to the state.  *See, e.g.*, *Wittner v. Banner Health*, 720 F.3d 770, 776–77 (10th Cir. 2013); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (explaining that under each of the state action tests, "the conduct allegedly causing the deprivation of a federal right" must "be fairly attributable to the State").  Plaintiffs' attempts to fit their allegations within the framework announced in *Lugar* are unavailing.

In support of the argument that Dominion's sending of document preservation letters pass the first part of the *Lugar* test, Plaintiffs analogize to *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991), a case involving peremptory challenges.  This reliance on *Edmonson*, however, rings hollow.  Unlike the peremptory challenges at issue in *Edmonson*, which "have no significance outside a court of law," as they can only be used as permitted by statute or rule under a judge's supervision, many letters requesting the preservation of documents, such as the ones Clare Locke LLP ("Clare Locke") sent on behalf of Dominion, are sent outside of the judicial framework and without a judge's approval.  *See Edmonson*, 500 U.S. at 620 (explaining that peremptory challenges to jurors in civil cases meet the first prong of the *Lugar* test by "their very nature").  There is no support for Plaintiffs' statement that their allegations pass this part of the *Lugar* test because Dominion's sending of the letters was "only possible because 'the government, by statute or decisional law, deem[ed] it appropriate.'"  (ECF No. 44, at 8 (quoting *Edmonson*, 500 U.S. at 620)).  Plaintiffs' claimed constitutional deprivation does not have any source in state authority.  Indeed, the allegations Plaintiffs cite in support of this argument— Dominion's assistance in administering elections—differ from the conduct they now challenge— the sending of document preservation letters.  (*See id.* at 8–9.)  The Amended Complaint contains no allegations that a state authorized Dominion to send the letters, and Plaintiffs fail to

explain how the act of sending these letters is borne out of statute or decisional law.

Plaintiffs' next argument—that the second part of the *Lugar* test is satisfied because Dominion made extensive use of significant government participation in administering elections and thus must have done so in sending the document preservation letters—likewise misses the mark.  (*Id.* at 9.)  Yet again, Plaintiffs focus exclusively on Dominion's election-related services, rather than addressing what role, if any, the state played as to the letters—the action or conduct at issue.  "[P]rivate use of state-sanctioned private remedies or procedures does not rise, by itself, to the level of state action."  *Edmonson*, 500 U.S. at 622.[2]  Plaintiffs have failed to allege that Dominion, by authorizing the sending of the letters, utilized state procedures with the "overt, significant assistance" from state officials, as required for state action.  *See id.*  It strains credulity to suggest that Dominion "could be described in all fairness as a state actor" in sending the letters, *see id.* at 620, and thus Plaintiffs' allegations fail to meet this part of the *Lugar* test.

Outside of the traditional *Lugar* framework, Plaintiffs further argue that Dominion sending the document preservations letters qualifies as state action because Dominion would not have been in a position to send these letters but for its role in providing election-related services. (*See* ECF No. 44, at 10–11.)  This "but-for" argument, however, does not fit within the any of the recognized state action tests.  *See Gallagher v. "Neil Young Freedom Concert"*, 49 F.3d 1442, 1447 (10th Cir. 1995) (discussing four tests as appropriate to determine whether a private

---

[2] Even if Dominion's election-related services were to cause the sending of the letters to qualify as state action—which, as explained in Dominion's Motion, they do not—Plaintiffs wrongly contend that "when a private party performs a traditional and exclusive public function, it may not regulate speech regarding that function."  (ECF No. 44, at 11 (citing *Lee v. Katz*, 276 F.3d 550, 556 (9th Cir. 2002)).)  *Katz* concerned a private entity that created a traditional public forum for speech, and the court held that it could not restrict speech within the forum it created.  *Id.* Dominion, in contrast, did not create any public forum for speech.

actor's conduct is fairly attributable to the state: (1) the nexus test, (2) the symbiotic-relationship test, (3) the joint-action test, and (4) the public-function test). The "but-for" standard is a causation test, whereas the state action tests focus on whether the relationship between the government and the challenged action is sufficiently connected so as to be attributable to the state itself. *See id.* at 1448. Plaintiffs' invitation to create a new state action standard and impermissibly extend liability for private actors under Section 1983 must be rejected.

