IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 21-cv-02672-PAB-STV

JENNIFER L. COOPER,
EUGENE DIXON,
FRANCIS J. CIZMAR,
ANNA PENNALA,
KATHLEEN DAAVETTILA,
CYNTHIA BRUNELL,
KARYN CHOPJIAN, and
ABBIE HELMINEN, individually, and on behalf of all others similarly situated,

      Plaintiffs,

v.

US DOMINION, INC.,
DOMINION VOTING SYSTEMS, INC.,
DOMINION VOTING SYSTEMS CORPORATION, and
HAMILTON PLACE STRATEGIES, LLC,

      Defendants.

---

**ORDER**

---

    This matter is before the Court on Dominion's Motion to Dismiss the First Amended Class Action Complaint [Docket No. 40] and Hamilton Place Strategies, LLC's Motion to Dismiss the First Amended Class Action Complaint [Docket No. 41]. Plaintiffs filed a combined response to the motions to dismiss, Docket No. 44, and defendants[1] filed a combined reply. Docket No. 47.

---

[1] The parties and the Court refer to US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation collectively as "Dominion," and, with defendant Hamilton Place Strategies, LLC ("HPS"), as "defendants."

## I. BACKGROUND[2]

Plaintiffs, who are Michigan citizens, were "poll watchers" or "poll challengers" in Michigan during the 2020 general election.  Docket No. 31 at 12–20, ¶¶ 16–29. Plaintiffs each claim to have witnessed "numerous problems" or "irregularities" on Election Day.  *See id.*  Between November 3, 2020 and November 9, 2020, each of the plaintiffs provided affidavits detailing what they claim to have witnessed.  *See id.*[3]  Soon after, plaintiffs received essentially identical letters from Clare Locke, LLP ("Clare Locke"), a defamation law firm, on behalf of Dominion, which manufactures voting machines and software.  *See id.*; *see also id.* at 22, ¶37.  These letters, which plaintiffs allege were sent to over 150 individuals, state[4]

_____

[2] This background is drawn from plaintiff's First Amended Class Action Complaint [Docket No. 31].  The Court assumes that the well-pled allegations are true in resolving defendants' motions, which are a motion to dismiss for failure to state a claim and a facial attack on the Court's subject matter jurisdiction.  *See* Docket Nos. 40, 41; *see also Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011) (motion to dismiss for failure to state a claim); *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020) ("A facial attack assumes the allegations in the complaint are true and argues they fail to establish jurisdiction.").  The Court recounts only those allegations necessary to resolve the motions before it.  Some of plaintiffs' allegations are similar to those considered (and rejected) by other courts, *see, e.g.*, *O'Rourke v. Dominion Voting Sys. Inc.*, No. 20-cv-03747-NRN, 2021 WL 1662742, at *6 (D. Colo. Apr. 28, 2021) (citing cases), *aff'd*, 2022 WL 1699425 (10th Cir. May 27, 2022), and, in some cases are verbatim duplicates of the counterclaims and allegations in *US Dominion, Inc., et al. v. MyPillow, Inc. et al.*, No. 21-cv-00445-CJN (D.D.C.), Docket No. 87.

[3] The complaint does not state whether anyone requested that plaintiffs provide these affidavits or to whom the affidavits were given; however, the complaint alleges that plaintiff Eugene Dixon was a poll challenger for the "Election Integrity Fund."  *Id.* at 14, ¶ 19.  The complaint does not indicate an affiliation of any other plaintiff.

[4] Plaintiffs provide screenshots of their affidavits and the letters that they received within the complaint itself and as exhibits to the complaint.  *See* Docket Nos. 1-1–1-15. In evaluating a Rule 12(b)(1) or Rule 12(b)(1) motion to dismiss, courts may consider not only the challenged complaint itself, but also attached exhibits and documents incorporated into the complaint by reference.  *See, e.g.*, *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).

2

> Our firm is defamation counsel to US Dominion Inc. [and Dominion's subsidiaries].  We write to you regarding the ongoing misinformation campaigns falsely accusing Dominion of somehow rigging or otherwise improperly influencing the outcome of the November 2020 U.S. presidential election.  In recent days we sent letters to Sidney Powell and various media entities demanding retraction of their myriad defamatory and conspiratorial statements about Dominion.
>
> Dominion is prepared to defend its good name and set the record straight.  Litigation regarding these issues is imminent.  This letter is your formal notice to cease and desist taking part in defaming Dominion and to preserve all documents and communications that may be relevant to Dominion's pending legal claims.

*Id.* at 4–6 (footnotes omitted).  The letter demands that the recipient preserve various categories of documents and records and contains a footnote that says, "[f]or the avoidance of doubt, this is a retraction demand pursuant to relevant state statutes and applicable rules of court."  *Id.* at 4.  The subject line of the letters is "Notice of Obligation to Preserve Documents Related to Dominion."  *Id.*

Plaintiffs believe that these letters were "boilerplate directives meant to instill fear and intimidation" and that, through the letters, Dominion "illegally demanded [the recipients] preserve all communications."  *Id.* at 7–8, ¶ 6.  According to plaintiffs, the letters were "especially offensive" because none of their affidavits mentioned Dominion.  *Id.* at 8, ¶ 7.