Plaintiffs' state action theory finds no support in the law, as their focus on Dominion's election-related work, and not the challenged conduct, is fatal to their state action argument. Because Plaintiffs fail to plead that Dominion is a state actor as to the sending of the letters, their constitutional claims must be dismissed.

> ii. *Plaintiffs' equal protection claim fails.[3]*

Even if Plaintiffs had adequately pleaded state action, their argument—that they allege sufficient facts that Dominion violated their equal protection rights in two ways: (1) "through blatant viewpoint discrimination" and (2) "through imposition of improper financial burdens on those expressing their viewpoint," (*see* ECF No. 44, at 17)—does not survive scrutiny.

In support of their first theory, Plaintiffs state that "Defendants aimed the Lawfare campaign only at a particular viewpoint regarding the Election—that the results were suspect."

---

[3] Plaintiffs also argue in support of a due process claim in their Response. (*See* ECF No. 44, at 19–20.) There is no due process claim, however, in their Amended Complaint. (*See generally* Am. Compl.) Thus, Plaintiffs' due process argument should be afforded no weight. Regardless, the cases Plaintiffs point to for the proposition that the letters "shocked the conscience," and therefore constitute a due process violation, all pertain to claims for abuse of executive power by government officials; thus, they are inapplicable. *See, e.g., Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) ("To this end, for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience."). And regardless of this limitation, nothing Dominion has done rises to the level of shocking the conscience.

(*Id.*)  Plaintiffs, however, ignore a fundamental requirement of their claim: viewpoint discrimination must be accompanied by allegations that a speaker was excluded from a particular forum.  *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985) (explaining that in assessing viewpoint discrimination, the court must "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic").  As Dominion argued in its Motion, neither the sending of document preservation letters nor the provision of voting systems to governments regulate speech in any particular forum.  (*See* ECF No. 40, at 25.)  Because Plaintiffs' allegations simply do not fit this paradigm, their equal protection claim under this theory cannot stand.

With respect to their second theory, Plaintiffs' argument that "the Lawfare campaign imposed viewpoint-based financial burdens when Dominion threatened expensive 'imminent' litigation," (*see* ECF No. 44, at 17), is refuted by both the text of the letters and the very cases on which Plaintiffs rely.  The plain language of the letters makes clear that Dominion did not threaten "expensive imminent litigation" against the recipients.  (*See* Am. Compl., ¶ 5.)  Rather, the letters simply noted that "[l]itigation regarding [defamatory statements about Dominion] is imminent."  (*See id.*)  Moreover, the cases on which Plaintiffs rely, such as *Simon & Schuster, Inc. v. Members of New York State Crime Victims Board*, are inapposite.  *Simon* concerned New York's "Son of Sam" law, which "require[d] that an accused or convicted criminal's income from works describing his crime be deposited in an escrow account."  502 U.S. 105, 108 (1991).  In declaring the law unconstitutional, the Court explained that "a ***statute*** is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech."  *Id.* at 115 (emphasis added).  But here, Plaintiffs do not allege that

Dominion filed an action against them, let alone enacted a statute imposing a financial burden upon them.  This deficiency is also fatal to Plaintiffs' equal protection claim.

  iii.    *Plaintiffs' First Amendment claim fails.*

Plaintiffs clarify in their Response that their First Amendment claim alleges that Dominion retaliated against Plaintiffs for engaging in constitutionally protected speech and then cite to the "ordinary firmness" test in support for why this claim survives a Rule 12(b)(6) challenge.  (*See* ECF No. 44, at 12–15.)  To state a First Amendment retaliation claim, a plaintiff must prove: (1) "he was engaged in constitutionally protected activity," (2) "the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity," and (3) "the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct."[4]  *Smith v. Plati*, 258 F.3d 1167, 1177 (10th Cir. 2001).