Plaintiffs believe that they have been silenced from speaking about various topics, including a Michigan report on the 2020 election, Dominion's machines and software used in a 2009 New York congressional election and a 2010 Philippine general election, various court cases and news stories, the "Robert Mueller report," an HBO documentary, the Biden Administration's Russian sanctions, or Dominion's lawsuits.  *Id.* at 50–51, ¶ 77.  Plaintiffs also assert that Dominion is a "state actor," *id.* at 9–10, 22–28 ¶¶ 10, 36–43, and allege that Democratic Party congressional leaders and others have

raised concerns about Dominion and its machines.  *Id.* at 28–51, ¶¶ 44–77.

Plaintiffs allege, that Dominion has used "promiscuous delivery of aggressive threats of litigation" to "intimidate anyone who might speak out regarding election integrity and security concerns, whether such speech is related to Dominion or not," to create a "national culture of intimidation and fear" and to "silence anyone, including [p]laintiffs . . . and *every American*."  *Id.* at 11, 58 ¶¶ 12, 81.  Plaintiffs seek to certify a class of "[a]ll persons who received [l]etters from non-party co-conspirator Clare Locke on behalf of their client, Dominion, from November 4, 2020 to the present."  *Id.* at 65, ¶ 91.  Plaintiffs bring four claims: (1) "violations of the Racketeer Influenced and Corrupt Organization Act" ("RICO"), (2) "deprivation of equal protection by Dominion's state action" under 42 U.S.C. § 1983, (3) "deprivation of First Amendment by Dominion's state action," also under § 1983, and (4) "civil conspiracy."  *Id.* at 68–77, ¶¶ 99–122.  Defendants move to dismiss the complaint on Rule 12(b)(1) and Rule 12(b)(6) grounds.  *See* Docket Nos. 40, 41.

## II.  LEGAL STANDARDS

### A.  Rule 12(b)(1)

Defendants argue that plaintiffs' claims are not ripe for review and that plaintiffs lack standing.  Both of these justiciability challenges question the Court's subject matter jurisdiction.  *See SK Finance SA v. La Plata Cnty.*, 126 F.3d 1272, 1275 (10th Cir. 1997); *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1498–99 (10th Cir. 1995).  Rule 12(b)(1) challenges are generally presented in one of two forms: "[t]he moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction

rests." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004) (quoting *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003)).  Although defendants do not specify whether they bring a facial or factual challenge, they appear to accept the allegations in plaintiffs' complaint as true, at least for present purposes, and have not "adduced any evidence outside the pleadings to contest jurisdiction."  *See Laufer v. Looper*, 22 F.4th 871, 875 (10th Cir. 2022).  Thus, the Court considers their challenge to be facial.  Plaintiffs have "[t]he burden of establishing subject matter jurisdiction" because they are "the part[ies] asserting jurisdiction."  *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1189 (10th Cir. 2008).

### B.  Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible."  *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)).  Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting Twombly, 550 U.S. at 555) (alterations omitted).  However, a plaintiff still must provide "supporting factual averments" with its allegations.  *Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009) ("[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." (citation omitted)).  Otherwise, the Court

need not accept conclusory allegations. *Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (alterations omitted).

## III.  ANALYSIS

Defendants argue that plaintiffs have not plausibly stated claims for relief and that the Court lacks subject matter jurisdiction to consider those claims. *See generally* Docket Nos. 40, 41. The Court must consider defendants' jurisdictional arguments first. *See Citizens Concerned for Separation of Church & State v. City & Cnty. of Denver*, 628 F.2d 1289, 1297 (10th Cir. 1980) (noting that a court must satisfy itself as to its own jurisdiction, even if doing so requires *sua sponte* action, in every case and at every stage of the proceeding); *Cunningham v. BHP Petroleum Gr. Brit. PLC*, 427 F.3d 1238, 1245 (10th Cir. 2005) (holding that, absent an assurance that jurisdiction exists, a court may not proceed in a case).

**A.  Plaintiffs' Standing**

Defendants' jurisdictional arguments are that plaintiffs' claims are not ripe or concrete and that plaintiffs lack standing.  Docket No. 40 at 28–30; Docket No. 41 at 14–15.  Although standing and ripeness are analytically distinct concepts, they overlap substantially and, especially where the issue is whether the plaintiff has sustained an injury-in-fact, "the issues of standing and ripeness are particularly difficult to divorce." *Morgan v. McCotter*, 365 F.3d 882, 887 (10th Cir. 2004); *Awad v. Ziriax*, 670 F.3d 1111, 1124 (10th Cir. 2012) (citation omitted) ("[I]f a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied.").