As to the second element, Plaintiffs argue that their allegations establish that the document preservation letters "would chill a person of ordinary firmness from openly discussing the integrity of the 2020 Election."  (ECF No. 44, at 13.)  Plaintiffs, however, misconstrue the content of the letters.  (*Id.* at 14.)  Because the letters do not threaten any litigation against the recipient, but rather detail the recipient's document preservation obligations, Plaintiffs' assertion that the letters would chill the speech of someone of ordinary firmness is simply implausible.  At

---

[4] Dominion strongly disputes that the letters were motivated (substantially or otherwise) by Plaintiffs engaging in constitutionally protected activity.  Dominion authorized the letters because of Plaintiffs' association with Sydney Powell-led litigation and her defamatory statements damaging Dominion's reputation.  However, the Court need not rely on these points in deciding this Motion because Plaintiffs have failed to allege a viable claim for relief.

most, these letters merely discourage the recipient from making defamatory statements about Dominion—statements that are not afforded constitutional protection.  Plaintiffs retain "the ability to speak freely about any political, social or other concern related to" the 2020 election, so long as those statements are truthful.  *See Smith*, 258 F.3d at 1177 (explaining that the ordinary firmness test's "focus, of course, is upon whether a person of ordinary firmness would be chilled, rather than whether the particular plaintiff is chilled").

Plaintiffs also ignore that the allegations underpinning their First Amendment claim are belied by the various forms of prelitigation notices and demands that are embedded in state defamation law.  As Dominion argued in its Motion, many states require some form of notice of the alleged defamation and demand for a correction or retraction, either as a pre-requisite to filing suit or as an incentive to demand a retraction, because recovery is restricted to certain specified categories of damages in the absence of a demand.  (*See* ECF No. 40, at 24–25.)  Accepting Plaintiffs' theory would require a finding that these statutes incentivize or require violations of the First Amendment.  Thus, it makes little sense that Dominion, or anyone else, violated Plaintiffs' First Amendment rights by sending these letters.

**b.    Plaintiffs' RICO arguments are unavailing.**

*i.    Plaintiffs fail to allege a sufficient RICO injury.*

Plaintiffs' RICO arguments fair no better.  Principally, Plaintiffs' argument that a RICO plaintiff need not plead a ***specific*** injury to his property or business is blatantly incorrect.  (*See* ECF No. 44, at 21.)  Indeed, the cases Plaintiffs rely on illustrate why this claim fails.

For instance, in *National Organization of Women, Inc. v. Scheidler*, the plaintiffs brought a RICO claim against a coalition of anti-abortion groups, alleging they were members of a

nationwide conspiracy to shut down clinics through a pattern of racketeering activity.  510 U.S. 249, 252–53 (1994).  Plaintiffs alleged that the defendants "conspired to use force to induce clinic staff and patients to stop working and obtain medical services elsewhere," and that the defendants "threatened [a] clinic administrator with reprisals if she refused to quit her job at the clinic."  *Id.* at 256.  Based on these factual allegations, the Court concluded that the plaintiffs' complaint adequately alleged a RICO injury.  *Id.*  Here, in contrast, the Amended Complaint is entirely devoid of any factual allegations concerning injuries to Plaintiffs' business or property interests.  Instead, it alleges that some Plaintiffs bought home security devices, such as ring doorbells, and then merely repeats the conclusory allegation that Plaintiffs have suffered "an actual injury in the form of damages to [their] property . . ." (*See* Am. Compl., ¶¶ 18, 20, 21, 23, 25, 26, 27, 28.)  This is not enough.  *See Scheidler*, 510 U.S. at 256; *see also Robbins v. Wilkie*, 300 F.3d 1208, 1211 (10th Cir. 2002) (reversing dismissal of plaintiff's RICO claims because there were "several references to business or property damage which allegedly resulted from Defendants' activities," including "allegations that various Defendants took actions that adversely affected his business, caused resource damage, interfered with guest ranch operations, caused grievous economic injury, economic loss, and property damage").

ii.    *Plaintiffs fail to allege a RICO enterprise.*

Plaintiffs also argue that they have adequately alleged the existence of an association-in-fact enterprise necessary for RICO claim.  This argument is flawed for at least two reasons.