Federal courts are not "constituted as free-wheeling enforcers of the Constitution and laws." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006) (en banc).  Rather, as the Supreme Court "ha[s] often explained," federal courts are instead "courts of limited jurisdiction."  *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1746 (2019).  Article III of the United States Constitution limits the Court's jurisdiction to "cases" and "controversies."  *Allen v. Wright*, 468 U.S. 737, 750 (1984); U.S. Const. art. III, § 2, cl. 1.  Absent a justiciable case or controversy between interested parties, the Court lacks the "power to declare the law."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  The Court has an independent duty to determine whether the dispute, as framed by the parties, presents a justiciable controversy.  *People for the Ethical Treatment of Animals v. Rasmussen*, 298 F.3d 1198, 1202 (10th Cir. 2002).  If the Court finds that it does not have subject matter jurisdiction, for instance because the plaintiff's claims are not ripe or the plaintiff does not have standing, the Court may not proceed.  *Colorado Outfitters Ass'n v.*

*Hickenlooper*, 823 F.3d 537, 544 (10th Cir. 2016).

In addition to the issue of whether the dispute involves a "case" or "controversy," the ripeness doctrine addresses prudential considerations limiting the Court's jurisdiction. *Alto Eldorado P'ship v. Cnty. of Santa Fe*, 634 F.3d 1170, 1173 (10th Cir. 2011). The ripeness doctrine is "intended 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" *Gonzales*, 64 F.3d at 1499 (citation omitted). The ripeness inquiry "focuses not on whether the plaintiff was in fact harmed, but rather whether the harm asserted has matured sufficiently to warrant judicial intervention." *Morgan*, 365 F.3d at 890 (internal quotation and citation omitted). Thus, the "[r]ipeness doctrine addresses a *timing* question: *when* in time is it appropriate for a court to take up the asserted claim." *ACORN v. City of Tulsa*, 835 F.2d 735, 738 (10th Cir. 1987) (quoting *Action Alliance of Sr. Citizens v. Heckler*, 789 F.2d 931, 940 (D.C. Cir. 1986)) (emphasis in original). The doctrine of ripeness also forestalls judicial determination of disputes until the controversy is presented in clean-cut and concrete form. *Gonzales*, 64 F.3d at 1499. Thus, ripeness requires "that a case embody a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions." *Carney v. Adams*, 141 S. Ct. 493, 498 (2020). "The doctrine of standing implements this requirement by insisting that a litigant 'prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision.'" *Id.* (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013)). An injury to a would-be litigant cannot be "conjectural or hypothetical," and a "grievance that amounts to nothing more than an abstract and generalized harm to a citizen's interest in the proper application of the law does not

count as an injury in fact." *Id.* (citations and quotations omitted).  Because defendants'
ripeness arguments are that plaintiffs cannot show that they have been harmed by
defendants and that any argument that plaintiffs may be harmed in the future is too
hypothetical or contingent, Docket No. 40 at 28–30; Docket No. 41 at 14–15, which
arguments implicate standing, the Court considers defendants' ripeness and standing
challenges together.

Defendants argue that plaintiffs' claims are unripe because Dominion has not
sued them and plaintiffs ask the Court to "grant them relief based on the nebulous
theory that they have been harmed receiving document preservation letters and the
speculative possibility that they could be harmed in the future" by a defamation lawsuit.
Docket No. 40 at 28–29.  As noted previously, plaintiffs bring four claims for relief –
violations of RICO, violations of the First and Fourteenth Amendments under § 1983,
and civil conspiracy.  From those claims, the Court discerns four main injuries that
plaintiffs have alleged.  First, plaintiffs allege that defendants' letters and public relations
campaign, which plaintiffs refer to as "Lawfare," has chilled the dialogue on topics
important to all Americans.  Second, plaintiffs claim that Dominion has threatened
litigation.  Third, some plaintiffs allege that they have invested in home security systems.
Fourth, plaintiffs allege that their equal protection rights have been violated.[5]

Courts are clear that "[e]ach plaintiff must have standing to seek each form of

[5] Plaintiffs' response to defendants' motions to dismiss states that plaintiffs
believe that they have suffered "damages from RICO violations, denial of equal
protection, deprivation of First Amendment rights, and injuries arising from overt acts of
a civil conspiracy, all of which flow from [d]efendants' coordinated Lawfare campaign."
Docket No. 44 at 44.  Plaintiffs, however, do not specify what their damages from the
alleged RICO violations and civil conspiracy actually are beyond those that the Court
has already identified.

relief in each claim." *Collins v. Daniels*, 916 F.3d 1302, 1312 (10th Cir. 2019) (quoting

*Am. Humanist Ass'n, Inc. v. Douglas Cty. Sch. Dist. RE-1*, 859 F.3d 1243, 1250 (10th

Cir. 2017)).  "The standing inquiry ensures that a plaintiff has a sufficient personal stake

in a dispute to ensure the existence of a live case or controversy which renders judicial

resolution appropriate." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004).