First, Plaintiffs only summarily address in their Response the requirement that they must allege a "RICO-qualifying common purpose" that unites Dominion, Clare Locke, and HPS.  (*See* ECF No. 44, at 30.)  This conclusory assertion merely echoes the same allegations in the

Amended Complaint that "Dominion, HPS, and Clare Locke" sought to "weaponize[ ] the court system and the litigation process in an improper attempt to silence Plaintiffs." (*See* Am. Compl., ¶ 35; *see also id.* ¶ 81.) But these statements are unsupported by factual allegations. Instead, the crux of the Amended Complaint is that Dominion, with Clare Locke's assistance,[5] sent document preservation letters to Plaintiffs. (*See generally id.*) "[T]here is nothing inconsistent or even particularly suspicious about" the conduct at issue here. *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1213 (11th Cir. 2020) (finding that the complaint failed to establish a common purpose because the "concrete factual allegations" did not show any criminality in the defendants' business activities).

Second, Plaintiffs misconstrue settled precedent surrounding the "distinctness" requirement for a RICO association-in-fact enterprise. Relying on *George v. Urban Settlement Services*, Plaintiffs contend that a RICO defendant and the RICO enterprise are sufficiently distinct so long as the enterprise is not made up of a parent corporation and its subsidiary. (*See* ECF No. 44, at 31 (discussing 833 F.3d 1242 (10th Cir. 2016)).) However, Plaintiffs ignore the crux of *George*'s holding, which is that the plaintiff adequately alleged that the RICO enterprise because the entities conducted "the enterprise's affairs, rather than [the corporate defendant's] own affairs." *See George*, 833 F.3d at 1250. Here, Plaintiffs allege nothing more than an association between a corporate defendant (Dominion) and its agents (Clare Locke and HPS) conducting Dominion's regular affairs. (*See* Am. Compl., ¶¶ 6, 8 (alleging that Clare Locke was "dispatched" by Dominion to send these document preservation letters and that HPS amplified

---

[5] Plaintiffs still fail to address what role, if any, HPS played in the sending of the letters, which is fatal to their claims against HPS and their personal jurisdiction argument. (*See* ECF No. 41.)

Dominion's defamation lawsuits through a "well-orchestrated publicity campaign" on Dominion's behalf.)  HPS and Clare Lock were "acting as [ ] agent[s] for" Dominion "and therefore not [ ] separate and independent entit[ies]" for RICO purposes.  *See Kelly v. Palmer, Reifler & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1379 (S.D. Fla. 2010).  Accordingly, Plaintiffs fail to meet the distinctness requirement to form the basis of a RICO enterprise.

   *iii. Plaintiffs fail to allege predicate RICO offenses.*

   Plaintiffs devote a considerable amount of their Response arguing that Defendants committed various predicate RICO offenses.[6]  Plaintiffs' arguments do nothing but demonstrate the fundamental disconnect between the predicate acts alleged (such as mail fraud, extortion, and witness tampering) and the conduct at issue (the sending of document preservation letters).

   With respect to extortion, Plaintiffs seemingly change course on the alleged purpose behind the letters in order to shoehorn this conduct to meet the elements of that predicate offense under Colorado law and the Hobbs Act.  In so doing, Plaintiffs contend that the true aim of the letters was not to chill Plaintiffs' speech, but rather to "obtain transferrable property from Plaintiffs."  (ECF No. 44, at 25.)  Critically, Plaintiffs distort the plain language of the letters to advance this new theory—a theory that unsupported by the allegations in the Amended Complaint.  Contrary to Plaintiffs' assertion, the letters in no way state that Dominion ***sought to obtain*** documents from Plaintiffs; rather, Dominion asked Plaintiffs to ***preserve*** documents

---

[6] Plaintiffs incorrectly contend that *CGC Holding Co. v. Broad & Cassel* stands for the proposition that they need not allege each RICO defendant committed a predicate act.  This is incorrect.  Rather, the court in *CGC Holding* explained that "[p]ursuant to § 1962(d), ***conspiracy to commit a RICO*** violation also constitutes a violation of the Act when a conspirator adopts the goal of furthering the enterprise, even if the conspirator does not commit a predicate act."  773 F.3d 1076, 1088 (10th Cir. 2014) (emphasis added).  Because Plaintiffs have not alleged HPS committed any predicate acts, their Section 1962(c) claim against HPS fails.