To establish Article III standing, a plaintiff must meet three elements:

> First, the plaintiff must have suffered an "injury in fact" – an invasion of a
> legally protected interest which is (a) concrete and particularized, and (b)
> "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must
> be a causal connection between the injury and the conduct complained of
> – the injury has to be "fairly . . . trace[able] to the challenged action of the
> defendant, and not . . . th[e] result [of] the independent action of some third
> party not before the court."  Third, it must be "likely," as opposed to merely
> "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted).  "Injury

in fact is a constitutional requirement, and '[i]t is settled that Congress cannot erase

Article III's standing requirements by granting the right to sue to a plaintiff who would not

otherwise have standing.'"  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016)

(quoting *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997)).  An injury is particularized if it

affects "the plaintiff in a personal and individual way."  *Id.* at 1548.  "A 'concrete' injury

must be 'de facto'; that is, it must actually exist"; it must be "real," not "abstract."  *Id.*  "If a

party satisfies these minimum constitutional requirements, then a court may still deny

standing if the injury alleged constitutes a "generalized grievance" that more

appropriately should be addressed by the representative branches."  *Colo. Taxpayers*

*Union, Inc. v. Romer*, 963 F.2d 1394, 1396 (10th Cir. 1992) (citing *Allen*, 468 U.S. at

751).  At the pleading stage, a complaint must "clearly allege facts demonstrating each

element."  *Spokeo*, 136 S. Ct. at 1547 (quotation marks, citation, and alterations

omitted).

### 1. Alleged Chilling Effect

Plaintiffs allege that Dominion, HPS, and Clare Locke's actions have had a "chilling effect" on plaintiffs and others, who have felt "threatened and intimidated from speaking out."  Docket No. 31 at 20, ¶ 29.  Plaintiffs allege that they are "restricted – according to the [l]etters – from speaking about a topic of major public concern."  *Id.* at 8–9, ¶ 9.  They also allege that Dominion has waged an "intimidation campaign" and that Dominion's goal is to "silence any person, including news networks whose job it is to hold government officials accountable, who might speak about election integrity and security or bring evidence of possible voting fraud or irregularities to light regarding the November 2020 election."  *Id.* at 2–3, ¶ 3.  Plaintiffs claim that Dominion seeks to "intimidate and silence not just [p]laintiffs and the [c]lass,"[6] but also "the public at large."  *Id.* at 8–9, ¶ 9.  This includes "anyone who might speak out regarding election integrity and security concerns, whether such speech is related to Dominion or not."  *Id.* at 11, ¶ 12.  There appear to be two main bases for plaintiffs' allegations: (1) that the letters have chilled plaintiffs' and potential class members' speech; and (2) that defendants have waged an intimidation campaign to silence anyone who speaks out about the November 2020 election and election integrity, which has chilled the national dialogue.

The Court first considers plaintiffs' allegations that the letters they received chilled their speech.  An "allegation of inhibition of speech, without more, will not support standing."  *Nat'l Council for Improved Health v. Shalala*, 122 F.3d 878, 884 n.9 (10th Cir. 1997) (citing *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("Allegations of a subjective 'chill'

---

[6] Plaintiffs seek to certify a class of all people who received letters from Clare Locke, *id.* at 65, ¶ 91, which plaintiffs believe is at least 150 people.  *Id.* at 2, ¶ 4.

are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.")).  Courts, however, have found standing where plaintiffs allege not only a chill of their speech, but also some other harm, such as to their "personal, political, and professional reputations in the community" because such an injury is "distinct and palpable."  *See, e.g.*, *Riggs v. City of Albuquerque*, 916 F.2d 582, 585–86 (10th Cir. 1990); *see also Meese v. Keene*, 481 U.S. 465, 472 (1987) (challenging designation of films as political propaganda, which the plaintiff claimed would harm his reputation in the community if he showed the films).

　　　　Plaintiffs allege that defendants' actions have had a "predictable and enormously intimidating chilling effect on the speech of any reasonable person" and that defendants have "issued a general threat to all," which was "sharpened" by "delivering [l]etters to specific individuals."  Docket No. 31 at 63, ¶ 85.  Plaintiffs claim that defendants "have likely accomplished their goal of significantly diminishing, if not entirely silencing, the First Amendment-protected national discussion about the integrity and security of the November 2020 election."  *Id.*, ¶ 86.  This campaign, plaintiffs assert, has "not only chilled [p]laintiffs' speech, but also chilled the speech of many others that received a [l]etter."  *Id.* at 63–64, ¶ 87.

　　　　These are allegations of a "subjective 'chill'" or of an "inhibition of speech," which "are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm," *see Laird*, 408 U.S. at 13–14; *Shalala*, 122 F.3d at 884 n.9, because plaintiffs do not allege that the letters chilled their speech in a way that was "both distinct and palpable."  *See Riggs*, 916 F.2d at 584–85; *see also D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004) (finding no standing because the plaintiff had not "indicated any other objective source for the statute's alleged chilling effect," which

made his "unsupported claims of a subjective 'chill' . . . insufficient to support standing");

*Citizen Ctr. v. Gessler*, 770 F.3d 900, 913 (10th Cir. 2014) (reviewing court's grant of

motion to dismiss and noting that, "[b]ased on *Laird*, we required the plaintiffs to present

evidence that they had intended to refrain from the desired activity because of a credible

threat that the government would enforce the restriction.").[7]  Plaintiffs' allegations that

the letters chilled their and potential class members' speech are not sufficient to for

Article III standing.