through the letters.  (*See* Am. Compl., ¶ 5.)  Nor did the letters state that Dominion intended to file suit against Plaintiffs.  (*See id.*)  And even if the letters did threaten suit against the recipients—which they did not—this is insufficient to state a claim for extortion.  The cases Plaintiffs cite confirm as much.  *See Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 248 (S.D.N.Y. 2012) (concluding plaintiff stated a claim for extortion because it alleged defendants sought a particular "pay off" from plaintiff); *Hall Am. Ctr. Assocs. v. Dick*, 726 F. Supp. 1083, (E.D. Mich. 1989) (declining to dismiss an extortion claim because plaintiff alleged that defendant manufactured evidence of a contract to wrongfully obtain money from plaintiff). Because the plain language of the letters belies Plaintiffs' new-found theory, they cannot establish attempted extortion as a predicate act.

Second, and in that same vein, Plaintiffs contend that the sending of document preservation letters constitutes mail fraud because Defendants sought to wrongfully obtain property from the recipients.  (ECF No. 44, at 29.)  Again, this assertion is contradicted by the plain language of the letters.  (*See* Am. Compl., ¶ 5 (asking the recipients to preserve documents and noting only that litigation had been filed against others).)  Because the face of the letters makes clear that Defendants did not seek to obtain money or documents from Plaintiffs, they have failed to allege sufficient facts to support the predicate act of mail fraud.

Finally, Plaintiffs argue that the sending of the document preservation letters qualifies as witness tampering and intimidation[7] because Defendants sought to "either prevent Plaintiffs from

---

[7] Plaintiffs appear to abandon their allegation in the Amended Complaint that the sending of document preservation letters constitutes witness retaliation, which makes sense given that Plaintiffs do not allege that they actually testified as witnesses in any official proceeding.  (*See generally* Am. Compl.)

testifying" or "at least cause them to withhold their testimony." (ECF No. 44, at 27.) It bears repeating that Plaintiffs' position is inconsistent with their argument concerning extortion and mail fraud, in which they contend that the purpose of the letters was to wrongfully obtain documents and money from Plaintiffs. Moreover, the letters plainly do not threaten Plaintiffs with any sort of litigation. Instead, they ask the recipients to cease *defaming* Dominion to the extent that they have already done so. (*See* Am. Compl., ¶ 5.) Defamation by its very nature requires a false statement. It goes without saying if Plaintiffs were to indeed provide testimony as witnesses, they should not proffer false statements as they must swear an oath to tell the truth. Accordingly, Plaintiffs' argument that Defendants sought to dissuade Plaintiffs from providing truthful testimony is simply implausible and, therefore, the predicate acts of witness tampering and witness intimidation cannot stand.

        iv.    *Plaintiffs fail to allege an effect on interstate commerce.*

Plaintiffs appear to argue that because they allege Defendants attempted to purportedly "spread influence" on a national level, they have satisfied RICO's requirement that the activity of the RICO enterprise affects interstate commerce. But spreading "influence" alone is insufficient to support this requirement of a RICO claim and overlooks that the complained of conduct is the sending of the letters. Indeed, even the case in which Plaintiffs rely—*United States v. Beasley*—held that the enterprise's conduct met the interstate commerce requirement not simply because it attempted to "establish national and international influence," but also because of its "membership's extensive travel in interstate commerce" and because its publications and tapes were distributed throughout the United States in trucks or by mail and were sent to foreign countries. 72 F.3d 1518, 1526 (11th Cir. 1996). Here, because Plaintiffs

fail to allege some sort of activity by Defendants having even a slight effect on interstate commerce, Plaintiffs' allegations do not adequately plead this aspect of a RICO claim.  *See, e.g.*, *Rose v. Bartle*, 692 F. Supp. 521, 534 (E.D. Pa. 1988) (dismissing Section 1962(c) claim because plaintiff did not allege that the enterprises affected interstate commerce), *aff'd in part, vacated in part, rev'd in part*, 871 F.2d 331 (3d Cir. 1989); (*see also* ECF No. 40, at 16–17).