　　Plaintiffs' second basis for their claimed chilling injury is that defendants have

engaged in a coordinated campaign to silence and intimidate anyone who speaks out

about elections security and the November 2020 election, which has chilled the national

dialogue on these issues.  *See* Docket No. 31 at 21, ¶ 35 (alleging an "attempt to silence

[p]laintiffs, the [c]lass, and American citizens from participating in a long-standing,

ongoing national conversation about election integrity"); *id.* at 60, ¶ 81 (alleging that

Dominion's purported campaign "demonstrates that [d]efendants are seeking to silence

anyone, including [p]laintiffs, the [c]lass, and *every American*"); *id.*, ¶ 83 (alleging that

the "the Lawfare campaign is total; it seeks to deter *any public expression* questioning

the 2020 election"); *id.* at 61, ¶ 84 (alleging that Dominion is "seeking to ensure

everyone – not just the recipients of the [l]etters – knows that they will be punished with

Lawfare if they exercise their First Amendment rights to speak against Dominion or

---

[7] In their response, plaintiffs rely on *Walker*.  Docket No. 44 at 43–44.  In that
case, the Tenth Circuit set forth a standing test for plaintiffs who bring a suit for
"prospective relief based on a 'chilling effect' on speech."  *Walker*, 450 F.3d at 1089.
Here, however, plaintiffs do not seek prospective relief.  The prayer for relief in the
complaint asks only for damages and fees.  *See* Docket No. 31 at 77–78.  Accordingly,
the Court finds *Walker* distinguishable.  Below, the Court considers plaintiffs' allegations
that they face a "specific present objective harm or a threat of specific future harm," *see*
*Laird*, 408 U.S. at 13–14, in the form of a potential lawsuit against them by Dominion.

about concerns over the conduct of the 2020 General Election generally"); *id.* at 63–64, ¶ 87 ("Dominion, HPS, and Clare Locke's campaign not only chilled [p]laintiffs' speech, but also chilled the speech of many others that received a [l]etter, including potentially thousands of poll watchers, news media reporters and bloggers, and others."). Although plaintiffs' allegations mention plaintiffs and the class, the allegations do not distinguish plaintiffs' or class members' actual injuries from those felt by every American.

The Tenth Circuit considered similar standing allegations in a recent case against Dominion. In *O'Rourke v. Dominion Voting Sys., Inc.*, No. 21-1161, 2022 WL 1699425, at *2 (10th Cir. May 27, 2022), the court explained that, to allege an injury sufficient for Article III standing, a plaintiff must allege that he or she has been injured in a way that "affect[s] the plaintiff in a personal and individual way." *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1). The court further explained that the "Supreme Court has rejected standing based only on 'a generalized grievance shared in substantially equal measure by all or a large class of citizens.'" *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). "That means that a plaintiff who is 'claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large . . . does not state an Article III case or controversy.'" *Id.* (quoting *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam)). Although the plaintiffs in *O'Rourke* did not allege that they received letters from Dominion like plaintiffs allege here, *O'Rourke* is persuasive on the issue of plaintiffs' generalized grievances because plaintiffs in this case do not allege how the letters caused them a "direct injury" that was a "distinct and palpable harm." *See Riggs*, 916 F.2d at 584–85.

The court in *O'Rourke* explained that, "no matter how strongly [p]laintiffs believe

14

that [d]efendants violated voters' rights in the 2020 election, they lack standing to pursue this litigation unless they identify an injury to themselves that is distinct or different from the alleged injury to other registered voters."  *O'Rourke*, 2022 WL 1699425, at *2. Here, no matter how strongly plaintiffs believe that Dominion and others have chilled "*any public expression*," *see* Docket No. 31 at 60, ¶ 83, plaintiffs lack standing unless they identify an injury that is distinct or different from the injury that they claim "*every American*" has suffered.  *See id.* at 59–60, ¶ 81; *see Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) ("[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." (quotation omitted)).[8]  Plaintiffs' allegations that defendants have chilled the national dialogue on the 2020 election support only a generalized grievance that is insufficient to establish plaintiffs' standing.

### 2.  *Alleged Threat of Litigation*

Second, plaintiffs claim that defendants seek to "intimidate anyone who might speak out regarding election integrity and security," Docket No. 31 at 11, ¶ 12, because the letters that Clare Locke sent state that "[l]itigation regarding these issues is imminent."  *Id.* at 6–7, ¶ 5.  Plaintiffs claim that they are "threatened by the prospect of having to defend against a meritless defamation lawsuit" brought by Dominion.  *Id.* at 63, ¶ 85.  In so far as plaintiffs' alleged intimidation injury is based on defendants'

---

[8] To the extent plaintiffs base their standing arguments on allegations that "news media reporters and bloggers" have been chilled, *see id.* at 62–63, ¶ 87, such allegations are irrelevant to the inquiry of whether plaintiffs "personally ha[ve] suffered some actual or threatened injury."  *See Valley Forge*, 454 U.S. at 472; *O'Rourke*, 2022 WL 1699425, at *2.