       *v.*    *Plaintiffs' conspiracy to commit RICO claim fails.*

Plaintiffs also argue that their RICO conspiracy claim under Section 1962(d) should survive for two primary reasons.  They first argue that because they have pleaded a valid RICO claim under Section 1962(c), their Section 1962(d) claim should not be dismissed.  (*See* ECF No. 44, at 35.)  However, as explained at length above, because their Section 1962(c) claim fails, they cannot sustain a claim for a conspiracy to commit a RICO violation under Section 1962(d).  *See, e.g.*, *E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 15 (D.D.C. 2014); *Snyder v. ACORD Corp.*, No. 1:14-cv-01736-JLK, 2016 WL 192270, at *9 (D. Colo. Jan. 15, 2016).  Plaintiffs also argue that they have alleged sufficient facts to support their Section 1962(d) claim because HPS "agreed to further the overall goal of the enterprise to silence political speech through Lawfare and did so through its nationwide public relations campaign."  (*See* ECF No. 44, at 35.)  But the Amended Complaint is devoid of allegations to support an inference of any sort of agreement between Defendants to that effect.  (*See generally* Am. Compl.)  The RICO conspiracy claim must be dismissed.

    **c.**    **Plaintiffs fail to state a claim for civil conspiracy.**

Plaintiffs' final claim—civil conspiracy—meets the same fate as their other claims for relief.  Plaintiffs argue that they have pleaded (1) sufficient unlawful over acts, and (2) that HPS

and Clare Locke acted outside the scope of their agency relationship with Dominion, (*see* ECF No. 44, at 38–39), but the allegations in the Amended Complaint do not support these arguments.

First, as detailed above, Plaintiffs have not alleged any unlawful overt acts by Defendants that could support their conspiracy claim. Indeed, Plaintiffs have alleged nothing more than Clare Locke sending the document preservation letters on behalf of Dominion, and HPS publicizing Dominion's separate defamation lawsuits against non-parties. (*See* Am. Compl., ¶¶ 4, 8.) This conduct does not constitute any sort of unlawful overt act sufficient to sustain this claim. *See, e.g.*, *Sensoria, LLC v. Kaweske*, 548 F. Supp. 3d 1011, 1032 (D. Colo. 2021) (dismissing a civil conspiracy claim under Colorado law on the grounds that the plaintiff failed to plead any "form of wrongdoing").

Second, Plaintiffs appear to assert that because HPS and Clare Locke were not acting toward a "legitimate representational goal" when they provided their respective public relations and legal services, they could not have been acting as Dominion's agents and, therefore, their conspiracy claim should survive. (*See* ECF No. 44, at 38–39.) However, as explained at length above, the Amended Complaint simply alleges that Dominion employed as its agent Clare Locke to provide legal services in drafting the document preservation letters and HPS to create a public relations campaign. According to Plaintiffs, a public relations firm is not providing traditional services by "orchestrating interviews" and "extensively promot[ing]" its client, and a law firm is not providing traditional legal services when it drafts and sends document preservation letters. (*See id.*, at 39.) This makes little sense. Because these actions clearly fall within the ambit of legitimate representation on behalf of Dominion, Plaintiffs' claim fails because Dominion cannot conspire with itself (*i.e.*, with its agents, HPS and Clare Locke). *See, e.g.*, *Heffernan v. Hunter*,

189 F.3d 405, 412–13 (3d Cir. 1999) (holding that attorney-client conspiracy is impossible by analogy to the intracorporate conspiracy doctrine); *Zelinger v. Uvalde Rock Asphalt Co.*, 316 F.2d 47, 51–52 (10th Cir. 1963) (applying Colorado law in holding that a corporation and its employees cannot conspire to tortiously interfere with and bring about the breach of a distributorship agreement).  For these reasons, the civil conspiracy claim must be dismissed.

## II.    Plaintiffs Fail to Show Exercise of Personal Jurisdiction over HPS Is Proper.

### a.    There is no personal jurisdiction under Section 1965.

Plaintiffs first argue that personal jurisdiction over HPS lies in Colorado because 18 U.S.C. § 1965 of RICO authorizes the exercise of such jurisdiction.  (*See* ECF No. 44, at 40–41.)  Although Plaintiffs are correct that RICO authorizes personal jurisdiction over defendants where it may not otherwise lie in some instances, the allegations in the Amended Complaint here fall far short of rendering personal jurisdiction over HPS appropriate.