"general threat to all," *see id.*, that is a generalized grievance that cannot support standing.  However, plaintiffs and the class received an actual letter, which distinguishes the alleged threat of litigation against them from Dominion's "general threat to all" Americans.

Standing requires not only a particularized injury, but an "actual or imminent, not 'conjectural' or 'hypothetical'" one.  *See Lujan*, 504 U.S. at 560.   "Allegations of possible future injury do not satisfy the requirements of Art. III.  A threatened injury must be 'certainly impending' to constitute injury in fact."  *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).  "An Article III injury . . . must be more than a possibility. . . .  The threat of injury must be both real and immediate."  *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1155 (10th Cir. 2005) (quoting *Essence, Inc. v. City of Fed. Heights*, 285 F.3d 1272, 1282 (10th Cir. 2002) (quotation omitted).  "A claimed injury that is contingent upon speculation or conjecture is beyond the bounds of a federal court's jurisdiction."  *Tandy*, 380 F.3d at 1283–84.  "But '[o]ne does not have to await the consummation of threatened injury to obtain preventive relief.  If the injury is certainly impending, that is enough.'"  *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923)).

The letters that plaintiffs received state that they are "formal notice[s] to cease and desist taking part in defaming Dominion and to preserve all documents and communications that may be relevant to Dominion's pending legal claims" and that "[l]itigation regarding these issues is imminent."  *See* Docket No. 31 at 4, ¶ 5.  Defendants argue that the letters do not indicate that litigation against plaintiffs is "certainly impending," *see Whitmore*, 495 U.S. at 158, and that plaintiffs' allegations about the "prospect of having to defend" a lawsuit, *see* Docket No. 31 at 63, ¶ 85, show

16

that their alleged injury is "speculation or conjecture."  *See Tandy*, 380 F.3d at 1284.

The issue of whether a plaintiff's fear of threatened litigation is sufficient for standing often arises in the context of pre-enforcement challenges to criminal statutes. *See, e.g.*, *Bronson v. Swensen*, 500 F.3d 1099, 1108–09 (10th Cir. 2007).  Consistent with the usual standing requirements of an "actual or imminent, not 'conjectural' or 'hypothetical'" injury, *see Lujan*, 504 U.S. at 560, courts have held that, for a threat of prosecution to be sufficient for Article III injury, a plaintiff must show a "credible threat of prosecution," *see Babbitt*, 442 U.S. at 298, or a "real and immediate threat" of prosecution.  *See D.L.S.*, 374 F.3d at 974 (quoting *Faustin v. City & Cnty. of Denver*, 268 F.3d 942, 948 (10th Cir. 2001)).  The plaintiff's fear must be an "objectively justified fear of real consequences."  *Id.* at 975.

Plaintiffs have not plausibly alleged that litigation against them was actual, imminent, or certainly impending when they filed their lawsuit.  Although such litigation was possible, a mere possibility of injury is not sufficient for standing.  *Whitmore*, 495 U.S. at 158.  The threatened injury "must be both real and immediate," *Nova Health Sys.*, 416 F.3d at 1155, not speculative.  *Tandy*, 380 F.3d at 1283–84.  Plaintiffs have not alleged that a lawsuit against them was certainly impending when they filed suit. *See Babbitt*, 442 U.S. at 298.  For instance, plaintiffs do not allege that they took any action consistent with fear of a certainly impending lawsuit, such as hiring attorneys to defend the suit.  Plaintiffs allege only that they feared being sued.  Moreover, there are no allegations that could support that plaintiffs' fear was objectively justified.  Given that plaintiffs' affidavits did not mention Dominion at all, Docket No. 31 at 8, ¶ 7, and Dominion's defamation law firm "completely failed to identify even one supposedly defamatory statement," *see id.* at 51, ¶ 78, plaintiffs' fear of litigation was not objectively

reasonable. *See D.L.S.*, 374 F.3d at 975 (affirming grant of motion to dismiss for lack of standing because the plaintiff's fear of prosecution was not objectively reasonable). Although plaintiffs note that Dominion has sued Fox News, One America News Network, Newsmax Media, MyPillow, Sidney Powell, Rudy Giuliani, Mike Lindell, and Patrick Byrne, *see* Docket No. 31 at 51, 58, ¶¶ 77, 81, plaintiffs do not allege that these individuals' and entities' conduct was similar to plaintiffs', which could lend credibility to a threat of litigation. *Cf. Bronson*, 500 F.3d at 1108 ("[T]he credibility of a 'threat' is diluted when a factual dissimilarity exists between the plaintiff's intended future conduct and the conduct that triggered any prior prosecutions under the challenged statute.").