 RICO authorizes personal jurisdiction over out-of-state defendants when (1) personal jurisdiction can be established over one defendant; (2) the ends of justice require nationwide service; and (3) the exercise of jurisdiction comports with due process.  *Greenway Nutrients, Inc. v. Blackburn*, 33 F. Supp. 1224, 1248 (D. Colo. 2014).  Here, Plaintiffs "are incorrect that RICO confers nationwide service of process and therefore personal jurisdiction over all defendants" in this case—including HPS—simply because Dominion is subject to jurisdiction "in the forum state."  *List Interactive, Ltd. v. Knights of Columbus*, No. 17-cv-00210-RBJ, 2017 WL 3217817, at *7 (D. Colo. Jul. 28, 2017).  Indeed, rather than engaging in this analysis, Plaintiffs proffer single conclusory sentences on the remaining elements of the RICO jurisdictional analysis.

Plaintiffs first assert that because HPS purportedly "agreed to participate in and support

the [RICO] enterprise," "the ends of justice require nationwide service on HPS."  (*See* ECF No.

44, at 41.)  This conclusory statement in no way explains why the "ends of justice" make

personal jurisdiction over HPS in this forum proper.  Rather, the relevant considerations concern

financial interests and the like.  *Godwin v. Bruggeman-Hatch*, No. 13-cv-029373-RED-MEH,

2014 WL 4244214, at *8 (D. Colo. Jul. 14, 2014) (recognizing that a plaintiff's "financial

impediment to suit in another forum" may be relevant to the ends of justice concept, but

declining to exert personal jurisdiction on allegations of financial impediment alone).  "RICO

still requires that [Plaintiffs] prove that the 'ends of justice' require" the exercise of jurisdiction

over HPS.  *See List Interactive*, 2017 WL 3217817, at *10 (D. Colo. Jul. 28, 2017) (concluding

"[p]laintiffs' argument on this point seriously short-circuits that analysis by ignoring completely

the 'ends of justice'" element).  Plaintiffs' decision to sidestep this requirement is fatal.

Plaintiffs then seemingly confuse the "ends of justice" requirement with the final element

of the analysis—that the exercise of jurisdiction comports with due process.  Relying on *Godwin*,

Plaintiffs contend that the exercise of personal jurisdiction over HPS comports with due process

because "it is less expensive for HPS to defend this case in Colorado 'where the events giving

rise to the claims primarily occurred.'"  (*See* ECF No. 44, at 41 (quoting *Godwin*, 2014 WL

4244214, at *8)).  But *Godwin* was discussing the "ends of justice" element, and ultimately

concluded that the expense factor did not satisfy it.  2014 WL 4244214, at *8.

### b.    Plaintiffs cannot show that jurisdiction over HPS comports with due process.

As HPS explained it its Motion to Dismiss, exercising personal jurisdiction over it in this

forum decidedly does not comport with due process.  (*See* ECF No. 41, at 5–11.)  Due process

requires a nonresident to have "certain minimum contacts . . . such that the maintenance of the

suit does not offend 'traditional notions of fair play and substantial justice.'" *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Thus, "[f]or a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Id*. at 284.

      Here, the Amended Complaint establishes neither general nor specific jurisdiction over HPS. Contrary to Plaintiffs' contention, the Amended Complaint is devoid of allegations establishing general jurisdiction over HPS because it allegedly "conducted substantial business within the state." (*See* ECF No. 44, at 42.) The only allegations concerning HPS's business in Colorado is that it contracted with the Colorado Dominion entities, which is insufficient. *See, e.g.*, *Diamler AG v. Bauman*, 571 U.S. 117, 127 (2014). Nor may Plaintiffs establish specific jurisdiction on the basis that "HPS has doubtless made many telephone, email, and Zoom video communications with Dominion," as those allegations appear nowhere in the Amended Complaint and they simply show HPS's contacts with Dominion generally and not Colorado specifically. (*See* ECF No. 44, at 41.) Even if these allegations were in the Amended Complaint, "the Tenth Circuit has stated that it is well established that phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts." *String Cheese Incident Ticketing, LLC v. Stylus Shows, Inc.,* No. CIVA05-CV01934LTBPAC, 2006 WL 994239, at *3 (D. Colo. Apr. 14, 2006) (finding that defendant's letters and faxes to the forum were insufficient to establish personal jurisdiction).