Standing is determined at the time the action is commenced, *Smith v. Rockett*, 522 F.3d 1080, 1081 (10th Cir. 2008), but a plaintiff must have standing throughout the litigation. *See Citizens Concerned*, 628 F.2d at 1297. Plaintiffs' affidavits are dated between November 3 and November 9, 2020, and plaintiffs claim to have received defendants' letters in December 2020 and January 2021. Docket No. 31 at 12–20, ¶¶ 16–29. Plaintiffs filed this lawsuit at least nine months later on September 30, 2021. *See generally* Docket No. 1. Although a recipient of one of defendants' letters may have thought that litigation was "certainly impending," *see Whitmore*, 495 at 158, in December 2020 or January 2021, plaintiffs waited to file this lawsuit for nine months, during which time Dominion sued none of them. Plaintiffs do not allege that defendants took any action against them that could have made a possible lawsuit actual, imminent, real, or immediate. Plaintiffs' allegations that they feared litigation after nine months of defendants' inaction are not plausible. To conclude otherwise would render meaningless the imminence requirement of standing. Accordingly, the Court finds that plaintiffs' hypothetical injury of threatened litigation is not sufficient for standing.

### 3. Alleged Expenditures

Third, some plaintiffs claim that they invested in home security systems after they received the letter from Clare Locke. *See* Docket No. 31 at 13–19, ¶¶ 18, 20, 23, 26, 27. The Supreme Court has found similar "manufactured" injury insufficient for Article III standing. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013). *Clapper* concerned a group of plaintiffs whose work allegedly required them to engage in sensitive communications that might be subject to surveillance under a federal statute. *Id.* at 406. The plaintiffs claimed that they took "costly and burdensome measures" to protect themselves from possible future government surveillance, for instance, traveling abroad to have in-person conversations instead of communicating electronically. *Id.* at 406–07. The Court held that the measures did not confer a present injury in fact because a plaintiff "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.* at 416. "If the law were otherwise," the Court continued, "an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear." *Id.*

Plaintiffs here contend that some of them have standing because they incurred certain costs, such as through the installation of a video doorbell or home security system, but, as in *Clapper*, plaintiffs manufactured this harm based on uncertain fear of future events. As a result, plaintiffs who purchased security equipment "lack Article III standing because they cannot demonstrate that the future injury they purportedly fear is certainly impending and because they cannot manufacture standing by incurring costs in anticipation of non-imminent harm." *See id.* at 422. Plaintiffs also do not explain why buying security equipment is not a "fanciful, paranoid, or otherwise unreasonable"

19

response to receiving a cease-and-desist letter.  *Cf. id.* (quoting *Amnesty Int'l USA v. Clapper*, 638 F.3d 118, 134 (2d Cir. 2011), *rev'd*, 568 U.S. 398 (2013)).

Plaintiffs do not allege that plaintiffs Cizmar, Daavettila, or Helminen purchased home security equipment after receiving the Clare Locke letter.  *See* Docket No. 31 at 15–18, 20, ¶¶ 21, 25, 28.  The complaint alleges that those plaintiffs "sustained an actual injury in the form of damages to [their] property and violations of [their] constitutionally protected rights as a result of [d]efendants' and Clare Locke's illegal Lawfare campaign and [l]etters."  *Id.* at 16, 18, 20, ¶¶ 21, 25, 28.  These are the same conclusory allegations that plaintiffs provide for the plaintiffs who also allegedly purchased security equipment.  Such allegations are insufficient.  *See COPE v. Kan. State Bd. of Educ.*, 821 F.3d 1215, 1221 (10th Cir. 2016) ("[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" (quoting *Iqbal*, 556 U.S. at 678)).

### 4.  Alleged Equal Protection Clause Violations

Finally, plaintiffs allege that defendants have deprived plaintiffs of the equal protection guarantees of the Fourteenth Amendment.  Docket No. 31 at 72–74, ¶¶ 109–13.  It is not clear how this purported injury differs from plaintiffs' other alleged injuries, given plaintiffs' allegations that the supposed Equal Protection Clause violation is the improper use of the courts through threatened litigation and the chilled speech.  Nevertheless, the Tenth Circuit has held that the "injury in fact" in the equal protection context "is the denial of equal treatment" itself.  *Am. C. L. Union of N.M. v. Santillanes*, 546 F.3d 1313, 1319 (10th Cir. 2008).  While some courts have required that the plaintiff be a member of a protected class in order to have standing for an Equal Protection Clause claim, *see, e.g.*, *MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*, 861 F.3d

40, 45 (2d Cir. 2017) ("An injured plaintiff has standing to raise an equal protection claim when the state imposes 'unequal treatment' on the basis of a protected characteristic, such as race."), the Tenth Circuit has found Equal Protection Clause standing in cases not involving protected classes. *See, e.g.*, *Citizen Ctr.*, 770 F.3d at 913–14.