      Therefore, because Plaintiffs have failed to satisfy their burden of proving that HPS purposefully availed itself of the privileges of conducting activities within Colorado, exercising personal jurisdiction over HPS would violate its due process rights and offend "traditional

notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316.

## III. This Court Lacks Jurisdiction to Decide Plaintiffs' Alleged Claims.

Aside from the failure to properly allege a claim for relief, Plaintiffs' claims remain non-justiciable. Plaintiffs argue that they have alleged damages stemming from actions "to silence a national debate over election security and voting system reliability," which have "caused concrete injury including property loss and economic damages." (ECF No. 44, at 44.) These conclusory statements are insufficient—there are no specific allegations in the Amended Complaint that Plaintiffs lost property or suffered economic damages, that Defendants' actions actually dissuaded them from engaging in protected speech, or that establish a causal connection between the alleged injuries and HPS's alleged conduct. As described in the Motions to Dismiss, Plaintiffs must plead that they suffered a concrete and particularized injury, that their claims are ripe for review, and that Defendants' conduct caused them injuries. They have not.

Best illustrating this point is Plaintiff's now-clarified retaliation claim under the First Amendment. Plaintiffs allege in the Amended Complaint that Defendants' actions have had a "predictable and enormously intimidating chilling effect on the speech of any reasonable person." (Am. Compl., ¶ 85.) But they never explain specifically how their speech has been chilled or allege any instance where they chose not the speak out because of the document preservation letters they received. Allegations of a generalized chilling effect do not establish standing. *See, e.g.*, *Laird v. Tatum*, 408 U.S. 1, 13–14 (dismissing plaintiffs' First Amendment claim on standing grounds because they alleged that the existence of the Army's surveillance of political activists caused them fear and had a generalized chilling effect on their activities, and "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present

objective harm or a threat of specific future harm"); *Meese v. Keene*, 481 U.S. 465, 473 (1987) (noting that "[i]f [plaintiff] had merely alleged that the [designation of films as political propaganda] deterred him by exercising a chilling effect on the exercise of his First Amendment rights, he would not have standing to seek its invalidation"); *Riggs v. City of Albuquerque*, 916 F.2d 582, 585 (10th Cir. 1990) (finding standing because "plaintiffs allege more than a chilling of their First Amendment rights; they also allege harm to their personal, political, and professional reputations in the community"); *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) ("A plaintiff has standing if he can show either that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm.").[8]

Plaintiffs' claims therefore lack the necessary specificity because they merely allege the speculative possibility of a future defamation lawsuit that *could* cause them to incur defense costs *if* filed.  Plaintiffs' "dispute" is a topic for political discourse but has no place in court.

**CONCLUSION**

For the foregoing reasons and those stated in the Motions to Dismiss, this case must be dismissed in its entirety against all Defendants.

Dated:  April 18, 2022

BROWNSTEIN HYATT FARBER SCHRECK, LLP

By: s/ *Stanley L. Garnett*
    Stanley L. Garnett, Colo. Bar No. 12282
    David B. Meschke, Colo. Bar No. 47728
    Bridget C. DuPey, Colo. Bar No. 53958

By: s/ *Rodney Smolla*
    Rodney Smolla

Attorneys for Defendants

---

[8] The case cited by Plaintiffs—*Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1097–98 (10th Cir. 2006)—addressed standing for claims where plaintiffs seek prospective injunctive relief against a statute for chilling their right to free speech, and thus is inapplicable.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 18th day of April, 2022, I electronically filed a true and correct copy of **DEFENDANTS' REPLY IN SUPPORT OF MOTIONS TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT** with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s Stanley L. Garnett* _____
Stanley L. Garnett

24040340.6