Plaintiffs allege that Dominion "engaged in invidious discrimination or intentional misconduct" by targeting conservatives over liberals who also "publicized the role of Dominion voting machines in election fraud and election tampering." Docket No. 31 at 73, ¶ 113. Dominion, which plaintiffs allege is a "state actor," has allegedly "attempted through the use of the courts and the litigation process to suppress [p]laintiffs' freedom of speech" and thereby "disfavored and discriminated against" conservatives, even though Democrats have also raised concerns about Dominion's voting machines. *Id.* These allegations are sufficient to plausibly allege injury in fact. *See Citizen Ctr.*, 770 F.3d at 913 ("Citizen Center alleges an additional injury in fact: the unequal imposition of the risk of a traceable ballot and related ability to discover how a member voted, depending on the location of the voter's residence. . . At the pleading stage, this allegation is sufficient for an injury in fact on the equal protection claims." (internal citation omitted)); *see also* Wright & Miller, 13A *Fed. Prac. & Proc.*, Juris. § 3531.6 (3d ed. Apr. 2022) ("The inequality itself is an injury that is remedied by restoring equality.").

### B.  Plaintiffs' Equal Protection Claim

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985) (quoting U.S. Const. amend. XIV, citing *Pyler v. Doe*, 457 U.S. 202, 216 (1982)). Plaintiffs bring their

claim under § 1983.  Docket No. 31 at 72, ¶ 110.  Section 1983 is a "vehicle through which one may vindicate rights conferred elsewhere in the Constitution and laws of the United States," *Jones v. Norton*, 809 F.3d 564, 577 (10th Cir. 2015), including a denial of the equal protection of the law.  *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1124 (10th Cir. 2008).

The Fourteenth Amendment's text, however, "establishes an 'essential dichotomy' between governmental action, which is subject to scrutiny under the Fourteenth Amendment, and private conduct, which 'however discriminatory or wrongful,' is not subject to the Fourteenth Amendment's prohibitions."  *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1446 (10th Cir. 1995) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 349 (1974) (quotation omitted)).  Section 1983 "establishes a similar dichotomy."  *Id.* at 1447.  "Under Section 1983, liability attaches only to conduct occurring 'under color of law.'"  *Id.* (quoting § 1983).  "Thus, the only proper defendants in a Section 1983 claim are those who 'represent [the state] in some capacity, whether they act in accordance with their authority or misuse it.'"  *Id.* (quoting *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988) (quotation omitted)).  Accordingly, the conduct that constitutes state action under the Fourteenth Amendment necessarily constitutes conduct "under color of law" for § 1983.  *Id.* (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 (1982)).

Defendants argue that plaintiffs have not plausibly pled an equal protection violation because Dominion is not a state actor.  Docket No. 40 at 18–21; Docket No. 41 at 14–15.  The Tenth Circuit has applied four tests for whether a defendant's conduct constitutes state action for a § 1983 claim.  These tests are the "nexus test," the "symbiotic relationship test," the "joint action test," and the "public function test."  *See*

*Gallagher*, 49 F.3d at 1448; *Wittner v. Banner Health*, 720 F.3d 770, 775 (10th Cir. 2013). Plaintiffs allege that Dominion meets some or all of these tests. Docket No. 31 at 22–28, 72, ¶¶ 36–43, 111 (alleging, for instance, that jurisdictions have "outsourced responsibility for administering, collecting, counting, recording, and auditing ballot results" to private companies like Dominion, which has 1,300 contracts with jurisdictions; that "Dominion employees stand by to provide troubleshooting and support" when polls are open; that Dominion provides "complete, end-to-end election solution[s]").

However, even assuming that Dominion is a state actor, which at least one court is skeptical of, *see, e.g.*, *US Dominion*, 2022 WL 1597420, at *11, the Court must look at the specifically challenged conduct to determine whether Dominion's alleged constitutional violations occurred as a state actor. *See Gallagher*, 49 F.2d at 1441–53 (the nexus test ensures that the "state will be held liable for constitutional violations only if it is responsible for the specific conduct of which the plaintiff complains"; the symbiotic relationship test applied if the private party is "recognized as a joint participant in the challenged activity"; the joint action test examines "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights"); *Wittner*, 720 F.3d at 777 (the public function test "asks whether the challenged action is a traditional and exclusive function of the state"). Here, plaintiffs' allegations of Dominion's state action are only based on Dominion's role in supplying voting systems. The allegedly unconstitutional conduct, however, is Dominion's alleged disparate treatment of conservatives vis-à-vis liberals in Dominion's alleged threats of litigation and attempts to silence national debate. There is no allegation that Dominion was a state actor when it allegedly targeted conservatives with its letters. Plaintiffs, therefore, have not plausibly alleged that Dominion's allegedly discriminatory conduct occurred

under color of state law.  *See Gallagher*, 49 F.3d at 1447.  Accordingly, the Court will dismiss this claim.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Dominion's Motion to Dismiss the First Amended Class Action Complaint [Docket No. 40] is **GRANTED**.  It is further

**ORDERED** that Hamilton Place Strategies, LLC's Motion to Dismiss the First Amended Class Action Complaint [Docket No. 41] is **GRANTED**.  It is further

**ORDERED** that plaintiffs' first, third, and fourth claims are **DISMISSED without prejudice**.  It is further

**ORDERED** that plaintiffs' second claim is **DISMISSED with prejudice**.  It is further

**ORDERED** that this case is closed.


DATED September 22, 2022.


BY THE COURT:


PHILIP A. BRIMMER
Chief United States District Judge